IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.                                              Criminal No. ELH-11-0258

RICHARD ANTHONY WILFORD

**MEMORANDUM OPINION**

In April 2011, law enforcement agents in Maryland seized cocaine that had an estimated street value of more than $13 million dollars. That seizure, as well as other evidence obtained during a joint State and federal investigation, led to a federal indictment of six members of a drug-trafficking organization operating in the Baltimore area (the "Organization" or "Hayes DTO") (ECF 1).[1] In particular, on May 5, 2011, defendant Richard Anthony Wilford, along with co-defendants Lawrence Lee Hayes, Jr., Bryan Eammon Williams, George Lamar Plunkett, Mark Anthony Hawkins, and Robert Nyakana, were charged in federal court with conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 846.[2]

According to the Government, Hayes was "the leader" of the Hayes DTO. Government's Opposition to Wilford's Motion to Suppress (ECF 165), at 2. Wilford was allegedly "a source of supply for the Hayes DTO, providing the organization with kilogram quantities of cocaine." *Id.*

---

[1] Six others were charged in Maryland State court.

[2] A superseding indictment was returned on August 25, 2011, adding a forfeiture count, pursuant to 18 U.S.C. § 853. *See* ECF 59. With the exception of Wilford, all of the federal defendants have pled guilty.

Williams was also "a source of supply for the Hayes DTO," while Plunkett and Hawkins served as "lieutenants." *Id.* Nyakana was "a transporter of narcotics from California to the Baltimore, Maryland area." *Id.*

Now pending is Wilford's "Supplemental and Consolidated Motion to Suppress Tangible and Derivative Evidence" ("Motion to Suppress") (ECF 160), challenging evidence derived from the surveillance conducted by law enforcement officers by means of Global Positioning System ("GPS") tracking devices and court-authorized "pinging" of cellular phones. *See* ECF 160.[3] Relying on the Supreme Court's recent decision in *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945 (2012), Wilford maintains that the warrantless use of GPS tracking technology violated his Fourth Amendment rights. Additionally, Wilford asserts that, despite court authorization obtained under Maryland's pen register and trap and trace statute, Md. Code (2006 Repl. Vol., 2012 Supp.), Cts. & Jud. Proc. ("C.J.") §§ 10-4B-01, *et seq.*, the pinging of his cellular phone was not authorized by the statute, and was conducted in violation of Maryland law and the Fourth Amendment. Thus, according to Wilford, evidence derived from the use of GPS and pinging must be suppressed under the Fourth Amendment's exclusionary rule.

───────────────

[3] The Motion to Suppress (ECF 160) was filed on November 11, 2012. According to Wilford, it "clearly define[s] the limited issues before the Court." Motion to Suppress at 1 n.1. However, on March 9, 2012, Wilford filed the first iteration of his suppression motion (ECF 92). On April 3, 2012, he filed an "Addendum to Motion to Suppress Tangible and Derivative Evidence and Request for Franks Hearing" (ECF 97).

Also on March 9, 2012, Wilford filed a "Motion for Disclosure of Promises of Immunity" (ECF 93); a "Motion for Release of Brady Materials" (ECF 94); and a "Motion for Disclosure Pursuant to Fed. R. Evid. 404(b) and 609" (ECF 95). Thereafter, Wilford filed a "Motion to Designate Trial Transcripts" (ECF 96). On the second day of the hearing, held on March 8, 2013, Wilford conceded that ECF 93, 94, 95, and 96 are either moot or not ripe. Therefore, they are not addressed in this Memorandum Opinion.

Wilford also requested a hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the veracity of an application dated November 18, 2010, submitted to a Maryland State judge for an order authorizing pinging of Wilford's cell phone[4]; an application for a search and seizure warrant, dated May 10, 2011, submitted to a Maryland State judge, and used to recover physical evidence from multiple locations associated with Wilford and the Hayes DTO[5]; and an application for a wiretap order, dated April 1, 2011, as to Wilford's cell phone, which was not provided. According to Wilford, these applications contained deliberately false and misleading statements, and thus evidence derived from them should be suppressed.

In addition, Wilford filed a "Motion for Disclosure of Relevant Evidence and Request for Immediate Hearing" ("Disclosure Motion") (ECF 165). In the Disclosure Motion, Wilford seeks, *inter alia*, internal memoranda circulated by "various law enforcement agencies" pertaining to GPS tracking, in light of the decision in August 2010 in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010). According to Wilford, this information is pertinent to his Motion to Suppress.[6]

The Government opposes Wilford's Motion to Suppress ("Opposition" or "Opp.," ECF

---

[4] The application for pinging and the order, included in Exhibit 6 to the Motion to Suppress, are a single document, submitted and approved on the same date (hereafter, "November 18 Pinging Application").

[5] Exhibit 1 to Wilford's Motion includes both the application for a search and seizure warrant ("Warrant Application" or "Warrant App."), submitted to Maryland State District Court Judge Kathleen Sweeney on or about May 10, 2011, and the search and seizure warrant ("Search Warrant"), which Judge Sweeney signed on the same day. *See* Motion to Suppress, Exh. 1.

[6] Wilford also requested production of GPS data and information regarding the investigative techniques used to obtain cell phone numbers used by Hayes DTO members. The Government disclosed the investigative techniques used to obtain phone numbers, and Wilford withdrew the request for production of GPS data, as that data had been produced. *See* ECF 171.

165).[7]  With respect to GPS tracking, the Government relies, *inter alia*, on the good faith exception to the exclusionary rule, claiming that its use of the GPS devices took place prior to the Supreme Court's decision in *Jones* and, at the relevant time, it was in compliance with what was then settled law.  Further, the Government disputes Wilford's argument that cell phone pinging violates Maryland law and the Fourth Amendment, and maintains that, in any event, the pinging orders comported with the Fourth Amendment's warrant requirement.  The Government vehemently opposed Wilford's request for a *Franks* hearing, insisting that any allegedly false or misleading statements were the result of negligence, rather than recklessness or a deliberate intent to mislead.  As to the Disclosure Motion, the Government responds that Wilford is not entitled to the production of internal law enforcement memoranda under Fed. R. Crim. P. 16.  It also argues that such material is not relevant to the issues raised by the Motion to Suppress.  *See* Government's Response to Defendant's Motion for Disclosure of Relevant Evidence ("Disclosure Opp.," ECF 173).

I held a motions hearing on January 25, 2013, and March 8, 2013, at which the parties presented evidence and argument.  The parties also filed supplemental briefs as to the scope of Maryland's pen register and trap and trace statute, C.J. §§ 10-4B-01, *et seq.*, and the issues raised under *Franks v. Delaware*.  *See* Memorandum to Counsel, Jan. 28, 2013 (ECF 175); Defendant's Response to Issues Raised by the Court ("Wilford Supp. Memo," ECF 180); Government's Supplemental Briefing ("Gov't Supp. Memo," ECF 181).  For the reasons that follow, I will grant, in part, and deny, in part, Wilford's Disclosure Motion.  And, I will deny Wilford's

---

[7]  As exhibits to its Opposition, the Government included the challenged Warrant Application and the Search Warrant (Opp. Exh. 1), as well as three applications for pinging orders, including the November 18 Pinging Application (Opp. Exhs. 2-4).

Motion to Suppress, without prejudice to his right to renew his argument as to the inapplicability of the good faith defense, pending possible Government disclosures, as discussed *infra*.

## I. Factual Background[8]

In August 2010, the Drug Enforcement Administration ("DEA"), the Baltimore City Police Department ("BPD"), the Baltimore County Police Department, the Maryland Transportation Authority Police, and the Internal Revenue Service ("IRS") began a joint investigation of the Hayes DTO, based on information obtained from two confidential sources ("CS1" and "CS2"). Opp. at 4-5. Law enforcement agents learned that Hayes and the Hayes DTO were involved in the distribution of cocaine in the Baltimore metropolitan area. *See id.* The investigation was run as a "DEA Task Force" matter.

DEA Agent Mark Lester served as the lead investigator of the DEA Task Force. DEA Agent Todd Edwards and BPD Officer Glenn Hester were his co-case agents. DEA Agent Mara Hewitt was also involved. An Assistant State's Attorney for Baltimore City, La Rai Everett, was the lead State prosecutor with respect to the investigation. During the investigation, all applications for warrants, pinging orders, and wiretaps were submitted to Maryland State court judges. *Id.* at 4. In 2011, a decision was made to prosecute certain members of the Hayes DTO in federal court. *See id.*

---

[8] The factual background is based largely on the facts set forth by the Government in its Opposition (ECF 165), to which the parties have stipulated. I have added, where pertinent, additional facts based on the testimony of Drug Enforcement Administration Agents Mark Lester and Mara Hewitt, who testified on January 25, 2013. Quotes attributed to the DEA agents are not necessarily the precise words of the witness, as I do not have a transcript of the testimony.

I also refer to the Warrant Application, which consumes almost 157 pages, exclusive of lengthy attachments. Both the Government's Opposition and the Warrant Application often refer generically to "officers" or "law enforcement agents." Where possible, I have identified by name the individual law enforcement officers involved in the investigation. In other instances, I have used generic terminology, such as "law enforcement officers" or "agents."

*A. Location Technology*

1. <u>GPS Tracking Devices</u>

During the investigation, four "slap on" GPS tracking devices, which did not require permanent installation, were placed on twelve different vehicles, as set forth below, Opp. at 2-3[9]:

- A Nissan registered to and utilized by Hayes;

- A Range Rover registered to Deneen Bolden and utilized by Hayes;

- A Honda Crosstour registered to and utilized by Wilford;

- A Jeep registered to BLOW IT OFF POWER WASHING and utilized by Hawkins;

- An Acura 2 registered to Donna Lee Oneal and utilized by Hayes and Antoine Lamont Goodson;

- A Honda Crosstour registered to and utilized by Hayes;

- A Jeep Liberty registered to Arki Lamar Reid-Labrousse and utilized by Plunkett;

- A Volvo sport utility vehicle registered to Arki Lamar Reid-Labrousse and utilized by Plunkett;

- An Acura 4S registered to and utilized by Hayes;

- A Honda registered to and utilized by Plunkett;

- An Oldsmobile minivan registered to BLOW IT OFF POWER WASHING and utilized by Hawkins and Wilford;

- A Honda Crosstour registered to Robin Michelle Douglas and utilized by Hayes.

Agent Lester testified at the hearing on January 25, 2013, as to the GPS devices used during the investigation. The GPS devices, which were battery powered, communicated location information through a wireless connection. The agent explained generally that the GPS device is

_____

[9] I address, *infra*, Wilford's standing to contest the use of GPS devices.

triggered by the movement of the vehicle.  A DEA agent could obtain the real-time location of the GPS while a vehicle is moving, and location data could also be accessed at a later time through a DEA computer application.  An icon representing the vehicle could be displayed through a computer mapping program, along with the approximate street address of its location. However, the GPS devices could not identify the driver of the car.  Thus, GPS devices served as aids to obtain visual surveillance, but did not substitute for such surveillance.

According to Agent Lester, a GPS device was placed on Wilford's Honda Crosstour between November 17, 2010, and December 8, 2010, and between December 12, 2010 and April 16, 2011.  Between January 18, 2011 and May 19, 2011, a GPS device was also placed on the Oldsmobile minivan registered to BLOW IT OFF POWER WASHING.  The Government claims, and Agent Lester confirmed: "All of the GPS devices were placed on vehicles while they were parked on public streets, driveways accessible from the street, or public parking lots."  Opp. at 4.  However, as discussed more fully, *infra*, no search warrants were obtained for the use of GPS tracking devices.

GPS data was not transmitted every day.  According to the testimony of a defense witness, Joshua Brown, of GLS Litigation Services,[10] the GPS data indicated that the location of Wilford's Crosstour was transmitted 4,022 times, on 78 days, and the location of the minivan was transmitted 7,326 times, on 68 days.

2.  Cell Phone Pinging

During the investigation, DEA agents submitted numerous applications to the Circuit Court for Baltimore City, each under oath, for an order to authorize the pinging of Wilford's

---

[10]  The defense initially proffered Brown as an expert, based on his professional experience in organizing GPS and pinging data.  He was permitted to testify as a fact witness.

cellular phone, pursuant to C.J. § 10-4B-03. Each order was valid for sixty days. Three applications are relevant here.

The first application is the subject of defendant's *Franks* challenge, discussed *infra*. It was submitted by DEA Agent Mara Hewitt on November 18, 2010. *See* Nov. 18 Pinging App. at 1. Judge Pamela White of the Circuit Court for Baltimore City found "that probable cause exists based upon the information supplied in this application, that the said individual is using the above captioned cell phone for criminal activity and that the application will lead to evidence of the crime(s) under investigation." *Id.* at 11. Therefore, she approved the application, on the same date. *Id.* Agent Lester filed the Second Application, which was approved by Baltimore City Circuit Court Judge Barry Williams on January 19, 2011, upon his finding of probable cause. *See* Opp. Exh. 3. Agent Lester also filed the third application, which was approved by Baltimore City Circuit Court Judge Timothy Doory on April 29, 2010, upon his finding of probable cause. *See* Opp. Exh. 4.

No testimony was offered at the motions hearing as to the precise technology used to obtain cellular phone location information. But, the manner in which cell phones transmit their location has been the subject of discussion in the literature and is generally known:

> Cellular telephones send their communications by radio waves to cell sites—transmitting stations in stand-alone towers or on other buildings—that are strategically placed throughout the provider's service area. As a cell phone (and its user) moves from place to place, the cell phone's signal shifts from tower to tower to achieve the best signal. In order to determine which tower to use, the cell phone regularly communicates with nearby towers to test the available signals. When a user places or receives a call on his cell phone, the phone's radio transmitter must communicate with nearby cell towers so that the appropriate one (or ones) may handle the call.

Susan Freiwald, *Cell Phone Location Data and the Fourth Amendment: A Question of Law, Not Fact*, 70 Md. L. Rev. 681, 702-703 (2011) (footnotes omitted). Thus, a cell phone will transmit its location information to nearby cell towers "[w]hen the government calls the target's cell phone." *Id.* at 703. Moreover, because a cell phone regularly communicates with cell towers to test signal capacity, data may be received from a service provider, even without calling. The applications appear to be worded broadly enough to encompass either practice.

According to the evidence, when a cellular phone was turned on, a ping occurred every fifteen minutes, with the service provider for the cellular phone sending an e-mail to law enforcement with latitudinal and longitudinal coordinates. These coordinates could locate a phone within a radius of 3 to 5,000 meters. As with GPS data, Agent Lester testified that pinging was an aid for, but not a replacement for, visual surveillance.

At the hearing on January 25, 2013, defense witness Joshua Brown displayed a digital map of Baltimore, overlaid with color-coded circles representing each GPS and pinging data point based on data disclosed by the Government in discovery. According to Brown, each data point included locational coordinates, along with the date and time. The radius of each circle purported to represent the relative precision with which law enforcement agents could locate Wilford's phone or vehicle. In other words, a large circle indicated a rough estimate, while a small circle indicated a very precise estimate. The majority of data points appeared to reveal Wilford's location in a public space. On several occasions, however, the data appeared to indicate Wilford's presence in or around a private location.

*B. Investigation of the Hayes DTO as it pertained to Wilford*

On October 8, 2010, through a "slap on" GPS tracking device on Hayes's Nissan, Hayes was located in the vicinity of the 3600 and 3700 blocks of Wabash Avenue in Baltimore. Opp. at 5. Following instructions from law enforcement agents, CS2 observed Hayes at a barber-shop at 3739 Wabash Avenue, and witnessed Hayes and Plunkett exchange a plastic bag believed to contain money. *Id.* On the same day, based on the GPS device placed on Hayes's Nissan, DEA Agents Lester and Edwards followed Hayes to 30th and St. Paul streets in Baltimore City, where they observed Hayes interact with an unknown individual, later identified as Wilford, who was driving a Ford F-150 pickup truck. *See id.* Agents saw Wilford give a large cardboard box to Hayes and, shortly afterwards, saw Hayes take it to the Belvedere Towers Apartments at 1190 Northern Parkway in Baltimore (the "Belvedere"), a suspected stash house, where they had seen Hayes several times before. *Id.* The agents also determined that the F-150 was registered to Wilford.

On October 18, 2010, CS2 informed law enforcement agents that Wilford was dealing narcotics with Hayes, and that Wilford was driving a Mercedes Benz that cost approximately $150,000. Opp. at 6. A search of Wilford's criminal record revealed two prior federal felony drug convictions. *Id.*

On October 22, 2010, Agents Lester and Edwards again located Hayes through the GPS device on his vehicle. *Id.* at 6. They observed him in an encounter with Wilford at 30th and St. Paul streets. *See id.* They watched Wilford and Hayes walk around the block for approximately an hour before leaving in Hayes's vehicle. *Id.* While Hayes and Wilford were gone, Agent Lester took photographs of the interior and exterior of the F-150. When the two men returned, Wilford was seen exiting Hayes's vehicle with a backpack that appeared full, while Hayes

removed a large cardboard box from Wilford's truck, similar in size to the box exchanged on October 8, 2010. *Id.* Anticipating Hayes's next move, Agent Edwards proceeded to the Belvedere, where he observed Hayes bring the box into the building. *See id.*

Based on a review of land records, law enforcement agents determined that in 2007 Wilford purchased a large house in Cecil County, Maryland for about $540,000, and refinanced it in March 2007 for $637,000. *Id.* at 5-6. Yet, Wilford's Maryland tax returns revealed that in 2006 he only earned approximately $21,855. *Id.* at 6. Agents also learned that Wilford owned a dump truck company named "R.A.W. ENTERPRISES," located at 2512 Erick Street in Baltimore. *Id.* Because "B'MORES DUMPING," a dump truck company allegedly owned by Michael Smooth, also operated out of 2512 Erick Street, agents suspected that Wilford was involved with Smooth in operating B'MORES DUMPING. *See id.*

On November 4, 2010, utilizing a GPS device planted on a vehicle owned by Antoine Goodson (a suspected member of the Hayes DTO), law enforcement agents located and observed Plunkett at a residence at 301 W. 27th Street in Baltimore. *Id.* at 6. That is the address listed on Hayes's Maryland driver's license. *Id.* at 7. During surveillance, agents observed Plunkett purchase several rolls of paper towels at a nearby 7-11 and take them to the residence. *Id.* According to Agent Lester and Officer Hester, the affiants on the Warrant Application, paper towels are often used by persons converting powder cocaine into crack cocaine. *Id.*; Warrant App. at 25. Agent Lester and Officer Hester believed that the residence was used to convert powder cocaine into crack cocaine. Opp. at 7; Warrant App. at 25.

On November 17, 2010, Agents Lester and Edwards removed a GPS device they had placed on Hayes's Land Rover and placed it on a Honda Crosstour registered to Wilford, which

they had seen Wilford driving.  Opp. at 7.  At the time, the Crosstour was parked outside Hayes's residence at 1020 Park Avenue in Baltimore.  *Id.*  That GPS device was removed from the Crosstour on December 8, 2010, while it was at a Honda dealership for repairs.  *Id.*

Agents Lester and Edwards placed another GPS device on the Honda Crosstour on December 12, 2010, while the vehicle was parked at Baltimore Washington International – Thurgood Marshall Airport ("BWI").  *Id.* at 7.  Pinging data had revealed that Wilford's cell phone was in California in early December 2010, and Agents Edwards and Lester speculated that Wilford may have parked a vehicle at BWI.  *See id.* at 7-8.  Agent Lester recalled that, after a "painstaking[]" three-hour visual scan of the airport parking lots, they found Wilford's vehicle.

On December 17, 2010, based on GPS devices located on the respective vehicles of Hayes and Wilford, along with the "pinging" of their cellular phones, law enforcement agents located and observed Hayes and Wilford, again at 30th and St. Paul streets.  Opp. at 8.  Wilford gave Hayes a large cardboard box, similar in size to the other boxes that had been exchanged.  *Id.*  The two men entered Wilford's vehicle and drove away.  *Id.*  Ten minutes later, law enforcement agents observed Wilford's vehicle at the Belvedere; they saw Hayes enter the building carrying a large cardboard box, and leave six minutes later, empty handed.  *Id.*  After Hayes entered Wilford's vehicle, Wilford drove away.  *Id.*  According to lease paperwork, Apartment 717 at the Belvedere was leased by an employee of B'MORES DUMPING.  *See* Warrant App. at 26.

On January 19, 2011, law enforcement agents placed a GPS tracker on the Oldsmobile minivan utilized by Hawkins and Wilford and registered to BLOW IT OFF POWER

WASHING.  *See* Opp. at 8.  The tracker was placed on the vehicle while it was parked on Woodbourne Avenue in Baltimore.  *Id.*

Through GPS and pinging, Wilford was located on January 28, 2011, at a Staples store on York Road in Baltimore, and then at another Staples store on Goucher Boulevard in Towson, Maryland.  *See id.*[11]  Surveillance videos from those stores, obtained by law enforcement agents, show Wilford taking a large cardboard box into each store on January 28, 2011.  *Id.*  Agents also obtained the shipping records for the Staples on Goucher Boulevard, which indicated that Wilford had paid cash to send a 15 pound box to an address in Long Beach, California.  *Id.* at 8-9.  The sender was listed as Janice Tate, although it was determined that she did not live at the listed address.  *Id.*  The recipient was listed as Ronald Tate, and it was determined that he did not live at the specified address.  *Id.* at 9.  Rather, Alejandro Miller was the resident at the recipient's address.  *Id.*

Miller had a connection to Pierre Bantan, a relative of Wilford's girlfriend.  *See id.*  Bantan had previously been connected with a package sent by a fictitious person in Baltimore to a fictitious person in California.  *Id.*  Law enforcement agents obtained a search warrant for the Tate box and discovered approximately $79,650 hidden in a Magnavox VCR/DVD player.  *Id.*

On January 31, 2011, law enforcement agents again located Wilford's Honda Crosstour at BWI airport by pinging his cellular phone, pursuant to an order issued by Baltimore City Circuit Court Judge Barry Williams on January 19, 2011.  *Id.*  Because pinging data indicated that Wilford was in California, agents again deduced that Wilford had parked his vehicle at a BWI parking lot.  *Id.*  When they located Wilford's vehicle, agents saw that it contained a bag of

_____

[11] No evidence was offered as to how Wilford was located.  But, no objection was made as to defense counsel's assertion.

"motherboards," which are the internal parts of a computer. *Id.* According to officers involved in the investigation, motherboards are often removed from a computer so that the "shell" can be used to transport drugs or money. *Id.*; *see* Warrant App. at 38.

On February 10, 2011, agents tracked Hayes and Plunkett, through GPS devices on their respective vehicles, to the Belvedere. Opp. at 10. With the aid of a hallway "surveillance camera" in the apartment building,[12] agents saw Hayes carry a large cardboard box into the apartment with him, and then saw Plunkett take two large boxes from the apartment to the dumpster. *Id.* In the dumpster outside the Belvedere, agents discovered four computer boxes; two computer shells (one of which had black paper taped over the holes, to hide the interior); a small plastic bag containing white powder residue (later determined to be cocaine); latex gloves; two empty boxes of sandwich bags; and a razor blade. *Id.* at 10-11.

Law enforcement obtained a surveillance video of Wilford on March 10, 2011, purchasing a Magnavox VHS/DVD player at a Walmart. *Id.* at 12; *see* Opp. Exh. 4 at 9.[13] On March 17, 2011, law enforcement tracked Wilford and Hawkins to the Staples store located on Goucher Boulevard in Towson by using GPS devices planted on Wilford's Crosstour and Hawkins's minivan, and by pinging Wilford's cellular phone. Opp. at 11. Wilford and Hawkins were seen packing three boxes in the Staples parking lot, similar in size and shape to the boxes seen in the surveillance videos of January 28, 2011. *Id.* Wilford took one of the boxes into the Staples store for shipping; he took another box to a different Staples in Towson, and the third

---

[12] According to the Government, the camera was placed in the Belvedere apartment building "on February 7, 2011, with the permission of the building's owner." Opp. at 10.

[13] No evidence was offered at the hearing as to how Wilford was located on this occasion. However, defense counsel asserted, without objection, that law enforcement agents located Wilford using GPS and pinging.

box to an Office Depot. *See id.* As before, the package deposited at the Staples on Goucher Boulevard listed Janice Tate as sender and Ronald Tate as recipient. *Id.* A canine scan yielded a positive alert for a controlled dangerous substance. *Id.* at 12. Pursuant to a warrant, agents located $100,000 in U.S. currency in the box, concealed in a Magnavox VCR/DVD player. *Id.*[14]

Law enforcement agents observed Wilford and Hawkins on March 30, 2011, "at a parking lot on Greenmount Avenue and Exeter Hall in Baltimore City." *Id.* Wilford was seen operating the Oldsmobile minivan registered to BLOW IT OFF POWER WASHING, which agents located through GPS. *Id.*[15] Wilford gave a box to Hawkins, who was operating a box truck. *Id.* Hawkins took the box, which was similar in size to the boxes previously observed, into a residence at 1500 Cliftview Avenue in Baltimore. *Id.*

On April 1, 2011, agents conducted surveillance of the barber-shop at 3739 Wabash Avenue in Baltimore. *Id.* However, neither GPS nor pinging was used to locate members of the DTO; rather, surveillance was based on the known routine of Hayes DTO members. *Id.* During the surveillance, agents observed Plunkett, Wilford, Hayes and another Hayes DTO member enter the barber-shop. Opp. at 12-13. Hayes and Plunkett left approximately ten minutes later. *Id.* at 13. About twenty minutes later, Wilford left in Hawkins's minivan. *Id.* Based "on a hunch" that Wilford would proceed to 1500 Cliftview Avenue, agents went to that address. *Id.* GPS tracking on Wilford's vehicle was used to alert law enforcement, who had already established visual surveillance of the address, that Wilford was about to arrive. *Id.* at 13 & n.6.

_____

[14] In the Opposition, the Government states that Wilford purchased a Magnavox *VHS*/DVD player on March 10, 2011, *see* Opp. at 12, but that the currency recovered on March 17, 2011, was concealed in a Magnavox *VCR*/DVD player. *See id.*; Warrant App. at 50. It is unclear whether this discrepancy is based on a typographical error. In any event, it is not material.

[15] According to the defense, law enforcement agents also relied on cell phone pinging.

Agents observed Wilford retrieve a blue shoulder bag and a red backpack from the minivan and enter the residence, using a key. *Id.* at 13. When Wilford returned to the van and opened the rear door, agents saw a red and white VCR box, identical to the VCR box seized previously from one of the packages that Wilford had sent to California. *Id.*

A few hours later, Wilford was observed interacting with the driver of a white Range Rover that had pulled in front of the residence. *Id.* Agents saw the driver hand Wilford a small object, which Wilford placed in his right front pants pocket. *Id.* After the Range Rover drove away, Wilford, Hawkins, and two other men exited 1500 Cliftview carrying backpacks and bags that they put in a silver Hyundai[16] before driving away. *Id.* Wilford, driving the Oldsmobile minivan, followed the Hyundai. *Id.*

Also on April 1, 2011, agents intercepted a phone call between Hayes and Bryan Williams, pursuant to a court order signed by a Maryland State judge authorizing the interception of communications as to Hayes's cell phone. *Id.* at 14; *see* Warrant App. at 53, 57-58. During the call, Williams told Hayes that, at the beginning of the following week, he was going to send him a "get well card," which was understood as a code for narcotics. Opp. at 14.

On April 3, 2011, Illinois State Troopers in Clark County stopped a Penske Tractor Trailer Truck for speeding on I-70. Opp. At 14. Nyakana, the driver, consented to a search of the vehicle, and the troopers discovered approximately 136 kilograms of cocaine. *Id.* The drugs were to be delivered to Bryan Williams in Jessup, Maryland; Nyakana was to be paid $200,000 for the transportation. *Id.* According to the Government, the wholesale value of the cocaine discovered in the trailer was estimated at $4,060,000, with an estimated street value of

---

[16] The silver Hyundai had been rented from Enterprise Rentals at Dulles Airport by Anthony Uzondu of Los Angeles. *See* Warrant App. at 56.

$13,600,000. *Id.* On April 4, 2011, Williams was arrested during the attempted delivery of the cocaine, and $269,000 was discovered in the trunk of his car. *Id.*

Agents Lester and Edwards removed the GPS tracker from Wilford's Honda Crosstour on April 16, 2011. *See id.* At the time, the vehicle was parked at an apartment complex in Elkton, Maryland. *Id.*

On April 18, 2011, agents observed Plunkett taking a large garbage bag from 301 W. 27th Street to his car, and then to the Belvedere. *Id.* There, agents saw Plunkett enter Apartment 717 and exit soon after. *Id.* at 15. Plunkett then went to the dumpster and dumped the garbage bag. *Id.* Agents subsequently retrieved the garbage from the dumpster and discovered several vacuum-sealed plastic bags that had been opened. *Id.* They contained cocaine residue, a broken Pyrex container, used paper towels, and two empty boxes of baking soda. *Id.*

The next day, April 19, 2011, Wilford was located at 3530 Seapines Circle in Randallstown, Maryland, through the GPS device on Hawkins's minivan, and by pinging Wilford's cellular phone. *See id.* at 15. Wilford took a large duffel bag, which appeared to be heavy and full, to the van, and then drove to a bank at 7 Slade Avenue in Baltimore. Opp. at 15. Agents observed Wilford exiting the bank with the duffel bag, which appeared to be empty. *Id.*

On April 22, 2011, law enforcement established surveillance in the vicinity of 1500 Cliftview Avenue. *Id.* Agents located the Oldsmobile minivan outside of the residence through the GPS placed on the vehicle. *Id.* According to defense counsel, pinging was also used. When a burgundy Jeep arrived, Wilford exited the minivan and left in the Jeep. *Id.* The jeep returned about ten minutes later. *Id.* at 16. In the interim, a UPS driver had arrived with a large box, similar in size and appearance to the boxes previously observed in possession of the defendants.

*Id.* at 15-16. Hawkins, the driver of the Jeep, took the box and brought it into 1500 Cliftview. *Id.* at 16. Wilford followed several minutes later. *Id.* Hawkins subsequently retrieved several empty bags from the Jeep and brought them into the residence. *Id.* He then brought a large, weighted-down duffel bag out to the Jeep, and he and Wilford drove away in the Jeep. *Id.*

Most of the defendants were arrested on May 16, 2011, although Wilford was not apprehended until September 2011. *Id.* When Hayes and Plunkett were apprehended, they were in possession of 1.5 kilograms of crack cocaine. *Id.*

On or about May 16, 2011, law enforcement agents executed the May 10, 2011 Search Warrant issued by Judge Sweeney. *See id.* Law enforcement agents recovered, *inter alia*, the following from Plunkett's residence: $200,000 in U.S. currency; wrappers for kilograms of cocaine; money counters; and pay/owe sheets. *Id.* At Hayes's residence they found $300,000 in U.S. currency. *Id.* At 3530 Seapines Circle, one of the residences associated with Wilford, the agents recovered $1,600,000 in U.S. currency from a large duffel bag that resembled the one previously carried by Wilford. *Id.* at 16-17. In addition, a hollow computer tower, identical in appearance to the computer towers recovered during the investigation, as well as a rectangular steel mold used to mold kilograms of narcotics, was recovered from 1500 Cliftview Avenue. *See id.* at 17; *see also* Search Warrant (listing premises to be searched).[17]

In late May 2011, law enforcement learned that a package was to be delivered by UPS to 1500 Cliftview Avenue. Opp. at 17. Agents obtained a search and seizure warrant for the package. *Id.* They searched the package on May 20, 2011, and it contained a large cardboard

---

[17] In its Opposition, the Government states that these searches were conducted pursuant to "a warrant." Because the Search Warrant was issued on May 10, 2011, and identifies these locations as premises to be searched, I assume that law enforcement agents conducted these searches pursuant to the Search Warrant.

box, the same size as those previously observed. *Id.* Ten kilograms of cocaine were packed inside a hollow computer shell. *Id.*

In July and August 2011, law enforcement learned that Wilford was residing in Los Angeles. *Id.* Law enforcement conducted a search of his California residence, pursuant to a warrant, and discovered $68,000 in U.S. Currency and several items of jewelry. *Id.* Eventually, law enforcement arrested Wilford in Baltimore on September 16, 2011. *Id.* at 18. Pursuant to a search warrant for Wilford's "secret Baltimore residence," $190,000 was recovered. *Id.*[18]

\*     \*     \*

In his papers and at the hearings, Wilford identified the following instances of surveillance as the subject of his suppression motion:

1) **December 17, 2010**: Observation of Hayes and Wilford, based on GPS tracking of their respective vehicles and pinging of their respective cell phones.

2) **January 28, 2011**: Video surveillance of Wilford bringing cardboard boxes to two Staples stores. According to defense counsel, surveillance was based on GPS tracking and cell phone pinging.

3) **January 31, 2011**: Surveillance of Wilford's 2010 Honda Crosstour while it was parked at the BWI Daily Parking lot, located, in part, through cell phone pinging.

4) **March 10, 2011**: Video surveillance of Wilford purchasing a Magnavox VHS/DVD player at a Walmart, located through a GPS device on Wilford's vehicle and cell phone pinging.

5) **March 17, 2011**: Surveillance of Wilford and Hawkins at a Staples store, based on GPS tracking of their respective vehicles and pinging of Wilford's cell phone.

6) **March 30, 2011**: Surveillance of Wilford and Hawkins at a parking lot on Greenmount Avenue and Exeter Hall in Baltimore City. Wilford was located through the GPS device on the Oldsmobile minivan.

7) **April 1, 2011**: Surveillance of Wilford and other Hayes DTO members in the area of 1500 Cliftview Avenue. GPS tracking on Wilford's car was used only to alert law

---

[18] The location of Wilford's "secret Baltimore residence" was not identified by either party.

enforcement, who were already conducting visual surveillance, that Wilford was about to arrive.

8) **April 19, 2011**: Surveillance of Wilford at 3530 Seapines Circle in Randallstown, and Bank of America at 7 Slade Avenue in Baltimore, based on GPS tracking of Wilford's vehicle and pinging of his cell phone.

9) **April 22, 2011**: Surveillance of Wilford and Hawkins at 1500 Cliftview Avenue, based on a GPS device on the Oldsmobile minivan driven by Wilford and cell phone pinging.

As the above summary reflects, for every occasion in which Wilford was tracked, law enforcement agents used two modalities: GPS and cell phone pinging. Initially, Wilford also sought to suppress surveillance of meetings between Hayes and Wilford on October 8, 2010, and October 22, 2010. However, as discussed, *infra*, he appears to have conceded that he lacks standing to contest surveillance of these meetings, which was based solely on GPS tracking of Hayes's vehicle.

Wilford also seeks suppression of the following physical evidence recovered during the investigation, as fruit of the poisonous tree, *see* ECF 160 at 32-33:

1) **March 17, 2011**: $100,000 in U.S. currency recovered, pursuant to a warrant, from a box brought by Wilford to the Staples on Goucher Boulevard in Towson, Maryland.

2) **May 16, 2011**: Evidence recovered, pursuant to the Search Warrant, from Wilford's home at 11 Rock Hollow Court in Elkton, Maryland.

3) **May 16, 2011**: Evidence recovered, pursuant to the Search Warrant, from 1500 Cliftview Avenue in Baltimore.

4) **May 16, 2011**: Evidence, including $1,600,000 in U.S. currency, recovered, pursuant to the Search Warrant, from 3530 Seapines Circle in Randallstown, Maryland.

5) **May 16, 2011**: Evidence recovered, pursuant to the Search Warrant, from 2512 Erick Street in Baltimore.

6) **May 20, 2011**: Ten kilograms of cocaine recovered, pursuant to a warrant, from a UPS box delivered to 1500 Cliftview Avenue in Baltimore.

## I.    Discussion

## A.  Disclosure Motion

Before discussing the merits of Wilford's Motion to Suppress, I will briefly address his Disclosure Motion.[19]   Wilford seeks the production of "any notice to the United [S]tates Attorney's [O]ffice for the District of Maryland, DEA Baltimore Field Office, the States Attorney's Office for Baltimore City, and any other applicable agency/office, involving the DC Circuit decision in" *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), decided in August 2010.   Disclosure Motion ¶ 1.   Wilford's request "includes any memo for DOJ, inter office memos, email and/or continued legal education newsletter or classes which discuss the DC Circuit's decision . . . ."   *Id.*   The Government counters that, under Fed. R. Crim. P. 16, disclosure is not required because Wilford's request concerns protected Government work product, and the requested information is not relevant to the issues presented in the Motion to Suppress.   *See* Disclosure Opp. at 4.

Fed. R. Crim. P. 16(a)(1)(E) governs a defendant's statutory right to disclosure of "documents and objects" in a criminal case.[20]   The rule states, in pertinent part: "Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, [or] data . . . within the government's possession, custody or control," if "the item is material to preparing the defense."   *Id.*   However, Fed. R. Crim. P.

---

[19] As noted, the Government has satisfied Wilford's discovery requests concerning the production of GPS and pinging data and the use of investigative techniques to obtain cell phone numbers.

[20] Wilford does not assert that disclosure of this material is required by due process considerations, which, in any event, provide a narrower right to discovery than does Rule 16. *See United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010).

16(a)(2) is also pertinent. It states: "Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Under Fed R. Crim. P. 16(a)(2), "a defendant may not examine Government work product in connection with his case." *United States v. Armstrong*, 517 U.S. 456, 463 (1996); *see United States v. Nobles*, 422 U.S. 225, 239 & n.13 (1975) (describing Rule 16(a)(2) as analogous to the attorney work product exception in civil cases). *Compare United States v. Maranzino*, 860 F.2d 981, 985-86 (10th Cir. 1988) (finding prosecution's file and presentence report from prior case brought against defendant exempt from disclosure under Rule 16(a)(2)), *with Gov't of V.I. v. Fahie*, 419 F.3d 249, 257 (3d Cir. 2005) (finding that Rule 16(a)(2) did not exempt from disclosure "a computer-generated printout from a government database maintained for broader purposes than the prosecution").

The information sought by Wilford appears to qualify as protected information under Fed. R. Crim. P. 16(a)(2), as it concerns the legal theories of Government agents and lawyers regarding the legality of GPS tracking. However, Rule 16(a)(2) allows disclosure to the extent that Rule 16(a)(1) "otherwise provides." Therefore, if the requested information is "material to preparing [Wilford's] defense," disclosure may be required under Fed. R. Crim. P. 16(a)(1)(E).

In *Armstrong*, 517 U.S. 456, the Supreme Court made clear that, to satisfy materiality under Rule 16, the information must pertain to the defendant's guilt or innocence with respect to the crime charged. *See id.* at 463-64. The Fourth Circuit has explained: "For the defendant to show materiality under this rule, '[t]here must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of

proof in his favor.'" *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (citation omitted). For example, "'[e]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *Caro*, 597 F.3d at 621 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)). Notably, the defendant bears the burden of showing "that the information would . . . actually help[] prove his defense." *Caro*, 597 F.3d at 621; *see also United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990) ("Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense.").

The *Armstrong* Court concluded that information pertinent to a defendant's claim of selective prosecution is not material under Rule 16, because it concerns "an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *See* 517 U.S. at 464. In other words, the selective prosecution claim was collateral to the defendant's guilt. Relying on *Armstrong*, 517 U.S. 456, the Government asserts that internal memoranda concerning the *Maynard* decision are not material to Wilford's defense, because Rule 16 does not extend to "a defense based on a pretrial motion." Disclosure Opp. at 4. However, information material to the Motion to Suppress, although sought in connection with a pretrial proceeding, might alter the "quantum of proof" in Wilford's favor if the suppression motion were successful. *See, e.g.*, *United States v. Cranson*, 453 F.2d 123, 126 (4th Cir. 1971) (explaining that defendant may use Rule 16 "to secure pre-trial information on identification procedures undertaken by Government in advance of trial as a basis for a motion to suppress").

In particular, certain information would be relevant to the Government's good faith defense under *United States v. Leon*, 468 U.S. 897 (1984), which I discuss, *infra*. For example, if the investigating agents who were using the GPS devices on Wilford's vehicles received instructions from DOJ or their supervisors, directing their compliance in Maryland with *Maynard*, this would be relevant to the claim of good faith. To be sure, Agent Lester claimed that he did not recall any internal memoranda resulting from *Maynard*, advising against the warrantless use of GPS tracking devices. *See infra* at 40-41. But, he was not the only law enforcement agent involved in the investigation. Moreover, his memory might be incorrect. Therefore, the defense is entitled to directives or instructions, if any, issued to the federal agents involved in the investigation of Wilford, directing compliance in Maryland with *Maynard* during any period of the investigation.

The remainder of the defense's discovery request is too broad. Rule 16 does not authorize "'a shotgun fishing expedition.'" *United States v. Anderson*, 481 F.2d 685, 694 (4th Cir. 1973) (citation omitted); *see also Maranzino*, 860 F.2d at 985 ("Rule 16 does not authorize a blanket request to see the prosecution's file."). For example, Wilford requests, *inter alia*, "any memo," "email," and "continued legal education newsletter" that discusses the D.C. Circuit's *Maynard* decision. Disclosure Motion ¶ 1. But, he has not explained why "any" discussion of *Maynard* is pertinent to this case. Indeed, as I discuss, *infra*, the investigation in this case took place in Maryland, not Washington, D.C., was conducted jointly with the State, and conformed to State appellate precedent. And, the documents Wilford seeks are material to good faith only insofar as they direct compliance in Maryland with *Maynard* by agents involved in the investigation of Wilford at the relevant time. Other documents need not be disclosed.

Accordingly, Wilford's Disclosure Motion will be granted, in part, and denied, in part.

**B.  Motion to Suppress: GPS and Pinging**

The Fourth Amendment to the Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Yet, "it is silent about how this right is to be enforced." *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419, 2423 (2011). As a "supplement" to the Fourth Amendment, the Supreme Court created the exclusionary rule, which "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Id.* The exclusionary rule applies to "evidence obtained during illegal police conduct," as well as "evidence that is the indirect product of the illegal activity." *United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961), *and Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

Wilford invokes the Fourth Amendment's exclusionary rule as to law enforcement's warrantless use of GPS tracking, as well as the use of cell phone pinging. In his view, evidence derived from the use of these investigative tools should be suppressed. I disagree.

1.  Standing

As a threshold matter, Wilford's Fourth Amendment challenge is necessarily limited in scope. A defendant bears the burden of establishing standing to challenge a Fourth Amendment violation. *See United States v. Bullard*, 645 F.3d 237, 242 (4th Cir.), *cert. denied*, ___ U.S. ___,

132 S. Ct. 356 (2011); *United States v. Rusher*, 966 F.2d 868, 874 (4th Cir. 1992). To do so, it is not enough to be "aggrieved" by "the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 172 (1969). Rather, a defendant may only challenge a Fourth Amendment violation to the extent that his personal Fourth Amendment rights were violated. *Rakas v. Illinois*, 439 U.S. 128, 140 (1978); *see, e.g.*, *Minnesota v. Carter*, 525 U.S. 83, 88-91 (1998) (holding that guests in apartment for cocaine transaction lacked standing to contest search of apartment on Fourth Amendment grounds); *United States v. Payner*, 447 U.S. 727, 731-32 (1980) (holding that defendant lacked standing under Fourth Amendment to contest documents seized illegally from a third party).

Thus, a defendant has no standing to challenge the admission of evidence illegally obtained from co-conspirators. *See United States v. Padilla*, 508 U.S. 77, 82 (1993) (per curiam). As the Fourth Circuit explained in *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988), "Fourth Amendment rights are . . . personal rights," which co-defendants "lack standing to assert vicariously." In other words, "'[c]o-conspirators and codefendants have been accorded no special standing.'" *Padilla,* 508 U.S. at 82 (quoting *Alderman*, 394 U.S. at 171-72). Indeed, a search can be unconstitutional with respect to one person yet lawful as to another. *United States v. Gray*, 491 F.3d 138, 144-45 (4th Cir. 2007), *cert. denied*, 552 U.S. 1190 (2008). And, of import here, an individual "normally has no legitimate expectation of privacy in an automobile in which he asserts neither a property interest nor a possessory interest." *United States v. Carter*, 300 F.3d 415, 421 (4th Cir. 2003) (citing *Rakas*, 439 U.S. at 148-49).

As to GPS tracking, the parties stipulated at the hearing that Wilford has standing to challenge the use of GPS devices on the Honda Crosstour registered to and used by him, and the

Oldsmobile minivan registered to BLOW IT OFF POWER WASHING, when driven by him. Wilford does not dispute that he lacks standing as to the other vehicles, in which he had no property or possessory interest, or as to the minivan when it was driven by another person. Further, Wilford lacks standing to challenge the pinging of any cell phone, other than his own.

Therefore, Wilford appears to have abandoned his challenge to surveillance conducted on October 8, 2010, or October 22, 2010, based on a GPS device located on Hayes's vehicle. In any event, he lacks standing to challenge the use of GPS tracking on Hayes's vehicle. As to evidence related to those dates, Wilford's Motion to Suppress must be denied.

2. GPS Tracking

In *Jones v. United States*, *supra*, 132 S. Ct. 945, the Supreme Court held that "the Government's installation of a GPS device on a target's vehicle,[1] and its use of that device to monitor the vehicle's movements, constitutes a 'search'" under the Fourth Amendment. *Id.* at 949. According to the majority opinion, authored by Justice Scalia, the use of a GPS device on a target's vehicle constitutes a search because it is a "common-law trespass" on the target's property. *Id.* at 949-50.[21] In so holding, the Court rejected the view that the reasonable expectation of privacy test, articulated in *Katz v. United States*, 389 U.S. 347 (1967), necessarily governs the existence of a search under the Fourth Amendment. *See id.* at 353 (holding that defendant was protected from warrantless eavesdropping on phone call because he "justifiably relied" upon privacy of phone booth); *id.* at 361 (Harlan, J., concurring) ("My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a

---

[21] Justice Sotomayor, writing separately, provided the fifth vote for the majority position, agreeing that a search occurs "at a minimum" when the Government procures information through a physical intrusion. *See* 132 S. Ct. at 954. She noted that "physical intrusion is now unnecessary to many forms of surveillance." *Id.* at 955.

person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'").[22]  According to the *Jones* majority, *Katz* did not "narrow the Fourth Amendment's scope."  132 S. Ct. at 951.  The Court explained: "[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common law trespassory test."  *Id.* at 952 (emphasis in original).  In contrast, Justice Alito, joined by Justices Ginsberg, Breyer, and Kagan, disagreed with the majority's trespass test, but agreed that a search had occurred under the reasonable-expectation-of-privacy test formulated in *Katz*.  *Id.* at 957-64 (Alito, J., concurring in the judgment).

Indisputably, the use of slap on GPS devices on Wilford's vehicles qualifies as a search under *Jones*.  And, according to the "basic rule," warrantless searches are per se unreasonable.  *Arizona v. Gant*, 556 U.S. 332, 338 (2009).  Evidence derived through "the exploitation of that illegality" ordinarily must be suppressed.  *Wong Sun*, 371 U.S. at 488.  However, *Jones* did not address whether the use of a GPS tracking device requires a warrant, supported by probable cause.  *See United States v. Sparks*, 711 F.3d 58, 62 (1st Cir. 2013) (discussing what *Jones* did not hold); *e.g.*, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may make a warrantless entry onto private property . . . to prevent the imminent destruction of evidence, or to engage in 'hot pursuit' of a fleeing suspect.") (citations omitted); *Terry v. Ohio*, 392 U.S. 1 (1968) (allowing temporary seizure of person based on reasonable articulable suspicion that person is engaged in criminal activity, as opposed to probable cause).

---

[22] Although Justice Harlan wrote a concurring opinion, his formulation is often quoted by courts, *see Kyllo v. United States*, 533 U.S. 27, 33 (2001), and has been viewed as the operative standard.  *See, e.g.*, *Jones*, 132 S. Ct. at 950 (discussing government's reliance on "Harlan standard").

The Government claims that the use of a GPS tracking device requires less than probable cause, and that no warrant is required under *Jones*. I need not resolve those contentions, however.

Even assuming, *arguendo*, that a GPS "search" does not fall within one of the "'few specifically established and well delineated exceptions'" to the warrant requirement, *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citation omitted), exclusion is not mechanically imposed for every Fourth Amendment violation. "Whether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question [of] whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983)).

In this case, the Government's warrantless use of GPS devices preceded the *Jones* decision. Thus, I agree with the Government that it is entitled to rely on the good faith exception to the exclusionary rule. *See Leon*, 468 U.S. at 923-24. In particular, I am satisfied that, at the relevant time, law enforcement authorities reasonably relied on a comprehensive body of what was regarded as settled law, including Maryland State appellate precedent, authorizing warrantless GPS tracking. *See Davis*, 131 S. Ct. at 2428-30; *Sparks*, 711 F.3d at 67-68. And, even in the absence of the good faith exception, the doctrines of inevitable discovery and independent source apply. *See Nix v. Williams*, 467 U.S. 431, 443-44 (1984).

### a. Good Faith

The exclusionary rule is a "'prudential' doctrine," fashioned "to 'compel respect for the constitutional guaranty.'" *Davis*, 131 S. Ct. at 2426 (citations omitted). It "is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional

search." *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)); *see Leon*, 468 U.S. at 906. Indeed, the use of evidence obtained in violation of the Fourth Amendment "'work[s] no new Fourth Amendment wrong,'" *id.* (quoting *United States v. Calandra*, 414 U.S. 338, 354 (1974)) (alteration in *Leon*), but exclusion cannot remedy the constitutional violation. *Id.* Thus, "[t]he [exclusionary] rule's sole purpose . . . is to deter future Fourth Amendment violations." *Davis*, 131 S. Ct. at 2426. In the absence of "'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Id.* (quoting *United States v. Janis*, 428 U.S. 433, 454 n. 29 (1976)) (alteration in *Davis*).

Notably, "[e]xclusion exacts a heavy toll on both the judicial system and society at large," because "[i]t almost always requires courts to ignore reliable, trustworthy evidence." *Davis*, 131 S. Ct. at 2427. The "'unbending application'" of the exclusionary rule "'would impede unacceptably the truth-finding functions of judge and jury,'" and "'generat[e] disrespect for the law and administration of justice.'" *Leon*, 468 U.S. at 907-08 (citations omitted). As a result, the exclusionary rule calls for a "balancing approach," which entails weighing the deterrent effect of suppression against the costs of exclusion, on a case-by-case basis. *See id.* at 913-24. To warrant exclusion, the "deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 131 S. Ct. at 2427.

The cost of exclusion is particularly high—and often disproportionate to exclusion's deterrent effect—"when law enforcement officers have acted in objective good faith or their transgressions have been minor." *Leon*, 468 U.S. at 908. In *Leon* the Court considered whether "suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" was justified. *Id*. at 922. Answering this question in the negative, the Court

held that a police officer's reliance on a technically sufficient warrant, supported by a magistrate judge's probable cause determination, was objectively reasonable, and thus evidence seized pursuant to an invalid warrant was not subject to suppression. *See id.* at 922-23. Quoting *United States v. Peltier*, 422 U.S. 531, 539 (1975), the *Leon* Court explained, 468 U.S. at 919:

> "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

*See also Herring v. United States*, 555 U.S. 135 (2008) (declining to suppress evidence based on police recordkeeping error); *Massachusetts v. Shephard*, 468 U.S. 981 (1984) (declining to apply exclusionary rule where warrant was invalidated due to a judge's clerical error).

The "good faith" exception carries equal force when law enforcement agents act in reasonable reliance on judicial decisions authorizing their conduct, although the conduct is subsequently deemed unconstitutional. *See Davis*, 131 S. Ct. at 2428-30 (holding that exclusionary rule did not apply to evidence obtained by officers acting in reliance on then-binding federal appellate precedent, although precedent was subsequently overruled and the officers' conduct held to violate the Fourth Amendment). The same reasoning applies when law enforcement agents act in accordance with a state statute. *See Illinois v. Krull*, 480 U.S. 340, 356-60 (1987) (holding that exclusionary rule did not apply to evidence obtained by officers acting in reliance on state statute authorizing warrantless administrative search, where statute was subsequently found to violate the Fourth Amendment and search was deemed unconstitutional).

In *Davis*, 131 S. Ct. 2419, the Supreme Court considered the legality of a search that violated the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009), but occurred two years prior to the ruling in *Gant*. In *Gant*, the Court held that a warrantless vehicle search incident to lawful arrest is not valid if it occurs after the defendant is arrested, handcuffed, and placed in the back of a patrol car. *See id.* at 335. In so holding, the Court departed from the decision in *New York v. Belton*, 453 U.S. 454 (1981), which "was widely understood to have set down a simple, bright-line rule" authorizing warrantless "automobile searches incident to arrests of recent occupants, regardless of whether the arrestee . . . was within reaching distance of the vehicle at the time of the search." *Davis*, 131 S. Ct. at 2424 (citing *Thornton v. United States*, 541 U.S. 615, 628 (2004) (Scalia, J., concurring in the judgment)). At the time of the search at issue in *Davis*, the search did not comport with *Gant*, but it complied with appellate precedent in the Eleventh Circuit in effect at the time of the search, which had "long read *Belton* to establish [such] a bright-line rule." *Davis*, 131 S. Ct. at 2426 (citing *United States v. Gonzalez*, 71 F.3d 819, 822, 824-827 (11th Cir. 1996)).

The Supreme Court held that when law enforcement agents conduct a search in objectively reasonable reliance on binding appellate precedent, police culpability is wholly absent. *See id.* at 2428-29. It reasoned, *id.*:

> The officers who conducted the search did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.

The Court elaborated: "[W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-

detection and public-safety responsibilities." *Id.* at 2429 (emphasis in original). In the Court's view, "all that exclusion would deter in this case is conscientious police work." *Id.*; *see also Krull*, 480 U.S. at 350 ("If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written.").

*United States v. Wilks*, 647 F.3d 520 (4th Cir. 2011), also provides guidance. There, the Fourth Circuit considered a search akin to that in *Davis*. At the time of the search, it comported with then-binding Fourth Circuit precedent, later overruled by *Gant*. *See id.* at 521-22. Law enforcement officers searched the front seat of a vehicle after handcuffing the defendant and placing him in the back seat of the patrol car. *Id.* at 521. The parties did not dispute that, under *United States v. Milton*, 52 F.3d 78, 80 (4th Cir. 1995), the search of the vehicle "was permissible at the time." *Wilks*, 647 F.3d at 522. Finding the case to be "on all fours" with *Davis*, the Fourth Circuit held that the exclusionary rule did not bar the admission of evidence recovered during the search. *Id.* at 524.

Invoking *Leon* and *Davis*, the Government urges that the exclusionary rule is not appropriate here, because "law enforcement agents . . . were acting in accordance with what was understood at the time to have been well-settled law, i.e., that under [*United States v. Knotts*, 460 U.S. 276 (1983),] the use of a GPS tracking device was not a 'search' because it did not infringe upon a reasonable expectation of privacy since a defendant's vehicular movements were exposed to the public." Opp. at 27.

*Knotts* involved the investigation by law enforcement agents of a suspected amphetamine manufacturing ring. 460 U.S. at 277-79. Agents arranged with the seller of chloroform, used in the manufacturing process, to place a radio transmitter, *i.e.*, a beeper, inside a chloroform container sold to one of the members of the ring. *Id.* at 278. They then relied upon the beeper to track the route of the vehicle used by a second suspect, who took the chloroform to a "secluded cabin." *Id.* at 277-78. After several days of surveillance, the agents obtained a search warrant for the cabin. The ensuing search revealed "a fully operable, clandestine drug laboratory." *Id.* at 279. The defendant, who owned the cabin, moved to suppress the evidence found inside, claiming the agents had violated his Fourth Amendment rights by using the beeper placed in the chloroform container to follow his co-defendant to the location. *Id.* at 284-85.

Citing the Supreme Court's 1967 decision in *Katz v. United States*, *supra*, 389 U.S. 347, the *Knotts* Court rejected the argument. It said, 460 U.S. at 281: "A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." In the Court's view, "[t]he government surveillance conducted by the means of the beeper in this case amounted to principally following an automobile on public streets and highways." *Id.* The Court reasoned that when the defendant "travelled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads," including "his final destination when he exited the public roads onto private property." *Id.* at 281-82. Concluding that the defendant had no reasonable expectation of privacy, the Court said, *id.* at 282:

> Visual surveillance from public places . . . would have sufficed to reveal all of these facts to the police. The fact that the officers in this case relied not only on visual surveillance, but on the use of the beeper to signal the presence of [the co-defendant's] automobile to the police receiver, does not alter the situation.

> Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case.

*United States v. Karo*, 468 U.S. 705 (1984), presented a variation on *Knotts*. There, law enforcement placed a beeper into a can of ether and monitored it while it was in the defendant's house. *Id.* at 708-10. The Supreme Court found no Fourth Amendment violation occasioned by the installation of the beeper in the can, which was done before it was transferred into the defendant's possession. *Id.* at 712-13. Rather, it held that the Fourth Amendment was violated by the Government's monitoring of the beeper while it was inside the defendant's residence. *Id.* at 714. The Court explained, *id.* at 715:

> The beeper tells the agent that a particular article is actually located at a particular time in the private residence and is in the possession of the person or persons whose residence is being watched. Even if visual surveillance has revealed that the article to which the beeper is attached has entered the house, the later monitoring not only verifies the officers' observations but also establishes that the article remains on the premises.

Unlike in *Knotts*, where "the beeper told the authorities nothing about the interior of Knotts' cabin," and the car's travel on public roads was "'voluntarily conveyed to anyone who wanted to look,'" the presence of the can of ether inside the house "could not have been visually verified" without entering the home. *Id.* at 715 (quoting *Knotts*, 460 U.S. at 281).

In view of *Knotts*, federal appellate courts reached a substantial consensus that the use of a GPS device to track the location of a target vehicle did not constitute a search under the Fourth Amendment. Indeed, at the time the GPS devices were used in this case, every federal court of appeals to address the question had, with the exception of the D.C. Circuit in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), held that warrants were *not* required for GPS tracking devices. *See United States v. Pineda-Moreno*, 591 F.3d 1212, 1216-17 (9th Cir. 2010) (holding

that GPS tracking device used to monitor individual's movements in his vehicle was not a search, relying on *Knotts*); *United States v. Garcia*, 474 F.3d 994, 997-98 (7th Cir. 2007) (same); *United States v. Marquez*, 605 F.3d 604, 609-10 (8th Cir. 2010) (suggesting same result, but in the alternative to a determination that defendant lacked standing to raise a challenge); *United States v. Smith*, 387 F. App'x 918, 920-21 (11th Cir. 2010) (unpublished) (same). The federal district courts had reached the same result. *See, e.g.*, *United States v. Burton*, 698 F. Supp. 2d 1303, 1307-08 (N.D. Fla. 2010); *United States v. Jesus-Nunez*, No. 1:10-CR-00017-01, 2010 WL 2991229, *5 (M.D. Pa. July 27, 2009); *United States v. Moran*, 349 F. Supp. 2d 425, 467-68 (N.D.N.Y. 2005). And, even after *Maynard* was decided in August 2010, courts distinguished or rejected the view of the D.C. Circuit. *See, e.g.*, *United States v. Hernandez*, 647 F.3d 216, 220-21 (5th Cir. 2011) (distinguishing use of GPS device for a cross-country trip, as opposed to continuous surveillance); *United States v. Narrl*, 789 F. Supp. 2d 645, 648-52 (D.S.C. 2011) (upholding warrantless GPS tracking used for 27 days).

Fed. R. Crim. P. 41 governs the issuance of a warrant in a federal criminal proceeding. The 2006 Advisory Committee's Note to Rule 41 cited *Knotts* and *Karo* for the proposition that, under the *Katz* test, warrantless GPS tracking is lawful, except in areas reasonably considered private. It stated: "Warrants may be required to monitor tracking devices when they are used to monitor persons or property *in areas where there is a reasonable expectation of privacy*." Fed. R. Crim. P. 41(b) advisory committee's note (2006) (citing *Karo*, 468 U.S. 705) (emphasis added). Therefore, it stated: "If the officers intend to install or use the device in a constitutionally protected area, they must obtain judicial approval to do so." *Id.* Of import here, it also said: "If, on the other hand, the officers intend to install and use the device without

implicating any Fourth Amendment rights, *there is no need to obtain the warrant*." *Id.* (citing *Knotts*, 460 U.S. 276) (emphasis added).

As noted, the underlying investigation began as a joint State and federal effort, under the guidance of a State prosecutor. In this context, it is noteworthy that a decision by the Maryland Court of Special Appeals, in effect at the relevant time, had concluded, in reliance on *Knotts*, that the warrantless use of a GPS device did not violate the Fourth Amendment. *See Stone v. State*, 178 Md. App. 428, 446-50, 941 A.2d 1238, 1249-51 (2008), *abrogated* after *Jones by Kelly v. State*, 208 Md. App. 218, 56 A.3d 523 (2012) (recognizing *Jones* but applying good faith exception to exclusionary rule for warrantless use of GPS tracking devices).

In *Stone*, the Maryland Court of Special Appeals, the State's second highest court, reviewed the legality of the warrantless attachment of a GPS tracking device to a pickup truck that ultimately led to the defendant's arrest. *See* 178 Md. App. at 434-38, 941 A.2d at 1242-44. The court said: "The GPS tracking device in the case at bar is simply the next generation of tracking science and technology from the radio transmitter beeper in *Knotts*, to which the *Knotts* Fourth Amendment analysis directly applies." *Stone*, 178 Md. App. at 448, 941 A.2d at 1250. Thus, the defendants "did not have a reasonable expectation of privacy in their location as they traveled on public thoroughfares." *Id.*

In my view, law enforcement agents could not have reasonably anticipated that in *Jones* the Supreme Court would revive trespass in Fourth Amendment jurisprudence. *Knotts* was, for all intents and purposes, reasonably viewed as the operative law. *See, e.g.*, *Sparks*, 711 F.3d at 67 (holding that *Knotts* qualified as binding appellate precedent for purposes of *Davis* good faith exception, despite absence of First Circuit precedent addressing GPS, because "*Knotts*'s apparent

bright-line rule that the Fourth Amendment is unconcerned with police surveillance of public automotive movements is analogous to *Belton*'s bright-line rule authorizing officers to search the passenger compartment of an arrestee's car.").  Indeed, as Judge James Bredar observed in *United States v. Stephens*, this area of the law seemed settled prior to *Jones*.  *United States v. Stephens*, JKB-11-cr-0447 (D. Md. Mar. 28, 2012) (declining to apply exclusionary rule to evidence obtained through GPS device prior to *Jones*) (transcript at 126-31).  Reliance on principles of property law, such as trespass, had been dormant.  *See, e.g.*, *United States v. Jones*, 31 F.3d 1304, 1309 (4th Cir. 1990) ("An individuals' capacity to claim the protection of the Fourth Amendment depends not upon a property right in an invaded place, but upon whether the person has a legitimate expectation of privacy in the invaded place.") (citing *Katz*, 389 U.S. at 353); *United States v. Michael*, 645 F.2d 252, 255 (5th Cir. 1981) (en banc) ("Although originally viewed as protecting property rights of individuals, the Supreme Court has . . . rejected the idea that [F]ourth [A]mendment coverage turns on 'arcane distinctions developed in property . . . law.'") (citation omitted).

To be sure, the Fourth Circuit had not opined on the legality of warrantless GPS tracking devices at the time of the Hayes DTO investigation.  And, I recognize that other federal courts have, since *Jones*, determined that the good faith exception does not apply in the absence of binding federal appellate precedent.  *See, e.g.*, *United States v. Ortiz*, 878 F. Supp. 2d 515, 539-43 (E.D. Pa. 2012); *United States v. Lee*, 862 F. Supp. 2d 560, 567-671 (E.D. Ky. 2012); *United States v. Lujan*, No. 2:11CR11–SA, 2012 WL 2861546, *3 (N.D. Miss. July 11, 2012).  However, the Maryland Court of Special Appeals had addressed the issue in *Stone*, and it unequivocally found no Fourth Amendment violation.  This is relevant because the investigation

in this case was conducted jointly by federal and State law enforcement authorities. Notably, the *Stone* decision constituted binding appellate precedent in Maryland State courts. *See Archers Glen Partners, Inc. v. Garner*, 176 Md. App. 292, 325, 933 A.2d 405, 424 (2007) (explaining that "a reported decision" of the Maryland Court of Special Appeals "constitutes binding precedent"); *e.g.*, *Kelly*, 208 Md. App. at 248, 56 A.3d at 541 (treating *Stone* as binding appellate precedent under *Davis*).

Specifically, although the case agents were all members of a "DEA Task Force," the investigation involved both federal and State law enforcement authorities, including the DEA, the Baltimore County Police Department, the Baltimore City Police Department, the Maryland Transportation Authority Police, and the IRS. According to Agent Lester, the investigation was "primarily" run at the State level, and only "turned" federal at the end. As noted, an Assistant State's Attorney for Baltimore City was the lead State prosecutor. She would have been aware of the use of GPS devices, and undoubtedly would have viewed their legality as governed by the *Stone* decision. She did not direct law enforcement agents to obtain warrants. In the period of January 2011 to March 2011, federal prosecutors received only occasional phone calls summarizing the status of the investigation, but did not direct any aspects of it. By the Spring of 2011, a decision was made to prosecute some members of the Hayes DTO in federal court. But, several individuals were, in fact, prosecuted by the State.

As Wilford points out, the investigation of the Hayes DTO began after the D.C. Circuit's decision in *Maynard*, in which that court held that the warrantless use of a GPS device to track a target vehicle's movements for 28 days constituted an illegal search under the Fourth Amendment. *See* 615 F.3d at 558-64. On this basis, Wilford insists that the good faith doctrine

does not apply to the warrantless use of the GPS devices for his Crosstour for a period of 78 days, and for a period of 68 days for the Oldsmobile minivan he occasionally drove. According to Wilford, as a result of the *Maynard* decision, law enforcement agents were "on notice" that monitoring a target's location through a GPS device for such extended periods, and without a warrant, would violate the Fourth Amendment, tainting the evidence derived therefrom. Motion to Suppress at 10. At least one federal trial court has agreed with Wilford that a circuit split as to this issue defeats the good faith exception, in the absence of binding federal appellate precedent in the applicable circuit. *See United States v. Katzin*, Criminal Action No. 11-226, 2012 WL 1646894, *7-10 (E.D. Pa. May 9, 2012). And, at the relevant time, no Fourth Circuit decision had approved of the agents' conduct.

I am not persuaded by Wilford's view. As noted, the exclusionary rule is not a "strict-liability" regime. *See Davis*, 131 S. Ct. at 2429. To merit suppression of evidence obtained by an unlawful search, the conduct of law enforcement must, at least to some degree, exhibit deliberate, reckless, grossly negligent, or systemically negligent disregard for the Fourth Amendment. *Davis*, 131 S. Ct. at 2427; *Herring*, 555 U.S. at 144. None of these qualities is evident here. Notably, *Maynard* was decided in another jurisdiction and it was generally an outlier. Moreover, Maryland appellate precedent in *Stone*, binding in the Maryland courts, conformed to the substantial consensus of the federal courts. And, as Agent Lester's testimony established, the *Maynard* decision was not recklessly or deliberately disregarded by the law enforcement agents.

Agent Lester testified that he was aware of the decision in *Maynard* in August 2010, and he discussed with Agent Edwards that they would need a warrant to use a GPS if they were in

Washington, D.C. But, to his knowledge, the warrantless use of a GPS device was lawful everywhere other than Washington, D.C., which the investigation did not reach. He also stated that no supervisor directed the agents to obtain a warrant, unless they were in Washington, D.C. Moreover, the investigation was conducted jointly with the State, and the Assistant State's Attorney who supervised it did not advise the agents to obtain a warrant for the use of the GPS devices in Maryland. Although Lester did not discuss with federal prosecutors whether to obtain a warrant, he did not recall any instructions from the Justice Department as to the need for a warrant. It was, in his words, "business as usual" after *Maynard*. Indeed, Lester stated that until *Jones* was decided in January 2012, it was "not the practice" of any of his colleagues to obtain a warrant for the use of GPS devices.[23] Lester also testified that he and his colleagues thought that *Maynard* would be reversed.

In view of Agent Lester's testimony, which I find to be quite credible; the substantial consensus among other federal courts at the time; the 2006 Advisory Committee's Note to Fed. R. Crim P. 41; and Maryland appellate law, which governed the State prosecutor in the joint investigation, the *Maynard* decision did not render the conduct of the law enforcement agents objectively unreasonable. Nor would application of the exclusionary rule further its goals, given the shift in extra-jurisdictional case law. As the Supreme Court reiterated in *Davis*, deterrence cannot justify exclusion of evidence when law enforcement agents conformed their conduct to what was reasonably understood to be the governing law; law enforcement agents cannot

---

[23] Agent Lester recounted one instance when a warrant was obtained for a GPS device. He explained that law enforcement agents obtained the warrant because they had to seize the vehicle to install the device.

reasonably be expected to conform their investigative practices to every shift in appellate law in another jurisdiction.  In comparison, the cost of exclusion would be high.

To be sure, "'[t]he justifications for the good-faith exception do not extend to situations in which police officers have interpreted ambiguous precedent or relied on their own extrapolations from existing caselaw.'"  *Sparks*, 711 F.3d at 67-68 (quoting *United States v. Davis*, 598 F.3d 1259, 1267 (11th Cir. 2010), *aff'd* 131 S. Ct. 2419 (2011)).  That is not the case here, however, "where new developments in the law have upended the settled rules on which the police relied."  *Sparks*, 711 F.3d at 68.

In *United States v. Baez*, 878 F. Supp. 2d 288 (D. Mass. 2012), the court acknowledged the "problematic . . . impact of *Jones* in jurisdictions which had no binding precedent."  Its reasoning is persuasive, *id*. at 297:

> A rigorous and realistic cost-benefit analysis recognizes that there is no meaningful deterrence value to be gained—and a great deal of benefit in terms of truth seeking and public safety to be lost—by discouraging such good faith reliance and thereby making law enforcement officers unduly cautious in pursuing investigatory initiatives. To be sure, a different approach might be chosen in which law enforcement agents take no steps—without asking permission of a court—regarding the myriad circumstances in which there is no precedential case on point. Such a regime seems unnecessarily unwieldy—and potentially enervating to timely police action in other settings—when, as here, a substantial consensus among precedential courts provides a good faith basis for the investigatory initiative law enforcement agents seek to pursue.

In sum, I find that the good faith exception under *Leon* and its progeny applies here. Therefore, I decline to suppress evidence derived from the warrantless use of GPS tracking devices.  However, defendant may renew his argument as to the inapplicability of the good faith defense in the event that Government disclosures in discovery reveal directives instructing compliance with *Maynard* at the relevant time.

*b. Inevitable Discovery and Independent Source*

Even if good faith were not applicable, suppression of evidence derived from warrantless GPS tracking would nonetheless be inappropriate. The exclusionary rule does not require suppression of all evidence obtained "'but for the illegal actions of the police.'" *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (quoting *Segura v. United States*, 468 U.S. 796, 815 (1984)). When the discovery of evidence is "too attenuated" from the constitutional violation, application of the exclusionary rule is not justified. *See Hudson*, 547 U.S. at 592-93. This principle takes form in the doctrines of independent source and inevitable discovery. *See id.*

"The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix*, 467 U.S. at 443; *see Murray v. United States*, 487 U.S. 533, 537 (1988); *Segura*, 468 U.S. at 814. In other words, if the evidence would have been obtained "even absent an illegal search," it is admissible. *Bullard*, 645 F.3d at 244. To illustrate, "where an unlawful entry has given investigators knowledge of facts x and y, but fact z has been learned by other means, fact z can be said to be admissible because derived from an 'independent source.'" *Murray*, 487 U.S. at 538 (citing *Segura*, 468 U.S. 796). The rationale of the independent source doctrine is that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred." *Nix*, 467 U.S. at 443.

Similarly, the doctrine of inevitable discovery permits the introduction of evidence if it "ultimately or inevitably would have been discovered by lawful means." *Id*. at 444; *see United*

*States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987). However, "the fact making discovery inevitable must 'arise from circumstances other than those disclosed by the illegal search itself.'" *United States v. Thomas*, 955 F.2d 207, 211 (4th Cir. 1992) (quoting *United States v. Boatwright*, 822 F.2d 862, 865 (9th Cir. 1987)). In *Nix*, for example, a detective persuaded the defendant to reveal the location of the body of a murder victim, but, in so doing, violated the defendant's right to counsel. 467 U.S. at 444. Because a comprehensive search for the victim's body was under way, the Court held suppression inappropriate because the body inevitably would have been discovered. *Id.* Again, in such circumstances, "the deterrence rationale" of exclusion "has so little basis that the evidence should be received." *Id.*

Here, GPS tracking was not the only basis for the surveillance of Wilford. Law enforcement pinged Wilford's cell phone, pursuant to court orders that, as I will discuss, were lawful. Additionally, law enforcement authorities were simultaneously tracking Wilford's co-conspirators, through GPS and pinging, which Wilford lacks standing to challenge.

For example, as indicated, *supra*, through GPS tracking in October 2010, the police surveilled Hayes, who was meeting with an unknown male, later identified as Wilford. On December 17, 2011, law enforcement conducted surveillance of the meeting between Hayes and Wilford based on GPS tracking of their respective vehicles as well as pinging of their respective cell phones. Similarly, on March 17, 2011, law enforcement conducted surveillance of Wilford and Hawkins based on GPS tracking of their respective vehicles and pinging of Wilford's cell phone. And, on April 1, 2011, GPS was not used to locate Wilford or members of the Hayes DTO for surveillance, which was conducted at 1500 Cliftview Avenue. Thus, even if the good faith exception were not applicable to GPS tracking, alternative and independent means of

investigation enabled law enforcement to conduct at least some, if not all, of the surveillance on Wilford that is at issue. Under the inevitable discovery and independent source doctrines, suppression of evidence derived from GPS tracking is not required.

3. Cell Phone Pinging

Wilford has also moved to suppress evidence obtained as a result of the court-authorized pinging of his cell phone. Specifically, he argues that cell phone pinging is not authorized by Maryland's pen register and trap and trace statute (the "pen register statute"), C.J. §§ 10-4B-01, *et seq*. He argues: "If the State statute were meant to allow for the invasion of privacy that cell phone tracking entails, the statute, to be constitutionally valid, would need to provide for a finding of probable cause." Motion to Suppress at 25.

A "pen register" is defined in the Maryland Code as "a device or process that records and decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." C.J. § 10-4B-01(c)(1). A "trap and trace device" is defined in the statute as "a device or process that captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." *Id.* § 10-4B-01(d)(1). The statutory definitions specifically exclude any device or process used to "obtain the content of a communication," *id.* § 10-4B-01(c)(2)(ii), (d)(2)—in other words, "any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication." *Id.* § 10-401(7).

"Wire communication" and "electronic communication" are defined in C.J. § 10-401. "'Wire communication' means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of a connection in a switching station) furnished or operated by any person licensed to engage in providing or operating such facilities for the transmission of communications." *Id.* § 10-401(18). "'Electronic communication' means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system," and excludes "any wire or oral communication," "any communication made through a tone-only paging device," and "any communication from a tracking device." *Id.* § 10-401(5).

The Maryland pen register statute, C.J. § 10-4B-02, provides, in part: "[A] person may not install or use a pen register or a trap and trace device without first obtaining a court order under [C.J.] § 10-4B-04 . . . ." C.J. § 10-4B-3(a) states: "An investigative or law enforcement officer may make application for an order . . . under [C.J.] § 10-4B-04 . . . authorizing or approving the installation or use of a pen register or a trap and trace device, in writing, under oath or equivalent affirmation, to a court of competent jurisdiction of this State [*i.e.*, Maryland]." *Id.* § 10-4B-03(a). "'Court of competent jurisdiction' means 'any [Maryland] circuit court having jurisdiction over the crime being investigated regardless of the location of the instrument or process from which a wire or electronic communication is transmitted or received.'" C.J. § 10-4B-01(b). The application must include "[t]he identity of the State law enforcement or investigative officer making the application and the identity of the law enforcement agency

conducting the investigation," accompanied by "[a] statement under oath by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency." *Id.* § 10-4B-03(b). Authorization may be obtained *ex parte*, provided that the issuing court "finds that the information likely to be obtained by the installation and use is relevant to an ongoing criminal investigation." *Id.* § 10-4B-03(b).

Wilford maintains that pinging is not authorized under the Maryland pen register statute. In particular, he argues that the statutory language "is limited to providing law enforcement numbers that dialed into the target phone and numbers dialed out," but does "not contemplate" the use of a cell phone as a "physical locator/tracking device." Motion to Suppress at 24. He also contends that an order authorizing pinging must be supported by a finding of probable cause, whereas C.J. § 10-4B-03(b) only requires "that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency." *Id*. at 25.

The Government counters that pinging falls under the statutory definition of a "pen register," as a "device or process that records and decodes . . . signaling information," *i.e.*, location signals, transmitted by a cell phone. C.J. § 10-4B-01(c)(1). The Government advises: "Since 2007, the [Baltimore Police Department] has submitted applications for orders authorizing the installation and use of pen register, trap and trace, and cellular tracking devices, pursuant to . . . [C.J.] § 10-4B-03, to obtain electronic geographical location/pinging data from common communications carriers." Gov't Supp. Memo at 2.

In support of its position, the Government submitted the Declaration of Lt. David Rosenblatt ("Rosenblatt Decl.," ECF 181-1), who serves as the Commanding Officer of the BPD's "Criminal Investigation Division – Advanced Technical Team," ("CID-ATT"), a section

of the BPD "that is responsible for investigating crimes where cellular telephones are involved." Rosenblatt Decl. ¶ 2-3. According to Lt. Rosenblatt, "[o]n average, the BPD CID-ATT submits to and obtains from the Circuit Court for Baltimore City approximately 25-35 orders per week to obtain electronic geographical location information/pinging data," and "approximately 20 additional orders per week are submitted and obtained by other investigative units of the BPD." *Id.* ¶ 5. Further, he avers: "The current practice in Baltimore City is to include a statement of probable cause in support of the applications . . . ." *Id.* Additionally, he asserts: "To the best of my knowledge, this practice has not been challenged or questioned by any judge in Baltimore City." *Id.*

With respect to whether the statute permits "pinging," the parties dispute the plain meaning of the statutory language. No judicial decision offers any guidance as to the scope of the Maryland statute with respect to pinging.[24]

Even accepting, *arguendo*, defendant's contention that pinging is not embraced by the pen register statute, that proposition alone does not provide a basis for suppression. Notably, the Maryland Code does not include a suppression remedy for evidence obtained in violation of the pen register statute. *See Sun Kin Chan v. Maryland*, 78 Md. App. 287, 310-11, 552 A.2d 1351, 1362-63 (1989) ((holding suppression remedy unavailable for evidence obtained in violation of

---

[24] Two bills were submitted to the 2013 session of the Maryland General Assembly, which concluded in April 2013. One would have required a finding of probable cause for law enforcements' use of a tracking device, such as pinging. *See* H.B. 377, 2013 Leg. Sess. (Md. 2013) (proposing revision to C.J. §§ 10-4B-01, *et seq.*, as to authorization of law enforcement's receipt of real-time location information, to require a finding that "there is probable cause to believe that the real-time location information is relevant to an ongoing criminal investigation"). The other, H.B. 887, 2013 Leg. Sess. (Md. 2013), proposed revisions to Md. Code, Crim. P. § 1-203.1, to require law enforcement to obtain a search warrant before obtaining location information generated by an electronic device, such as a cell phone. Neither bill was passed by the legislature.

Maryland pen register statute, because "[n]one has ever been created to handle violations of pen register statutes, either at the Federal or state level," and "[t]herefore, none exists"); *see also Upshur v. State*, 208 Md. App. 383, 399, 56 A.3d 620, 629 (2012) (same). Rather, the pen register statute provides only for financial and criminal penalties. *See* C.J. § 10-4B-02(c) (providing that a person who violates the statute faces "a fine not exceeding $5,000 or imprisonment not exceeding 1 year, or both"). And, even if a suppression remedy existed under State law, exclusion would not automatically be mandated in federal court. *See United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) (explaining that Virginia law could not "direct federal courts to exclude evidence obtained in violation of state statutes" because "[f]ederal not state law 'governs the admissibility of evidence obtained by state officers but ultimately used in a federal prosecution'") (quoting *United States v. Clyburn*, 24 F.3d 613, 616 (4th Cir. 1994)).

Moreover, a criminal defendant is not *ipso facto* entitled to an exclusionary remedy for evidence obtained in violation of the law:

> Although exclusion is the proper remedy for some violations of the Fourth Amendment, there is no exclusionary rule generally applicable to statutory violations. Rather, the exclusionary rule is an appropriate sanction for a statutory violation only where the statute specifically provides for suppression as a remedy or the statutory violation implicates underlying constitutional rights such as the right to be free from unreasonable search and seizure.

*United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006). As the Fourth Circuit recently said: "'The availability of the suppression remedy for . . . statutory, as opposed to constitutional, violations . . . turns on the provisions of [the statute] rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights.'" *Clenney*, 631 F.3d at 667 (quoting *United States v. Donovan*, 429 U.S. 413, 432 n. 22 (1977)) (alterations in *Clenney*).

To be sure, the lack of a suppression remedy for a statutory violation is troubling in cases implicating Fourth Amendment concerns.[25]  But, it is not my province to write an exclusionary rule into Maryland's pen register statute, where none exists.  "One may not wish an exclusionary rule into being by waving a magic wand."  *Sun Kin Chan*, 78 Md. App. at 311, 552 A.2d at 1363; *see, e.g.*, *Clenney*, 631 F.3d at 667 (holding that exclusionary remedy was not available for law enforcement's violations of the Electronic Communications Protection Act, 18 U.S.C. § 2703(c), and Virginia consumer protection law, Va. Code Ann. § 19.2-70.3); *Abdi*, 463 F.3d at 556-57 (holding that district court erred in suppressing evidence derived from failure to obtain an administrative warrant because "nothing in the text of [the statute] provides an independent statutory remedy of suppression"); *United States v. Jones*, ___ F. Supp. 2d ___, 2012 WL 6443136, *4 (D.D.C. Dec. 14, 2012) ("Even assuming the applications [for cell phone location data] lacked sufficient factual support, the Court would be powerless to order the suppression of the evidence that the government had obtained.").  Instead, Wilford must rely on the Fourth Amendment.  Although Wilford did not specifically invoke the Fourth Amendment exclusionary rule in his written submissions, defense counsel asserted at the hearing on March 8, 2013, his reliance on the Fourth Amendment as the basis of the suppression motion.

---

[25] In a few cases, the Supreme Court has exercised its supervisory authority to suppress evidence in response to statutory violations, but only when "the excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348-49 (2006) (holding suppression not warranted for violations of the Geneva Convention's consular notification provision.  *See Mallory v. United States*, 354 U.S. 449, 453 (1957) (suppressing evidence obtained in violation of Fed. R. Crim P. 5(a) requirement that persons arrested without a warrant be promptly presented to a judicial officer); *McNabb v. United States*, 318 U.S. 332, 344 (1943) (suppressing evidence obtained in violation of a federal statute requiring the same); *see also Miller v. United States*, 357 U.S. 301, 309-14 (1958) (suppressing evidence obtained incident to an arrest that violated 18 U.S.C. § 3109).  Wilford does not rely on such cases here, which are factually inapposite.

As a threshold matter, Wilford bears the burden of establishing a Fourth Amendment violation. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980) (holding that defendant bears the burden to establish a legitimate interest of privacy); *Bullard*, 645 F.3d at 242. In closing argument, to support his claim that pinging constitutes a search, Wilford invoked the view of the concurring Justices in *Jones* that "use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy," and therefore the continual surveillance of an individual, over a long period, is a "search" for Fourth Amendment purposes. *Jones*, 132 S. Ct. at 964 (Alito, J. concurring in the judgment)[26]; *see also Maynard*, 615 F.3d at 558-62. Their view has been referred to as the "mosaic theory," because it contemplates that discrete acts of surveillance by law enforcement may be lawful in isolation, but infringe on reasonable expectations of privacy in the aggregate, as they "paint an 'intimate picture'" of a defendant's life. *United States v. Graham*, 846 F. Supp. 384, 401-03 (D. Md. 2012) (quoting *Maynard*, 615 F.3d at 562); *see generally* Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 MICH. L. REV. 311 (2012) (examining the mosaic theory). As the concurring Justices reasoned in *Jones* with respect to long-term GPS tracking, Wilford asserts that long-term tracking by way of pinging also invades reasonable expectations of privacy, and is therefore a search.

But, the mosaic theory was not adopted as a holding by the Supreme Court, nor has it been endorsed by the Fourth Circuit. And, it appears somewhat unworkable in practice. *See Graham*, 846 F. Supp. at 401-03 (discussing "problematic consequences" of the mosaic theory, in the context of GPS and pinging data). Moreover, the Sixth Circuit has held that pinging does not qualify as a search under the Fourth Amendment, because cell phone users lack a reasonable

---

[26] Cell phone pinging does not involve a physical trespass, which is what occurred in *Jones*.

expectation of privacy in location data transmitted by the phone. *See United States v. Skinner*, 690 F.3d 772, 777-78 (6th Cir. 2012) (holding that defendant did not have a reasonable expectation of privacy in location data transmitted from cell phone, even though he was unaware that it was equipped with location technology).

Nevertheless, I will assume, *arguendo*, that the repeated pinging of Wilford's cellular phone constituted a "search" under the Fourth Amendment. I do so to avoid ruling, unnecessarily, on this unsettled area of Fourth Amendment jurisprudence. The Supreme Court has cautioned: "The judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." *City of Ontario, California v. Quon*, ___ U.S. ___, 130 S. Ct. 2619, 2629 (2010).

Even if the pinging constituted a search, I am persuaded that the orders authorizing the pinging satisfied the Fourth Amendment's warrant requirement.[27] As noted, the Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The Supreme Court

> has interpreted [these words] to require only three things. First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a criminal offense. Finally, "warrants must particularly describe the things to be seized as well as the place to be searched."

*Dalia v. United States*, 441 U.S. 238, 255 (1979) (citations omitted); *see, e.g., Groh v. Ramirez*, 540 U.S. 551, 557-59 (2008) (discussing warrant requirement, and holding that search warrant

---

[27] As indicated, the Government suggested that the use of a GPS device is exempt from the warrant requirement. But, it did not make that contention as to cell phone pinging.

that utterly failed to describe person or things to be seized was facially invalid); *Illinois v. Gates*, 462 U.S. 213, 239 (1983) (requiring that an affidavit contain sufficient information to support a finding of probable cause by magistrate, based upon the totality of the circumstances presented); *see also United States v. Simons*, 206 F.3d 392, 401-02 (4th Cir. 2000) (discussing requirements for a valid warrant under the Fourth Amendment).

Here, the pinging applications and pinging orders technically complied, on their face, with each of these requirements. The applications were signed, under oath, by a law enforcement officer; identified the number of the target cellular phone and its user; generally provided adequate information obtained through the investigation to establish probable cause linking Wilford to criminal activity; and the orders were issued upon a finding of probable cause by a detached and neutral Maryland State judge. That the pinging applications were for an "Order," as opposed to a "Warrant," is not material. *See, e.g.*, *Dalia*, 256-59 (holding that "court order" authorizing Title III wiretap "was a warrant issued in full compliance" with the Fourth Amendment warrant requirement).

Further, there is no inherent impropriety in the Government's reliance on a warrant issued by a state judge, even in a criminal case eventually prosecuted in federal court. *See United States v. Claridy*, 601 F.3d 276, 281-82 (4th Cir.) (holding that "[s]earch warrants obtained during a joint federal-state investigation may be authorized by Federal Rule 41(b) or by state law and may serve to uncover violations of federal law as well as state law"), *cert. denied*, ___ U.S. ___, 131 S. Ct. 259 (2010). As noted, federal and State law enforcement were working together in a joint investigation. As the Fourth Circuit explained in *Claridy*, *id.*:

> [T]here is nothing in the Federal Rules of Criminal Procedure that suggests that in
> a joint federal-state law-enforcement investigation, all search warrants must be

obtained under Federal Rule of Criminal Procedure 41(b). Stated differently, nothing in the Federal Rules of Criminal Procedure suggests that a joint task force cannot use either federal or state investigatory tools governed, respectively, by federal or state law.

Thus, I am satisfied that the orders for pinging facially satisfied the Fourth Amendment's warrant requirement. As I will discuss, however, the facts offered in the November 18 Pinging Application contained several material inaccuracies, which Wilford challenges under *Franks v. Delaware*.

## C. *Franks* Hearing

It is well settled that a strong "presumption of validity" attaches to an affidavit in support of a search warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Ordinarily, an accused is not entitled to challenge the veracity of a facially valid affidavit. *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). Review of the issuing judge's probable cause finding is generally confined to the four corners of the application documents. *Id.*; *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006). Relying on *Franks,* however, Wilford seeks to look beyond the facial validity of the November 18, 2010 Pinging Application, the Warrant Application, and a wiretap application. *See* Motion to Suppress at 26-27.

In *Franks*, the Supreme Court held that, under limited circumstances, an accused may obtain an evidentiary hearing concerning the veracity of the statements in an affidavit in support of a search warrant. To warrant a *Franks* hearing, the defendant must "make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause . . . ." 438 U.S. at 155-56; *see Clenney*, 631 F.3d at 633; *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). It is not

enough merely to identify false statements: "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72. Moreover, a *Franks* hearing is not appropriate when a motion to suppress offers only "bare allegations," and fails to make the required "substantial preliminary showing" by presenting an "offer of proof" through "affidavits or sworn or otherwise reliable statements by witnesses." *United States v. Chandia*, 514 F.3d 365, 373 (4th Cir. 2008).

In *Colkley*, for example, the defendant, a bank robbery suspect, complained that the affidavit in support of the warrant for his arrest did not state that an eyewitness failed to identify the defendant in a photo array. 899 F.2d at 299. He also complained that the affiant had based the affidavit's description of the suspect's height on only one eyewitness's testimony, disregarding other witnesses who had described the suspect as shorter. *Id.* The District Court granted the defendant a *Franks* hearing. *See id.*

The Fourth Circuit held that a *Franks* hearing was not warranted, because the agent's "acts fell far short of the level of flagrant police action *Franks* is designed to prevent, and a hearing under that decision was not required." *Id.* at 301. Mindful of "the realities of the warrant application process," the Court explained: "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation. *Id.* at 300. As the Fourth Circuit observed, every decision to include or not include information in an affidavit can, at some level, be described as intentional. *See id.* But, to fall within the scope of *Franks*, a misrepresentation or omission must be made with the intent to mislead, *i.e.*, it must be "the product of a 'deliberate falsehood or reckless disregard for the truth.'" *Id.* at 301 (quoting

*Franks*, 438 U.S. at 171). And, the Fourth Circuit declined to infer intent or recklessness from the fact of omission alone. *See Colkley*, 899 F.3d at 301.

By comparison, in *United States v. Tate*, 524 F.3d 449 (4th Cir. 2008), the Fourth Circuit held that the requirements for a *Franks* hearing had been met. In that case, the affiant, a police officer, submitted an application for a search warrant for the defendant's residence based on the officer's investigation of the defendant's trash. *Id.* at 450-51. In the warrant application, the officer represented that the trash had been "easily accessible from the rear yard" of the defendant's home. *Id.* at 451. According to the defendant, the officer deliberately crafted the affidavit to mislead the judge into assuming that the investigation and examination of the trash had been conducted legally. *Id.* at 452. The defendant claimed, however, that in order to examine his trash, the officer would have had to jump the fence that enclosed the defendant's backyard, trespass on the defendant's property, and search the trash in a container that had not been abandoned for collection. *Id.* Of import here, the defendant submitted several affidavits supporting his claims. *Id.* at 452-53.

The trial judge denied a *Franks* hearing, and the Fourth Circuit reversed. It stated: "The proffered facts tend to show that [the police officer] may have violated [the defendant's] reasonable expectation of privacy because the trash was not out at the curb for collection on the date of . . . [the] search but rather in a container near the steps of the home." *Id.* at 456. The Court continued: "If [the defendant's] facts are correct, the affidavit omitted the important details . . . that the trash had not been abandoned, and that the trash bags were seized in violation of [the defendant's] reasonable expectation of privacy." *Id.* Further, "inclusion of the allegedly omitted information . . . would have defeated probable cause," because "[i]f the trash investigation was

conducted illegally, the facts derived from it would have to be stricken from the affidavit." *Id.*
And, "[w]ithout the facts drawn from the trash investigation, the remaining contents of the
affidavit would not have supported a finding of probable cause." *Id.* at 457. Accordingly, the
Fourth Circuit determined that the defendant had met his burden for a *Franks* hearing.

Here, Wilford posits four reasons to support his request for a *Franks* hearing: (1) the
extensive use of GPS devices was not made known to the State judges who signed numerous
warrants; (2) the extent of the use of those GPS devices and underlying data has not yet been
fully disclosed to the defendant; (3) pinging was not authorized under the Maryland statute; and
(4) the affidavits supporting the warrants and pinging authorizations obtained in the case are
"riddled with misleading and false representations with a reckless disregard for truth and
accuracy." Motion to Suppress at 26-27.

Defendant's first three arguments are plainly meritless. First, defendant has not
explained how a more fulsome explanation in the affidavits as to the use of GPS devices would
have been relevant to the probable cause determination. The search warrants were signed by
Maryland State court judges, who were obligated to follow the *Stone* decision, discussed *supra*,
which authorized the warrantless use of GPS devices. Thus, omission of that particular
investigative technique could not have affected the probable cause determination. Second,
defense counsel has since obtained the relevant GPS data, so that contention is now moot. Third,
as discussed, the scope of the Maryland pen register statute with respect to pinging has no
bearing on whether suppression is appropriate. In any event, the Maryland State court judges
were aware of the statutory language, so the alleged "omission" was not relevant to the probable
cause determination.

Defendant's fourth argument—as to misleading statements in the November 18, 2010, application for a pinging order—merits further attention. Wilford specifically identifies several factual inaccuracies in that Application.

In the first paragraph, the Application incorrectly stated that in August 2010 CS1 identified Wilford as "a cocaine source of supply operating in Baltimore." *See* Nov. 18 Pinging App. at 2. Yet, as the Government concedes, CS1 named Hayes, not Wilford, as the source of cocaine supply in August 2010. In the third paragraph, the application incorrectly stated that CS2 "provided Wilford's telephone number as 410-984-4229." *Id.* at 2-3. Defendant claims, however, that his phone number during the period of the investigation was 443-927-4365. And, in the fourth paragraph, the Application incorrectly stated that Wilford used this phone number to contact Hayes, when, in fact, that number was registered to Michael Smooth. *Id.* at 3. It also stated that CS2 "advised agents that WILFORD owned a dump truck business" operating as B'MORES DUMPING, when, in fact, he owned a different dump truck business, R.A.W. ENTERPRISES, at the same location. *Id.*

Excising the allegedly false statements from the Application appears to leave little in the way of facts to support probable cause. Out of an abundance of caution, I held a *Franks* hearing on January 25, 2013, as to the November 18 Pinging Application. *See Clenney*, 631 F.3d at 661. Testimony was presented by Agent Mara Hewitt, the affiant on the November 18 Pinging Application, and Agent Lester, her former supervisor.[28]

Agents Lester and Hewitt conceded that the information in the first paragraph of the November 18 Pinging Application was incorrect. They explained that the information had been

---

[28] Agent Hewitt formerly worked at the DEA's Baltimore office, but transferred to the Atlanta office in 2011, where she is now located.

erroneously obtained from a prior application used to authorize the pinging of Hayes's cell phone. Hewitt stated that she had only begun working at the DEA in 2009, and nobody assisted her with drafting the application. Although Hewitt did not recall clearly the circumstances surrounding the writing of the Application, she maintained that she did not intend to mislead. Agent Lester testified that he should have reviewed the Application for accuracy before it was submitted, but he did not. He authored the subsequent applications for pinging orders, however.

The agents also conceded that certain information in paragraphs three and four of the Application was incorrect. Although the Application indicated that CS2 had advised law enforcement as to Wilford's phone number, the number had been identified using toll analysis, which showed that it was in constant contact with Hayes's cell phone. The agents testified that they inferred that Wilford was using that phone number. The phone number was associated with Wilford because the number was registered to a dump truck company operating as B'MORES DUMPING. The confusion was understandable, however, as both companies are in the same line of work and listed the same business address; Wilford's company, R.A.W. ENTERPRISES, also a dump truck company, was located at the same place as B'MORES DUMPING.

I find that the agents' testimony was credible. I also conclude that the inaccuracies were the result of negligence, and not a deliberate intent to mislead or a reckless disregard for the truth. Indeed, there was no need to mislead in order to obtain the order. By the time the November 18, 2010 Pinging Application was submitted, the agents had adequate evidence to support a finding of probable cause as to Wilford's involvement with the Hayes DTO, which they inexplicably omitted from the Application. *Cf. United States v. McKenzie-Gude*, 671 F.3d 452, 458-61 (4th Cir. 2011) (holding that suppression of evidence recovered pursuant to a

facially inadequate search warrant was not appropriate, under *Leon* good faith exception, in view of facts inadvertently omitted from warrant application that, if included, would have supported probable cause).

In particular, law enforcement agents had information indicating that Hayes was a major source of cocaine supply in Baltimore, and saw him meet with Wilford on October 8, 2010, and October 22, 2010, at 30th and St. Paul streets in Baltimore City. During each of those meetings, Wilford gave Hayes a large cardboard box, which Hayes subsequently took to the Belvedere, a suspected stash location for the Hayes DTO. On October 18, 2010, CS2, a credible informant who had previously reported Hayes's involvement with drug trafficking, informed law enforcement that Wilford was dealing narcotics with Hayes. Law enforcement agents had also learned that Wilford's reported income in 2006 was only about $21,855. Yet, Wilford purchased a home in April 2007 for $540,000, refinanced the home in March 2007 for $637,000, and reportedly drove a Mercedes valued at $150,000. Finally, Wilford operated a dump truck business, R.A.W. ENTERPRISES, out of the same address as another dump truck business with which Hayes had regular phone calls.

At most, the DEA agents are culpable for failing to recognize their own mistakes. But, errors can occur during the unavoidable haste that often attends the warrant application process. Accordingly, suppression is not appropriate.

As to the Warrant Application (which was provided to the Court) and the application for the April 1, 2011 wiretap order (which was not provided to the Court), Wilford's argument is largely redundant. He asserts that a *Franks* hearing is appropriate because these applications "include all of the previously mentioned information gained through improper 911 pinging and

misleading misrepresentations." Motion to Suppress at 30-31. He did not press this argument during the hearing. And, for the reasons discussed, *supra*, I see no basis to look beyond the facial validity of either the Warrant Application or the wiretap order. Further, Wilford offers only the bare assertion that "the affiants had to have or should have had some inclination that the information in the affidavits was misleading." *Id.* at 31. This assertion, bereft of any offer of proof, is plainly insufficient under *Franks*. *See Chandia*, 514 F.3d at 373.

## II.     Conclusion

For the foregoing reasons, defendant's Disclosure Motion will be granted, in part, and denied, in part. Defendant's Motion to Suppress will be denied, without prejudice. A separate Order, consistent with this Opinion, follows.


Date: June 7, 2013                                  _____/s/_____
                                                                    Ellen Lipton Hollander
                                                                    United States District Judge