IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

RICHARD ANTHONY WILFORD,

Defendant.

Criminal No.: ELH-11-258
Related Civil No.: ELH-19-1926

**MEMORANDUM OPINION**

This Memorandum Opinion resolves the remaining issue in a post-conviction petition filed by appointed counsel on behalf of defendant Richard Anthony Wilford, pursuant to 28 U.S.C. § 2255. In sum, defendant contends in this drug trafficking case that his retained trial counsel rendered ineffective assistance by overstating the likelihood of success with respect to defendant's suppression motion, and that this flawed legal advice caused defendant to reject a favorable plea offer from the government. According to defendant, as a result of the erroneous advice provided by his trial lawyer, he proceeded to a jury trial in December 2013 that resulted in his conviction and a sentence of incarceration far in excess of what the government had offered by way of a plea agreement.

## I.       Procedural Summary

On May 5, 2011, Wilford, along with codefendants Lawrence Lee Hayes, Jr., Bryan Eammon Williams, George Lamar Plunkett, Mark Anthony Hawkins, and Robert Nyakana, were charged with conspiracy to possess with intent to distribute five kilograms or more of cocaine, in

violation of 21 U.S.C. §§ 841(a)(1) & 846.  *See* ECF 1.[1]  The Indictment followed a seizure of cocaine by law enforcement in April 2011 that had an estimated street value of more than $13 million dollars.  That seizure, as well as other evidence obtained during a joint Maryland and federal investigation, led to the federal indictment of defendant and five other members of a drug-trafficking organization ("DTO") operating in the Baltimore area.  ECF 1.  Six other members of the DTO were charged in the Circuit Court for Baltimore City.

On August 6, 2010, shortly before the commencement of the DTO investigation, the United States Court of Appeals for the D.C. Circuit issued its opinion in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), *reh. den.*, 625 F.3d 766 (2010) (en banc), *aff'd sub nom. United States v. Jones*, 565 U.S. 400 (2012).  In *Maynard*, the court determined that the warrantless use of a Global Positioning System ("GPS") tracking device to monitor a target vehicle's movements for twenty-eight days constituted a search under the Fourth Amendment.

The *Maynard* case became *United States v. Jones*, 565 U.S. 400 (2012), in the Supreme Court.  *See United States v. Jones*, 564 U.S. 1036 (2011) (granting certiorari in "case below," identified as *United States v. Maynard*, 615 F.3d 544).  The Supreme Court decided *Jones*, 565 U.S. 400, in January 2012, during the pendency of Wilford's case.  In a landmark ruling that upended Fourth Amendment jurisprudence, the Court held that the "installation" of a GPS tracking device on a motor vehicle, and its use "to monitor the vehicle's movements" on public streets, "constitutes a search" under the Fourth Amendment.  *Id.* at 405.  In reaching that decision, the Court (Scalia, J.) said, *id.* at 404:  "It is important to be clear about what occurred in this case:  The Government physically occupied private property for the purpose of obtaining information."  As

---

[1] The Indictment was unsealed on June 7, 2011.  *See* Docket.  A Superseding Indictment was returned on August 25, 2011, adding a forfeiture count, pursuant to 18 U.S.C. § 853.  *See* ECF 59; *see also* ECF 60, ECF 61.

post-conviction counsel has acknowledged, *Jones* "broke new ground. [It] was a sea change in the law." ECF 749 at 125.

Based on *Maynard* and *Jones*, Wilford lodged a pretrial challenge, *inter alia*, to the warrantless use of GPS tracking devices on two of his vehicles. As discussed, *infra*, I denied the suppression motion, on the basis of the good faith doctrine.

Ultimately, Wilford was the only one of six federal defendants who proceeded to trial. The evidence of guilt was substantial, and the jury convicted Wilford. ECF 267. Pursuant to 21 U.S.C. § 851, defendant faced a minimum sentence of twenty years of imprisonment. The Court sentenced Wilford to 340 months of incarceration. ECF 353; ECF 354. Wilford's conviction and sentence were affirmed on appeal. ECF 501; *see United States v. Wilford*, 689 F. App'x 727 (4th Cir. 2017) (per curiam), *rehearing and rehearing en banc denied*, ECF 503, *cert. denied*, 585 U.S. 1033 (2017), *reh. den.*, 586 U.S. 912 (2018).

Thereafter, defendant, pro se, moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). *See* ECF 595; ECF 602; ECF 606; ECF 622; ECF 635; ECF 663. I granted the motion in part and reduced defendant's sentence to 280 months of incarceration, with credit dating from defendant's arrest on September 16, 2011. *See* ECF 628, ECF 679.[2]

Wilford, primarily through appointed counsel, also pursued a "Motion to Vacate or Correct Illegal Sentence," pursuant to 28 U.S.C. § 2255. ECF 546. The motion was supplemented on several occasions, both by defendant and counsel. *See* ECF 562; ECF 615; ECF 659; ECF 660; ECF 661. I shall refer to these submissions collectively as the "Petition." The government responded in opposition. ECF 640; ECF 673. Wilford replied. ECF 650; ECF 674.

---

[2] Wilford is currently incarcerated at Schuylkill FCI. *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Jan. 27, 2025). He has a projected release date of August 4, 2030. *Id.*

Initially, Wilford advanced numerous grounds for post-conviction relief. *See* ECF 546 (asserting more than 50 claims of ineffective assistance of counsel and prosecutorial misconduct); ECF 615 (asserting about 65 claims pertaining, *inter alia*, to the Court's jurisdiction, prosecutorial misconduct, ineffective assistance of counsel, and judicial errors). Eventually, the claims were narrowed by counsel in a Supplement filed in November 2021. *See* ECF 659 ("Supplement").[3] Wilford also requested an evidentiary hearing. *Id.* at 2.

In the Supplement, Wilford asserted three claims, *id.* at 2, summarized as follows: the failure to obtain an arraignment of the defendant and the consequences of this failure under the Speedy Trial Act, *id.* at 3-10; alleged defective advice by trial counsel relating to Wilford's pretrial suppression motions, by misleading defendant to believe his suppression motions had merit and by failing to advise defendant to accept the government's plea offers, *id.* at 11-15; and failure of the Fourth Circuit to provide counsel to Wilford during a portion of the pendency of his appeal. *Id.* at 15-18.

In support of the Petition, Wilford submitted his Declaration. ECF 661, ECF 661-1.[4] There, Wilford claimed that he rejected two plea offers from the government—one for less than ten years and one for less than fifteen years—because his trial lawyer advised him that his Fourth Amendment suppression motion "had merit and stood a good chance of winning in front of the district court or at least on appeal to the Fourth Circuit." ECF 666-1. And, he "trusted" counsel's advice. *Id.*

---

[3] Wilford has had multiple lawyers during various phases of this case. Brent Newton, who is current post-conviction counsel, is the third post-conviction lawyer appointed for defendant. *See* ECF 543, ECF 546, ECF 572, ECF 652, ECF 654. He was appointed on August 31, 2021 (ECF 654, ECF 655). Newton filed the Supplement (ECF 659) on November 17, 2021.

[4] An earlier version of Wilford's Declaration is docketed at ECF 660, ECF 660-1.

By Memorandum Opinion and Order of July 1, 2022 (ECF 678, ECF 679), I denied the Petition, without a hearing. Wilford noted an appeal to the Fourth Circuit. ECF 685. The Fourth Circuit granted a partial certificate of appealability, limited to "the issue of whether the district court abused its discretion by declining to hold an evidentiary hearing before denying Wilford's claim that his counsel rendered ineffective assistance during the plea process." ECF 727-1 at 2. And, in a per curiam opinion issued on August 15, 2024 (ECF 727-1), the Fourth Circuit dismissed in part, vacated in part, and remanded for an evidentiary hearing. *Id.* at 2, 4; *see United States v. Wilford*, 2024 WL 3825212 (4th Cir. Aug. 15, 2024) (per curiam).

Notably, the Court concluded that Wilford presented a "colorable claim that counsel's representation during the plea negotiations was both deficient and prejudicial." ECF 727-1 at 3. Citing *United States v. Stephens*, 764 F.3d 327 (4th Cir. 2014), which was decided well after this Court had ruled on defendant's pretrial suppression motions, the Fourth Circuit stated, ECF 727-1 at 3: "Given the existing law at the time, we conclude that it would have been unreasonable [for defense counsel] to characterize the suppression motion—which challenged law enforcement's [warrantless] use of GPS tracking and cell phone location data—as having a 'good chance' of success." The Court expressed no view on the merits of the Petition, however. *Id.* The mandate issued on October 7, 2024. ECF 728.

Thereafter, I scheduled an evidentiary hearing for December 20, 2024. *See* ECF 730. At the request of the Court (ECF 732), the defense submitted a pre-hearing memorandum (ECF 733), with exhibits, on December 12, 2024. The government responded on December 16, 2024. ECF 736.

At the hearing on December 20, 2024 (ECF 737), the Court heard testimony from two witnesses: defendant's retained trial counsel, William Purpura, Jr., and Mr. Wilford. Counsel also

presented argument.  The transcript is docketed at ECF 749; *see also* ECF 750 (sealed).  Defendant

filed a post-hearing memorandum.  ECF 740.  The government responded.  ECF 744.  The defense

replied.  ECF 746.

Defendant vigorously insists that the challenge to the warrantless use of GPS tracking

devices on his two vehicles lacked merit.  I spend considerable time addressing that claim.

However, the question of whether the suppression motion had merit is largely a detour from the

overarching question of whether Purpura misled Wilford to believe that the suppression motion

had a "'good chance' of success."  *See* ECF 727-1 at 3.  In other words, even if the suppression

motion lacked merit, the absence of merit is of no moment if defense counsel did not

mischaracterize the likelihood of success.  At the hearing on December 20, 2024, defense counsel

indicated that the advice of trial counsel is the only issue.  ECF 749 at 115, 116.

I conclude that the suppression motion was not clearly devoid of merit.  Regardless, I am

abundantly satisfied that Purpura did not mislead Wilford as to the viability of the suppression

motion.  For the reasons that follow, I shall deny the Petition.

## II.    Factual and Procedural Background[5]

### A.  Pretrial

On May 5, 2011, Wilford and five others were indicted in federal court and charged with

conspiracy to distribute and possess with intent to distribute five kilograms or more of a mixture

or substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  ECF 1.

According to the government, Hayes was the "leader" of the DTO and Wilford was "a source of

---

[5] To the extent relevant, I draw on and incorporate the procedural and factual summaries set forth in my opinions of June 7, 2013 (ECF 205); November 27, 2013 (ECF 252); February 26, 2016 (ECF 445); and July 1, 2022 (ECF 678).  I also incorporate the procedural and factual summary that I presented at the outset of the evidentiary hearing held on December 20, 2024.  *See* ECF 749 (Tr., 12/20/24), at 3-19.

supply . . . , providing the organization with kilogram quantities of cocaine." *See* ECF 165 (government's opposition to suppression motion, ECF 160), at 2.

Several law enforcement agencies were involved in the underlying drug investigation that led to the charges, including the Drug Enforcement Administration ("DEA") and the Baltimore City Police Department ("BPD"). *See* ECF 165 at 4. DEA Agent Mark Lester served as the lead investigator of the DEA Task Force. DEA Agent Todd Edwards and BPD Officer Glenn Hester were co-case agents.[6] Because the investigation was a joint federal/state investigation, applications for search warrants, pinging orders, and wiretaps were submitted to Maryland State court judges. *Id.*

A federal arrest warrant was issued for Wilford on May 5, 2011. ECF 6. Law enforcement authorities located Wilford in California in August 2011 and attempted to arrest him there, without success. He was eventually apprehended in Baltimore on September 16, 2011. Wilford appeared before U.S. Magistrate Judge Beth Gesner on the same date for his initial appearance. ECF 64. He was represented by Mr. Purpura.[7] *See* ECF 291 (Tr., Sept. 16, 2011); ECF 673-1 (same). An Order of detention was issued. ECF 66.

Defendant retained Purpura well before he was apprehended. ECF 749 at 54. As discussed, *infra*, Purpura had many conversations with the federal prosecutor, AUSA John Sippel, before and after defendant's arrest, in an effort to resolve the case by way of a guilty plea. *See*, *e.g.*, *id.* at 54-

---

[6] LaRai Everett, then an Assistant State's Attorney for Baltimore City, was the lead prosecutor for the State with respect to the investigation. She is now an Assistant United States Attorney in the District of Maryland.

[7] Purpura did not formally enter his appearance as counsel for Wilford until December 9, 2011. *See* ECF 85.

55. Indeed, according to Purpura, he had "ongoing discussions" with the government "up to two weeks before the start of the trial" in December 2013. *Id.* at 64.

During the pendency of the case, the Court issued several scheduling orders. *See*, *e.g.*, ECF 69, ECF 86, ECF 91, ECF 156. For example, by Order of February 23, 2012 (ECF 91), the Court extended until March 9, 2012, the deadline for the filing of defense motions. And, in ECF 156, I extended until November 12, 2012, the deadline for the defendant's filing of supplements to motions already filed.

I mention the scheduling orders only because defendant has criticized Purpura for the premature filing of suppression motions, without an adequate factual basis, such as the motion filed by the defendant on March 9, 2012 (ECF 92, "Motion to Suppress Tangible and Derivative Evidence"). *See*, *e.g.*, ECF 749 at 48, 117-18. However, the defense seems to have overlooked that the Court set deadlines for the filing of defense motions. Clearly, in filing ECF 92 when he did, Purpura sought to comply with the Court's schedule. In doing so, he preserved claims that he later amplified as discovery progressed. *See*, *e.g.*, ECF 97, ECF 160; *see also* ECF 324 (Tr., 11/6/13), at 18 (Purpura complaining that the government did not disclose in discovery its use of GPS until the defendant asked).[8]

In addition to the filing of ECF 92 on March 9, 2012, defense counsel filed several other motions on that date. *See*, *e.g.*, "Defendant's Motion to Compel Disclosure of Promises of Immunity, Leniency, or Preferential Treatment and Disclosure of Exculpatory Information and Points and Authorities in Support Thereof" (ECF 93); "Motion for an Order Directing the

---

[8] Defense counsel wrote to the government by letter of October 17, 2012, seeking discovery concerning GPS installation and data, and data regarding the pinging of Wilford's phones. ECF 157. On January 13, 2013, the defense filed a "Motion to Withdraw Request for GPS Data," because the government had, in fact, provided the material. ECF 171. I granted the motion. ECF 172.

Government to Provide *Brady/Giglio/Jencks* Material" (ECF 94); "Motion for Disclosure Pursuant to Fed. R. Evid. 404(b) and 609" (ECF 95); and "Motion for Pretrial Procedures Regarding Recordings" (ECF 96). Soon after, on April 3, 2012, the defense filed an "Addendum to Motion to Suppress Tangible and Derivative Evidence Pursuant to Federal Rule 12(b)(3) and Request for a Franks Hearing" (ECF 97). And, over a period of time, defendant filed many more motions. *See* "Supplemental and Consolidated Motion to Suppress Tangible and Derivative Evidence" (ECF 160); "Motion for Disclosure of Relevant Evidence Withheld by the Government and Request for Immediate Hearing" (ECF 166) ("Disclosure Motion"); "Defendant's Response To Issues Raised By The Court" (ECF 180); and "Request To Reconsider Court's Order Denying Suppression and Request For Franks Hearing Based on New Discovery" (ECF 217) ("Motion for Reconsideration"). Some of the motions were supported by exhibits. The government responded to the motions at ECF 165, ECF 173, ECF 181, and ECF 222.

In general, ECF 92, ECF 97, ECF 160, ECF 180, and ECF 217 all pertain to the use of GPS tracking devices by law enforcement on two vehicles belonging to or used by Wilford. I shall refer to ECF 92, ECF 97, ECF 160, ECF 180, and ECF 217 collectively as the "Suppression Motion."

ECF 160 is a comprehensive submission, about 35 pages in length, exclusive of exhibits. It was filed on November 12, 2012, more than two months before I held the first evidentiary motions hearing on January 25, 2013. *See* ECF 174; ECF 204 (Tr., 1/25/13). That hearing resumed with argument on March 8, 2013. ECF 182; ECF 218 (Tr., 3/8/13). The defense filed a supplemental memorandum prior to that date. ECF 180. And, I held another evidentiary motion hearing on November 6, 2013, in connection with Wilford's Motion for Reconsideration. *See* ECF 217; ECF 246; ECF 324 (Tr., 11/6/13).

I resolved various motions in opinions and orders issued on June 7, 2013 (ECF 205, ECF 206) and November 27, 2013 (ECF 252, ECF 253).  In the interest of judicial economy, I incorporate those opinions here, because they provide a comprehensive recitation of the issues that I considered.[9]  But, I shall also review particular portions of them.

As indicated, Wilford challenged the surveillance of his vehicles by means of the warrantless use of Global Positioning System slap-on tracking devices.  He maintained that the extended, warrantless use of GPS devices on his vehicles violated the Fourth Amendment.  Therefore, under the exclusionary rule, Wilford sought to suppress evidence derived from the warrantless use of the GPS devices.  Wilford relied, *inter alia*, on the Supreme Court's then-recent decision in *United States v. Jones*, 565 U.S. 400 (2012), issued on January 23, 2012, during the pendency of this case.  He also relied on *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), which was decided on August 6, 2010, shortly before the investigation of Wilford began, and which became the *Jones* case in the Supreme Court.

Additionally, Wilford challenged the "pinging" of his cellular phone.  He asserted that, despite court authorization for "pinging," obtained under Maryland's pen register and trap and trace statute, Md. Code (2006 Repl. Vol., 2012 Supp.), §§ 10-4B-01 *et seq*. of the Courts and Judicial Proceedings Article ("C.J."), the "pinging" of his cellular phone was conducted in violation of Maryland law and the Fourth Amendment.

In addition, Wilford sought a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  He challenged the veracity of several search warrants issued during the investigation by various

---

[9] At the time I issued my opinions of June 7, 2013 (ECF 205) and November 27, 2013 (ECF 252), I did not have transcripts of the pertinent hearings.  Therefore, in writing the opinions, I relied on my notes.  The transcript for January 25, 2013, was docketed on June 10, 2013.  *See* ECF 204.  The transcript for March 8, 2013, was filed on July 30, 2013.  *See* ECF 218.  The transcript for November 6, 2013, was docketed on July 16, 2014.  *See* ECF 324.

Maryland State judges. For example, he challenged an application dated November 18, 2010, submitted to a Maryland State judge for an order authorizing pinging of Wilford's cell phone; an application for a search and seizure warrant dated May 10, 2011, submitted to a Maryland State judge, and used to recover physical evidence from multiple locations associated with Wilford and his coconspirators; and an application for a wiretap order dated April 1, 2011, as to Wilford's cell phone. According to Wilford, these applications contained deliberately false and misleading statements, and therefore he sought to suppress the evidence derived from them.

Defendant filed his "Disclosure Motion" on December 26, 2012. ECF 166. There, he complained that the government withheld evidence, including internal memoranda circulated by various law enforcement agencies pertaining to GPS tracking, prompted by the August 2010 decision in *Maynard*, 615 F.3d 544.

As noted, I held a motions hearing on January 25, 2013. ECF 174. DEA Special Agent Mark Lester testified as to the GPS "slap on" devices used during the investigation of the DTO. The devices, which were battery powered, communicated location information through a wireless connection. The devices served as important aids to visual surveillance but did not substitute for such surveillance.

According to Lester, GPS slap-on tracking devices were placed on Wilford's Honda Crosstour vehicle between November 17, 2010, and December 8, 2010, and between December 12, 2010 and April 16, 2011. Between January 18, 2011 and May 19, 2011, a GPS device was also placed on the Oldsmobile minivan registered to BLOW IT OFF POWER WASHING and used by Wilford. *See* ECF 204 (Tr., 1/25/13), at 52, 54-61; ECF 205 at 6-7. No search warrants were obtained for the use of the GPS tracking devices. ECF 204 at 74. The GPS devices were placed on the vehicles when they were in public places. *Id.* at 52-56.

11

Agent Lester testified that the investigation of the DTO began in August 2010. *Id.* at 67. And, he was aware of the *Maynard* decision in August 2010, before the investigation of the DTO began. *Id.* at 43, 78-79. He discussed *Maynard* with DEA Agent Todd Edwards. *Id.* at 79. To Lester's knowledge, the warrantless use of a GPS device was lawful everywhere other than Washington, D.C. *Id.* at 80, 83. He also stated that no supervisor directed the agents to obtain a warrant to use a GPS device, unless they were in Washington, D.C. Moreover, the investigation in this case was conducted jointly with the State of Maryland, and the Assistant State's Attorney who supervised it did not advise the agents to obtain a warrant for the use of GPS devices in Maryland. *Id.* at 79-80.

Although Lester did not discuss with federal prosecutors whether to obtain a warrant for the use of GPS here, he did not recall any instructions from the Department of Justice as to the need for a warrant. *Id.* at 82. After *Maynard*, it was, in his words, "business as usual." *Id.* at 44. Indeed, Lester stated that until *Jones* was decided in January 2012, it was "not the practice" of any of his colleagues to obtain a warrant for the use of GPS devices.[10] Lester also testified that he and his colleagues thought that *Maynard* would be reversed. *Id.* at 83.

During the investigation, DEA agents also submitted several applications to the Circuit Court for Baltimore City, each under oath, for an order authorizing the pinging of Wilford's cellular phone, pursuant to C.J. § 10-4B-03. ECF 205 at 7-8. Each order was valid for sixty days. *Id.* at 8.

Joshua Brown, of GLS Litigation Services, testified for the defense. He confirmed that GPS was used on Wilford's Honda Crosstour during the period of November 17, 2010 through

---

[10] Agent Lester recounted one instance when a warrant was obtained for a GPS device. He explained that law enforcement agents obtained a warrant because they had to seize the vehicle to install the tracking device. ECF 204 at 44.

April 16, 2011, and on the Oldsmobile minivan during the period of January 19, 2011 to May 17, 2011. ECF 204 at 121-23. The data indicated that the location of Wilford's Honda Crosstour was transmitted 4,212 times, on 78 days. *Id.* And, the location of the Oldsmobile minivan was transmitted 7,326 times, on 68 days. *Id.*; *see also* ECF 205 at 7.

The defense identified many instances of observations, information, and evidence allegedly obtained as a result of the use of GPS. ECF 160 at 31-34. This included the following instances of surveillance, *id.* at 32-35; ECF 205 at 19-20:[11]

1) **December 17, 2010**: Observation of Hayes and Wilford, based on GPS tracking of their respective vehicles and pinging of their respective cell phones.

2) **January 28, 2011**: Video surveillance of Wilford bringing cardboard boxes to two Staples stores. According to defense counsel, surveillance was based on GPS tracking and cell phone pinging.

3) **January 31, 2011**: Surveillance of Wilford's 2010 Honda Crosstour while it was parked at the BWI Daily Parking lot, located, in part, through cell phone pinging.

4) **March 10, 2011**: Video surveillance of Wilford purchasing a Magnavox VHS/DVD player at a Walmart, located through a GPS device on Wilford's vehicle and cell phone pinging.

5) **March 17, 2011**: Surveillance of Wilford and Hawkins at a Staples store, based on GPS tracking of their respective vehicles and pinging of Wilford's cell phone.

6) **March 30, 2011**: Surveillance of Wilford and Hawkins at a parking lot on Greenmount Avenue and Exeter Hall in Baltimore City. Wilford was located through the GPS device on the Oldsmobile minivan.

7) **April 1, 2011**: Surveillance of Wilford and other Hayes DTO members in the area of 1500 Cliftview Avenue. GPS tracking on Wilford's car was used only to alert law enforcement, who were already conducting visual surveillance, that Wilford was about to arrive.

8) **April 19, 2011**: Surveillance of Wilford at 3530 Seapines Circle in Randallstown, and Bank of America at 7 Slade Avenue in Baltimore, based on GPS tracking of Wilford's vehicle and pinging of his cell phone.

9) **April 22, 2011**: Surveillance of Wilford and Hawkins at 1500 Cliftview Avenue, based on a GPS device on the Oldsmobile minivan driven by Wilford and cell phone pinging.

---

[11] Initially, Wilford also sought to suppress surveillance of meetings between Hayes and Wilford on October 8, 2010, and October 22, 2010. However, he conceded that he lacked standing to contest surveillance of these meetings, which was based solely on GPS tracking of Hayes's vehicle. ECF 205 at 27.

Wilford also sought suppression of physical evidence recovered during the investigation, as fruit of the poisonous tree, as follows, ECF 160 at 32-33; ECF 205 at 20:

1) **March 17, 2011**: $100,000 in U.S. currency recovered, pursuant to a search warrant, from a box brought by Wilford to the Staples store on Goucher Boulevard in Towson, Maryland.

2) **May 16, 2011**: Evidence recovered, pursuant to a search warrant, from Wilford's home at 11 Rock Hollow Court in Elkton, Maryland.

3) **May 16, 2011**: Evidence recovered, pursuant to a search warrant, from 1500 Cliftview Avenue in Baltimore.

4) **May 16, 2011**: Evidence, including $1,600,000 in U.S. currency, recovered, pursuant to a search warrant, from 3530 Seapines Circle in Randallstown, Maryland.

5) **May 16, 2011**: Evidence recovered, pursuant to a search warrant, from 2512 Erick Street in Baltimore.

6) **May 20, 2011**: Ten kilograms of cocaine recovered, pursuant to a search warrant, from a UPS box delivered to 1500 Cliftview Avenue in Baltimore.

After the evidentiary hearing in January 2013, counsel submitted supplemental briefing. *See* ECF 180 (defense); ECF 181 (government). The motions hearing resumed on March 8, 2013, limited to oral argument. ECF 182; ECF 218. Then, on May 22, 2013, Wilford, pro se, filed a ten-page motion, titled "Motion to Compel the Government to Disclose All Discovery That May Be Relevant and Material to Defendant's Defense." ECF 197.

By Memorandum Opinion (ECF 205) and Order (ECF 206) of June 7, 2013, I denied the Suppression Motion (ECF 160),[12] but granted the Disclosure Motion (ECF 166), in part. *See United States v. Wilford*, 961 F. Supp. 2d 740 (D. Md. 2013), *aff'd*, 689 Fed. App'x 727 (4th Cir. 2017) (per curiam).[13] I summarized Wilford's contention as to the GPS in part, as follows, ECF 205 at 39-40:

---

[12] In effect, ECF 160 incorporated the earlier suppression motions and superseded them.

[13] I pause to note that West Publishing Company, not this Court, designated ECF 205 for publication. *See* ECF 211 (advising counsel that West Publishing selected the opinion for

As Wilford points out, the investigation of the Hayes DTO began after the D.C. Circuit's decision in *Maynard* [615 F.3d 544], in which that court held that the warrantless use of a GPS device to track a target vehicle's movements for 28 days constituted an illegal search under the Fourth Amendment. *See* 615 F.3d at 558-64. On this basis, Wilford insists that the good faith doctrine does not apply to the warrantless use of the GPS devices for his Crosstour [vehicle] for a period of 78 days, and for a period of 68 days for the Oldsmobile minivan he occasionally drove. According to Wilford, as a result of the *Maynard* decision, law enforcement agents were "on notice" that monitoring a target's location through a GPS device for such extended periods, and without a warrant, would violate the Fourth Amendment, tainting the evidence derived therefrom. [ECF 160] at 10. . . .

I ruled that Wilford had standing to challenge the use of GPS devices on his Honda Crosstour and the Oldsmobile minivan registered to BLOW IT OFF POWER WASHING but used by him. ECF 205 at 26-27. However, I concluded that Wilford lacked standing to challenge the GPS tracking and pinging of vehicles and cell phones of co-conspirators. *Id.* at 25-27. Notably, although the warrantless use of GPS was improper in light of *Jones*, I concluded that the good faith doctrine precluded application of the exclusionary rule. *Id.* at 30-43.

In reaching that conclusion, I noted that the government's warrantless use of GPS tracking devices preceded the Supreme Court's 2012 decision in *Jones*, 565 U.S. 400. And, I observed that the Fourth Circuit had not yet opined on the legality of warrantless GPS tracking devices. ECF 205 at 38. Nevertheless, Maryland's intermediate appellate court had upheld the warrantless use of such devices in *Stone v. State*, 178 Md. App. 428, 941 A.2d 1238 (2008) (abrogated after *Jones* by *Kelley v. State*, 208 Md. App. 218, 56 A.3d 523 (2012), *aff'd*, 436 Md. 406, 82 A.3d 205 (2013)). In *Stone*, 178 Md. App. at 37, 941 A.2d at 39-40, the Maryland Court of Special Appeals[14]

---

publication). West Publishing's designation suggests that the issues were not cut and dry, contrary to the view of post-conviction counsel.

[14] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland

concluded that there is no reasonable expectation of privacy for a vehicle traveling on a public road. Therefore, I was satisfied that the good faith exception to the exclusionary rule, as articulated in *United States v. Leon*, 468 U.S. 897 (1983), and its progeny, was applicable. ECF 205 at 27-42. In the alternative, I found that suppression would be inappropriate under the doctrines of inevitable discovery and independent source. *Id*. at 43-45.

As for the cell phone pinging, I concluded that there was no Fourth Amendment violation. *Id*. at 45-54. And, I found that defendant had not met his burden for a *Franks* hearing. *Id*. at 54-61.

However, I was mindful of the defense argument that, based on *Maynard*, 615 F.3d 544, decided in August 2010, the government was on notice that warrantless GPS tracking of a vehicle might be deemed a search under the Fourth Amendment. Therefore, I granted the Disclosure Motion (ECF 166), in part. ECF 205 at 21-25. Specifically, I ordered the government to produce all directives or instructions issued to federal law enforcement agents that required compliance with *Maynard*, 615 F.3d 544. *See* ECF 206. And, I denied the Suppression Motion, without prejudice to Wilford's right to renew his argument as to the inapplicability of the good faith doctrine, based on documents that might be produced by the government in response to my Order.

On June 25, 2013, shortly after I issued ECF 205 and ECF 206, Wilford wrote to the Court (ECF 208), expressing "great concern" about the way his case was "being handled" by counsel, *id.* at 2, and for which he sought my "intervention." *Id.* at 3. In response, I referred the matter to a magistrate judge for an attorney inquiry hearing. ECF 210; *see also* ECF 209. United States

---

Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. I shall refer to the courts by the names that were in effect when the cited decisions were issued.

Magistrate Judge Beth Gesner conducted the hearing on July 3, 2013. ECF 212. A redacted version of the hearing transcript was made available on March 13, 2024. *See* ECF 725.

At the attorney inquiry hearing, Mr. Purpura advised Judge Gesner that Wilford is "very familiar with the federal system." ECF 725 at 3. He related his professional history with defendant and noted that defendant could face a sentencing enhancement under 21 U.S.C. § 851, based on "two federal predicates." *Id.* at 4. Characterizing defendant as "a bright man," *id.*, Purpura noted that defendant has "a lot of time to spend" considering the issues. *Id.* at 7. In addition, Purpura indicated that he had attempted "to resolve this case even before [defendant] was arrested." *Id.* at 4. He added, *id.*: "And we could have successfully completed this case and a below the mandatory minimum sentence would have been ten years . . . if we would have followed through."

With respect to Purpura's efforts to resolve the case, he explained, *id.* at 5-6:

> He [*i.e.*, Wilford] was very concerned about the GPS. It's I think what instigated the problems originally in this case was the GPS was undisclosed by the Government until it just seemed obvious there was GPS and then we broached was there GPS and then they admitted there was GPS. So that resonated with Mr. Wilford in essence that he felt that things would be hidden from him from all sides. I understand that.
>
> We then litigated the GPS issues and other issues and I filed a 37-page complete memorandum on this which took weeks and weeks. It may not have been absolutely complete-complete, but it was as complete as I could do under the circumstances at that time. We had a full day of litigating that and then a half-day to three-quarters of a day arguing at another date on the motions. Judge Hollander took it under consideration, kept it for probably 120 days, four months and wrote a 64-page opinion denying everything except one discovery issue which bears on the Franks and it was a comprehensive, a very, very comprehensive opinion. Obviously Mr. Wilford differs with the judges's opinion.

Purpura also indicated that he had engaged another lawyer, Marta Kahn, to review the legal issues in the case. *Id.* at 6. And, he stated, *id.* (emphasis added):

> So long story short we've got another set of eyes on this in addition to an associate in my office who was looking at it as well. *We felt there were issues, but we felt again, we would probably come out on the wrong side of it at least on this level*

17

*where the Fourth Circuit still hasn't decided some of these issues* whether it's different, *essentially a crap shoot when you're backing up the amount of time that* you're facing.[15]

So I brought in everything we can do in my opinion and we did the best we could do.

While acknowledging defendant's right to go to trial, Purpura also said, *id.* at 8 (emphasis added):

> *My advice would be because of the circumstances of this particular case that it's not worth it to preserve an appellate issue when you face such at the very minimum, 20 years.* If not, there's nothing preventing the Government and they've indicated since they've litigated this so feverishly over the past months that they would in all likelihood file the two prior felony federal convictions for an 851 life if convicted.

In addition, Purpura informed Judge Gesner that he had told Wilford he would not move for reconsideration as to this Court's rulings "to argue that the judge is wrong on the law . . . ." *Id.* at 7. But, he would "expand the record" to make sure this Court and the Fourth Circuit had "certain material . . . ." *Id.* at 8.

Wilford also addressed the court. *Id.* at 12-15. He complained that Purpura failed to offer proof to support the defense request for a *Franks* hearing. *Id.* at 12, 13, 14. And, he took credit for presenting "issues with the GPS . . . ." *Id.* at 12. He said, *id.* (emphasis added):

> And counsel will advise the Court that the issues that is presented on my behalf is *issues that I have discovered*. I'm not an attorney. *The issues with the GPS was the issue that I discovered.* The issue that may not all the way be settled, but it's obvious that it's a problem with the cell phone pinging under 104(b)03 by DEA agents and not state agents is a problem. *I presented this to counsel.*

---

[15] I pause to point out that Purpura was correct when he told Judge Gesner that some of the issues in the case had not yet been decided by the Fourth Circuit. As discussed, *infra*, it was not until August 19, 2014—more than a year later—that the Fourth Circuit decided *United States v. Stephens*, 764 F.3d 327 (4th Cir. 2014). There, in a two-to-one decision, the Court concluded that pre-*Jones* usage of warrantless GPS tracking was protected by the good faith doctrine.

Judge Gesner asked defendant how he wanted to proceed. *Id.* at 19. Wilford reiterated his belief that he was subjected to "illegal electronic surveillance . . . by the DEA . . . ." *Id.* He did not mention that, but for defense counsel's incorrect advisement to him that they had a meritorious suppression argument, he would have pleaded guilty. To the contrary, he persisted in his belief that law enforcement engaged in unlawful conduct.

Following the attorney inquiry hearing, Purpura remained as Wilford's defense counsel. On July 25, 2013, defense counsel filed a "Request to Reconsider Court's Order Denying Suppression and Request for *Franks* Hearing Based On New Discovery." ECF 217. In the Motion for Reconsideration, defense counsel raised several issues as to cell phone pinging; sought a *Franks* hearing; requested reconsideration of the Court's good faith analysis in ECF 205, based on an email that was produced by the government in response to ECF 166 and ECF 206; and again contended that the government was required to obtain a warrant before using GPS tracking devices for defendant's two vehicles. *Id.* The last issue was renewed by defense counsel in a letter filed prior to the motion hearing, docketed at ECF 243. The government opposed the Motion for Reconsideration. ECF 222; *see also* ECF 243 (Letter of 11/1/13 from defense counsel to Court, outlining issues).

Then, in August 2013, the government provided notice under 21 U.S.C. § 851 that, if convicted, Wilford would be subject to an enhanced penalty under 21 U.S.C. §§ 841(b)(1)(A) and 851. ECF 227. Section 841(b)(1)(A) provided for a mandatory minimum sentence of twenty years of imprisonment for an individual convicted of one prior felony drug offense. The government indicated that it intended to rely upon Wilford's federal drug convictions in two federal drug cases from the District of Maryland:  JFM-92-0116 and MJG-01-0399.

Also in August 2013, in response to my Order of June 7, 2013 (ECF 206), the government docketed, under seal, a memorandum disseminated by email on August 6, 2010, by the Office of Enforcement Operations ("OEO") of the United States Department of Justice ("DOJ") in response to the *Maynard* decision, which had been decided that day.  *See* ECF 222-1.  The United States Attorney's Office in Maryland was among the recipients of the communication.  AUSA Barbara Sale, then the Criminal Chief in the U.S. Attorney's Office (ECF 324 at 34), forwarded the communication to prosecutors in the United States Attorney's Office in Baltimore.[16]   The prosecutor in this case, AUSA Sippel, promptly forwarded it to DEA Special Agents Mark Lester and Todd Edwards, with whom he had been working on an unrelated matter.

The subject line of the OEO email of August 6, 2010, stated: "URGENT UPDATE:  Slap-on GPS vehicle tracking devices."  The communication email rated the importance of the content as "High."  The text provided, in part:  "OEO believes that the court's decision [in *Maynard*] is fundamentally wrong and incompatible with established Fourth Amendment principles.  (As a counterpoint, we note the decision last week in *United States v. Jesus-Nunez*, 2010 WL2991229 (M.D. Pa. July 27, 2010), finding such surveillance permissible over a period of more than eleven months.)".

Further, OEO stated:  "In the meantime, OEO's view is that other circuits are unlikely to follow *Maynard*, and that as a formal legal matter the use of magnetic vehicle tracking devices without a warrant ought to be upheld elsewhere in the federal courts."  Nonetheless, OEO warned:  "[P]rosecutors and agents outside the 7th, 8th, and 9th Circuits may wish to consider obtaining warrants as a precaution pending final disposition of *Maynard.*  In particular, districts in the Fourth

---

[16] AUSA Sale is now retired.

Circuit adjacent to D.C. should give careful thought to the possibility that tracked vehicles may travel into D.C., especially in cases where charges may eventually be brought in the latter district."

I held another evidentiary motion hearing on November 6, 2013, with respect to defendant's Motion for Reconsideration (ECF 217).  Agents Edwards and Lester both testified, along with Wilford.  In reference to Fed. R. Crim. P. 41, titled "Search and Seizure," defense counsel observed that "the state of mind of these agents at that time and whether they're candid or not candid" "all works into this particular [GPS] issue."  ECF 324 (Tr., 11/6/13), at 6.[17]  Defense counsel also said, *id.* at 8:

> In this particular case, as I know, as my client knows, his trial is with the motions and what we have here versus what we're going to face coming up in December [at trial].
>
> So for appellate reasons, for all the reasons we've tried to, and he has, he's been diligent in looking at every avenue in this particular case.  He's educated me on numerous nuances in the rule.  This was a request.

Agent Edwards, a lawyer (ECF 324 at 13), had been a DEA Agent for many years.  *Id.*  He testified that AUSA Sippel alerted him to the *Maynard* decision on or about August 6, 2010, by email and by phone.  ECF 324 at 27-32, 36.  At the time, he had just finished another matter with Sippel.  *Id.* at 30-31, 40. Agent Edwards acknowledged:  "This case hadn't even started yet."  *Id.* at 31; *see id.* at 41-42.

According to Agent Edwards, AUSA Sippel advised that the U.S. Attorney's Office thought *Maynard* was "a bad decision and that it wouldn't get upheld, and that as far as they're concerned that we do not need warrants for GPS trackers."  *Id.* at 29.  Sippel also indicated that a warrant was not needed for use of a GPS slap-on device.  *Id.* at 43-44.  And, the State prosecutor

---

[17] As noted, the transcript was not docketed until July 16, 2014.  *See* ECF 324.  Therefore, it was not available to me when I wrote ECF 252.

involved in the DTO investigation had also said that a warrant was not needed for use of a GPS tracker. *Id.* at 42-43.

Agent Edwards understood that it was "business as usual" with regard to the use of GPS slap-on tracking devices. *Id.* at 40, 41. He also recalled that "everyone" regarded *Maynard* as an "outlier." *Id.* at 41. Reiterating that it was "[b]usiness as usual," *id.*, Edwards said, *id.*: "[W]e talked about it and, based on law at the time, we didn't need a warrant." Therefore, when this case began, the agents "didn't apply for a warrant . . . ." *Id.* at 42.

Any suggestion that Purpura had not done his homework was dispelled by his questioning of Edwards regarding a case several years earlier, called *United States v. Alric Berry*, L-03-0313 (D. Md.). *Id.* at 20-21. *See United States v. Berry*, 300 F. Supp. 2d 366, 367 (D. Md. 2004). Agent Edwards was assigned to that case.

In *Berry*, police in Baltimore County obtained a court order to place a GPS device under the bumper of a car owned by Monika Hill, Berry's co-defendant. Agent Edwards used the tracking information to obtain a search warrant for the apartment of the co-defendant. In a challenge to the warrant, then Chief Judge Legg of this Court presciently noted that it was "unclear whether the information stored by the GPS . . . was the product of a search and seizure." *Id.* He cited, *inter alia*, *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S. 705 (1984). *Id.* Noting improved technology, Judge Legg observed, *id.* at 368: "The Supreme Court might conclude . . . that the new [GPS] technology is so intrusive that the police must obtain a court order before using it."

Agent Lester testified that he learned of *Maynard* from Agent Edwards. ECF 324 at 67-68, 74. He recalled that on August 31, 2010, *i.e.*, a few weeks after the *Maynard* decision was

issued, the agents "were attempting to identify who Hayes was." *Id.* at 68. That is the date when the DTO investigation began. *Id.* at 69.

By Memorandum (ECF 252) and Order (ECF 253) of November 27, 2013, I granted ECF 217 in part and denied it in part. Specifically, I suppressed all evidence concerning the vehicles located in the garage of Wilford's residence in Elkton, Maryland. ECF 252 at 10. But, I otherwise denied the Motion for Reconsideration, and also found any remaining defense issues "to be without merit." *Id.*

### B. Trial[18]

Trial commenced on December 11, 2013. ECF 257. At the outset of trial, both the government and defense counsel confirmed, under *Lafler v. Cooper*, 566 U.S. 156 (2012), that Wilford had rejected a plea offer from the government in April 2012. ECF 308 (Tr., Dec. 11, 2013), at 12-15. Mr. Purpura also stated, ECF 308 at 14: "At Mr. Wilford's request, I just recently, before start of trial, offered a resolution, which was rejected by the government. It wasn't the government suggested. It was defense, Mr. Wilford suggested it."[19]

Law enforcement began an investigation of codefendant Hayes in late August of 2010. ECF 273, ¶ 7; ECF 324 at 68-69. In October 2010, investigators twice observed Hayes with Wilford at 30th and St. Paul Streets in Baltimore City. ECF 273, ¶ 7. On the first occasion, Wilford took a large cardboard box from his Ford pick-up truck and gave it to Hayes. *Id.* During the

---

[18] For convenience, the summary of the evidence at trial is drawn largely from the defendant's Presentence Report. *See* ECF 273. The trial transcripts are docketed at ECF 304, ECF 305, ECF 306, ECF 307, ECF 308, ECF 309, ECF 310.

[19] As discussed, *infra*, at the post-conviction hearing held in December 2024, the evidence established that the government had, in fact, extended a plea offer to defendant in May 2012. ███████ ███████████████████████████████████████████████████████████████ But, the defendant rejected the plea offer.

second meeting, Wilford took a backpack from Hayes's car and Hayes took a large cardboard box from Wilford's pick-up truck. *Id.* The boxes exchanged by Wilford and Hayes appeared identical in size. *Id.* After both meetings, Hayes left alone and drove to 1190 W. Northern Parkway, *i.e.*, the Belvedere Towers Apartments ("Belvedere Towers"), and took the cardboard boxes inside. ECF 273, ¶ 7. It was later determined that coconspirator Michael Smooth rented an apartment in that building, which was used as the stash house for the DTO. *Id.*

In mid October 2010, investigating agents learned from a confidential source that Wilford was involved in drug trafficking with Hayes. *Id.* ¶ 8. Agents conducted a background check of Wilford and learned that he owned a large home on Rock Hollow Court in Cecil County, Maryland, and a residence in Baltimore City, located at 1500 Cliftview Avenue. *Id.*[20] In November 2010, agents observed coconspirator George Plunkett exit and then return to a residence located at 301 W. 27th Street in Baltimore. *Id.* ¶ 9. Agents also observed a meeting of Wilford and Hayes on November 12, 2010, at 30th and St. Paul Streets in Baltimore. *Id.*

Surveillance continued and on December 2, 2010, agents again observed Hayes and Wilford at 30th and St. Paul Streets in Baltimore. *Id.* ¶ 10. Plunkett's vehicle was also located in the area. *Id.* Hayes left the location and went to Belvedere Towers with Plunkett. *Id.* Plunkett carried a large cardboard box into the apartment building. *Id.* About two weeks later, agents again observed Hayes and Wilford at 30th and St. Paul Streets. *Id.*

Hayes exited his vehicle and entered Wilford's vehicle. *Id.* They left the area in Wilford's vehicle and went to Belvedere Towers, where Hayes exited Wilford's vehicle carrying a large

---

[20] In connection with the suppression motions, law enforcement agents determined that Wilford purchased the home in Cecil County for about $540,000, and refinanced it in March 2007 for $637,000. *See* ECF 165 at 5-6. Yet, Wilford's Maryland tax returns revealed that in 2006 he only earned approximately $21,855. *Id.* at 6.

cardboard box.  *Id*.  The boxes appeared to be the same size as the boxes exchanged between Wilford and Hayes in October 2010.  In addition, in January 2011 agents learned that Wilford, using a fictitious name, was shipping packages to a fictitious person in California.  *Id*. ¶ 11.

In February 2011, agents observed Hayes enter apartment 717 at Belvedere Towers, carrying a large cardboard box.  *Id*. ¶ 12.  Plunkett entered the apartment a few minutes later.  *Id*. The men then left the apartment.  *Id*.  Plunkett was seen carrying two large cardboard boxes and a small white plastic bag, which he tossed into a nearby dumpster.  *Id*.  The agents then went to the dumpster and recovered four computer boxes, two Compaq computer shells, and the bag that Plunkett had discarded.  ECF 273, ¶ 12. The bag contained drug packaging material with cocaine residue as well as other drug packaging paraphernalia.  *Id*.  One of the boxes had a shipping label with a recipient address of 35 Mainview Court in Reisterstown, Maryland, a residence owned by coconspirator Derrick Barbour.  *Id*.  The investigation revealed that Wilford's vehicle was at 35 Mainview Court on February 9, 2011, at the same time that the package was delivered to the residence.  *Id*.  The boxes appeared to be the same size as the boxes exchanged previously between Wilford and Hayes.  *Id*.

On March 15, 2011, Hayes was observed standing next to his vehicle, which was parked at 301 W. 27th Street in Baltimore.  *Id*. ¶ 13.  Wilford was also present, standing next to his vehicle. *Id*.  Hayes then placed two bags into Wilford's vehicle and each coconspirator left the area in his own vehicle.  *Id*.

Two days later, on March 17, 2011, Wilford and coconspirator Mark Hawkins were seen at a Staples store in Towson, Maryland.  *Id*. ¶ 14.  Wilford exited the Staples store with boxes and packaging material.  *Id*.  The boxes were described as looking smaller than the boxes exchanged between Wilford and Hayes in October and December 2010.  *Id*.  Wilford and Hawkins appeared

to be preparing several boxes for shipment. *Id*. Wilford placed two boxes in Hawkins's vehicle and then took one of the boxes into the Staples store. *Id*. Wilford took the other two boxes to other Staples stores. *Id*.

Agents obtained a shipping manifest from the Staples store in Towson and learned that Wilford's package listed the sender and receiver under the same fictitious names that agents learned about earlier. *Id*. The package was again destined for California. *Id*. The agents obtained a search warrant for the package. A search of the box revealed a hollowed-out DVD/VCR player containing $100,000 in cash. *Id.* ¶ 14.

About two weeks later, on March 30, 2011, agents observed Wilford and Hawkins together in Baltimore City. *Id*. ¶ 15. At the time, Wilford gave Hawkins a large cardboard box, which was the same size as the boxes exchanged previously between Wilford and Hayes. *Id*. Hawkins took the box to 1500 Cliftview Avenue in Baltimore City and placed the box inside of the residence. *Id*. Shipping records revealed that a package was delivered to 35 Mainview Court in Baltimore County on that same day. *Id*.

Wilford met with Hayes and Plunkett at a barbershop in Baltimore on April 1, 2011. *Id*. ¶ 16. Later that day, Wilford was observed entering the residence located at 1500 Cliftview Avenue. *Id*. Agents observed a DVD/VCR player in the rear of Wilford's vehicle, identical to one seized on March 17, 2011. *Id*. Hawkins, along with Anthony Uzondo and Pierre Bantan, were subsequently observed exiting 1500 Cliftview Avenue. *Id*. Testimony at trial revealed that Uzondo and Bantan flew from Los Angeles to Baltimore on April 1, 2011, and packaged and transported money back to California that same day. *Id*.

On April 3, 2011, law enforcement agents in Clark County, Illinois, stopped a Penske tractor trailer truck operated by defendant Robert Nyakana. *Id*. ¶ 17. During the search of the

trailer, the agents discovered approximately 136 kilograms of cocaine inside ten black bags. *Id*. The cocaine had a street value of $13.6 million. ECF 183 (Nyakana Presentence Report), ¶ 12.

The agents learned that the cocaine was loaded on the truck in California, with the help of coconspirator Bryan Eammon Williams. Telephone calls between Williams and Hayes indicated that Williams supplied cocaine to Hayes, and Williams was to receive the shipment in Jessup, Maryland. ECF 273, ¶ 17. Agents also learned that Nyakana was to receive over $200,000 as payment for the transportation of the cocaine. *Id*.

Nyakana and Williams were arrested on April 4, 2011. ECF 273, ¶ 17. Approximately $269,000 in U.S. currency was seized from the trunk of Williams's vehicle. *Id*.

Agents saw Plunkett enter Belvedere Towers on April 18, 2011, and then exit with a large bag. *Id*. ¶ 18. Plunkett entered his vehicle and drove to 301 W. 27th Street in Baltimore. When he exited the location, Plunkett had a dark garbage bag and a small backpack in his hands. *Id*. He placed the garbage bag in the rear seat of his vehicle and drove to Belvedere Towers. *Id*. Plunkett entered the stash apartment, exited a few minutes later, drove his car to a dumpster at the building, and discarded the trash bag. *Id*. Agents retrieved the garbage bag from the dumpster and recovered paper towels, two boxes of baking soda, and several vacuum sealed bags that had been opened. *Id*. The bags tested positive for cocaine residue. *Id*.

Wilford was also observed in April and May 2011 at a residence on Seapines Circle in Baltimore County. *Id*. ¶ 19. Wilford was seen leaving that residence on April 19, 2011, with a large duffel bag. *Id*. Defendant was followed to a bank, where he made a cash deposit. *Id*.

Agents observed a UPS truck in front of 1500 Cliftview Avenue on April 22, 2011. *Id*. ¶ 20. The UPS driver took a large cardboard box to the residence, but no one was there. *Id*. The box appeared to be the same size as the boxes exchanged previously between Wilford and Hayes.

27

*Id.* The driver took the box back to the truck and waited. *Id.* Hawkins and Wilford then arrived in Hawkins's vehicle. The driver gave Hawkins the cardboard box, and Hawkins took it inside 1500 Cliftview Avenue. *Id.* A few minutes later, Wilford entered 1500 Cliftview Avenue. *Id.*

On April 27, 2011, agents observed another large box in the dumpster located at Belvedere Towers. *Id.* ¶ 21. The box was the same size as the boxes exchanged previously between Wilford and Hayes. ECF 273, ¶ 21. The shipping label listed 35 Mainview Court in Reisterstown, Maryland as the recipient address. As noted, that residence was owned by Derrick Barbour. *Id.*

The federal indictment followed on May 5, 2011, charging Wilford as well as Hayes, Plunkett, Williams, Nyakana, and Hawkins. ECF 1. As mentioned, six others were charged by the State of Maryland. ECF 273, ¶ 22 n.1. Several defendants were arrested during the week of May 16, 2011. *Id.* ¶ 22. At the time of their arrests, Hayes and Plunkett had 1.5 kilograms of crack cocaine in their possession. *Id.* ¶ 22. A small amount of powder and crack cocaine was also seized from the stash apartment at Belvedere Towers. *Id.*

Wilford's residence at 1500 Cliftview Avenue was searched on or about May 16, 2011. ECF 205 at 18. A hollowed-out computer shell, a large cardboard box, and a mold for forming a kilogram of narcotics were seized. ECF 273, ¶ 23. The box was the same size as the boxes exchanged previously between Wilford and Hayes. *Id.*

A shipment of cocaine sent to the Cliftview Avenue address was intercepted and seized on or about May 20, 2011. It contained approximately eight kilograms of cocaine hydrochloride. *Id.* ¶¶ 23, 28. The cocaine was concealed inside a hollow computer shell, and the shipping box was the same size as the boxes exchanged previously between Wilford and Hayes. *Id.*

Plunkett's residence was also searched. ECF 205 at 18. The sum of $200,000 in U.S. currency was recovered, along with wrappers for kilograms of cocaine and other drug items. *Id.* At Hayes's residence, agents recovered $300,000 in U.S. currency. *Id*.

Approximately $1.6 million dollars in U.S. currency was seized during a search of the residence at 3530 Seapines Circle in Reisterstown. ECF 273, ¶ 24. Testimony at trial indicated that Wilford had a key to the residence and stored cash at that location. *Id*. The money was found underneath a stairwell to the basement, in a manner government counsel described at sentencing as "hidden away pretty, pretty secretly." ECF 369 (Tr., Aug. 7, 2014), at 64.

Testimony at trial indicated that defendant's Elkton residence was sometimes used as a location to prepare large sums of U.S. currency for shipment to California. ECF 273, ¶ 25. A search of Wilford's residence in Elkton, led to the seizure of a small amount of currency, receipts for six UPS shipments to California, and materials for wrapping and shipping currency. *Id.*

UPS shipping records indicated that Wilford shipped at least 28 packages to California, using fake names. *Id*. In addition, UPS shipping records revealed that in 2010 and 2011, six shipments of cocaine were sent to 35 Mainview Court in Reisterstown, and eighteen shipments of cocaine were sent to 1500 Cliftview Avenue, including the shipment intercepted on or about May 20, 2011. *Id*. ¶¶ 23, 28.

As indicated earlier, Wilford was not arrested with other defendants in May 2011. Instead, he fled to Los Angeles. *Id*. ¶ 26. Investigation revealed that Wilford had rented an apartment in Los Angeles under a fake name. In August 2011, a federal law enforcement agent attempted to arrest Wilford, but he was able to avoid apprehension in his vehicle. *Id*. ¶¶ 26, 35. A search of the Los Angeles apartment and the vehicle led to the recovery of approximately $68,000 in U.S. currency and fake IDs. *Id*. ¶ 26.

Wilford was finally arrested in Baltimore on September 16, 2011, at a "secret apartment" located on Laurel Avenue. *Id.* ¶ 27. Approximately $189,000 in U.S. currency, fourteen cell phones, and a fake ID were seized either from the apartment or defendant's vehicle. *Id.*

Wilford maintained a dump truck business, RAW Enterprises. *Id.* ¶¶ 32, 82. Testimony at trial suggested that Wilford's business earned approximately $1.4 million in income over four years. *Id.* ¶ 32; *see also* ECF 356.

In sum, "the evidence at trial established that Wilford was responsible for obtaining enormous quantities of cocaine from California for sale to the Hayes drug-trafficking organization." ECF 273, ¶ 33. Specifically, defendant received at least 192 kilos of cocaine in 2010 and 2011, valued at $30,000 per kilo. *Id.* ¶¶ 7-33.

On December 18, 2013, the jury found Wilford guilty of conspiracy to distribute five kilograms or more of cocaine. ECF 267; ECF 268. Sentencing was set for February 20, 2014. ECF 271.

### C. Post-Trial, Sentencing, and Appeal

On February 12, 2014, *i.e.*, about one week prior to sentencing, Wilford wrote to the Court with complaints about Purpura. ECF 281. He expressed "a drastic decline in [his] trust" for Purpura. *Id.* In response, the Court again referred the matter to a magistrate judge for an attorney inquiry hearing. ECF 283.

A few days later, on February 17, 2014, Purpura moved to withdraw as Wilford's attorney. ECF 285. In his motion, Purpura noted that throughout his representation of Wilford, the defendant had "repeatedly expressed his dissatisfaction and lack of trust in counsel," as reflected in his pro se motions and direct correspondence with the Court. *Id.* ¶ 2. Purpura also noted that throughout the proceedings, he visited Wilford on numerous occasions; retained another attorney and two law

clerks to respond to Wilford's concerns and to conduct legal research; filed numerous motions and briefs; met with Wilford prior to filing and arguing the motions; and worked extensively with Wilford at trial.  *Id*. ¶¶ 4, 6, 8.

Moreover, Purpura asserted that prior to trial he had engaged in plea negotiations with the government and obtained a plea offer that "could have resulted in a favorable sentence and the return of certain specified assets."  *Id.* ¶ 5.  He also represented that Wilford knew that a conviction at trial would lead to a mandatory minimum sentence of twenty years with a maximum potential sentence of life imprisonment.  *Id*.  Notably, Purpura claimed, *id.*: "Mr. Wilford followed his own advice, declined the government's offer and demanded full litigation of all legal issues and a trial."

Purpura concluded: "Counsel is confident that Mr. Wilford received exceptionally competent and complete legal representation in every aspect of this litigation. Nevertheless . . . Counsel has done all that he can do for this defendant and, therefore, for the first time in 35 years of practice, counsel has been placed in a position where counsel has no ethical choice but to request the Court to relieve counsel from further representing Mr. Wilford."  *Id.* ¶ 11.

Then Magistrate Judge Stephanie Gallagher[21] conducted the attorney inquiry hearing on February 18, 2014.  ECF 286.  The transcript was docketed on March 13, 2024 (*i.e.*, after my first post-conviction ruling).  ECF 726.  At the hearing, Purpura told Judge Gallagher that defendant "believes strongly that his motions would be successful and maybe on appeal they will be."  *Id.* at 3.  He also advised the Court that he had "never asked the Court in any criminal case in [his] memory in State and/or federal court to withdraw as counsel."  *Id.* at 5.

Mr. Wilford spoke at length.  *Id.* at 7-14.  Yet, he never complained that Purpura advised him to reject a plea offer agreement because his Suppression Motion was likely to succeed, either

---

[21] Judge Gallagher is now a United States District Judge in Maryland.

in the District Court or the Fourth Circuit. Nor did Wilford dispute Purpura's representation that it was Wilford who believed "strongly" that his Suppression Motion would be successful. Rather, defendant pressed his complaint about counsel's initial failure to submit documents in support of the "Franks request . . . ." *Id.* at 8; *see also id.* at 9. Wilford also complained that he did not receive discovery material. *Id.* at 14. And, he stated that Purpura came to see him on November 27, 2013, yet did not tell him of the Court's adverse ruling that date (*i.e.*, ECF 252, ECF 253). *Id.* at 12. Defendant stated, *id.*: "He [*i.e.*, Purpura] made a mention of a [guilty] plea and he asked me would I be interested in a Ingram-like plea and we discussed a plea. And it was unbeknownst to me that this conversation was irrelevant because the Government wasn't going to entertain a plea now that the judge had ruled against me."

As to defendant's complaint that Purpura failed to tell him of this Court's ruling when they met on November 27, 2013, I pause to note that court data shows that the Court's opinion was docketed at 3:21 p.m. on November 27, 2013. *See* ECF 252 (Notice of Electronic Filing). This suggests that, in all likelihood, Mr. Purpura visited Wilford *before* the opinion was issued or that he was at the facility when it was issued. Moreover, at the hearing on December 20, 2024, discussed *infra*, Purpura claimed he had plea discussions with the government until two weeks prior to trial.

Mr. Purpura informed Judge Gallagher that he had attempted to arrange a CJA appointment with a capable criminal defense attorney, "as a favor." *Id.* at 15. He explained, *id.*: "I said [to the CJA panel attorney that] there's some issues in this case and particularly the GPS issue which I thought was an interesting issue. It may be a successful issue. It was an issue that Judge Hollander wrote an approximately 62-page opinion on and he graciously agreed."

32

Judge Gallagher granted the motion to withdraw on February 18, 2014. ECF 287. Thereafter, Jenifer Wicks was appointed to represent Wilford for sentencing. ECF 293; ECF 297. Sentencing was rescheduled for July 24, 2014. ECF 313.

On July 2, 2014, at defendant's request, Wicks moved to withdraw as Wilford's lawyer. ECF 320; *see also* ECF 323 (letter from Wilford to Clerk of the Court). Counsel cited miscommunications and disagreements with Wilford. ECF 320, ¶¶ 3-5. Once again, I referred the matter to a magistrate judge for an attorney inquiry hearing. ECF 322. Judge Gallagher conducted the hearing on July 17, 2014. ECF 325; ECF 379 (Tr., 7/17/14). At the hearing, defendant made an assertion in reference to Wicks that was similar to an earlier comment he made about Purpura (*see* ECF 281). He said, ECF 379 at 21: "And honestly . . . I don't trust her. I don't trust her." Nevertheless, Judge Gallagher denied the motion to withdraw. ECF 327.

Then, on July 18, 2014, Wilford, acting pro se, filed a detailed "Motion to Vacate Verdict and for a New Trial." ECF 329. He argued, *inter alia*, that the verdict should be vacated because he was denied his right to an arraignment, *id*. at 3-4; his right to a speedy trial was violated, *id.* at 4; illegal evidence was used to convict him, *id.* at 4-8; and he received ineffective assistance of counsel. *Id.* at 8-11. Notably, Wilford had the wherewithal to assert a total of nineteen grounds of alleged ineffective assistance. Yet, Wilford never once claimed that he rejected a favorable plea agreement because he was misled by Purpura to believe that his Suppression Motion was likely to succeed.

Defense counsel filed a "Notice of Preliminary Issues Related to Sentencing and Forfeiture Proceeding" on August 5, 2014. ECF 339. She indicated that defendant intended to raise, *inter alia*, his lack of an arraignment. *Id.* ¶ 1. Wilford also filed his own motion for return of seized property. ECF 328; *see also* ECF 316; ECF 321.

Under § 2D1.1(c)(1) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the Presentence Report (ECF 273, "PSR") calculated Wilford's base offense level at 38, based on the quantity of drugs involved. *Id.* ¶ 37. Two levels were added, pursuant to U.S.S.G. § 2D1.1(b)(12), because defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance. *Id.* ¶ 38. Under U.S.S.G. § 2D1.1(b)(14), the PSR added two more levels because defendant used friendship to involve another individual, Mark Hawkins, in the illegal purchase, sale, transport, or storage of controlled substances. *Id.* ¶ 39. And, under U.S.S.G. § 3B1.1(a), the PSR added four levels because defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. *Id.* ¶ 41. Moreover, in regard to the attempted arrest of defendant in Los Angeles in August 2011, and pursuant to U.S.S.G. § 3C1.2, the PSR added two levels because defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from law enforcement. *Id.* ¶ 42.

Therefore, according to the PSR, Wilford had an adjusted offense level of 48. *Id.* ¶ 44. However, because the maximum offense level under the Guidelines is 43, per Chapter 5, Part A, Application Note 2, defendant had a final offense level of 43. *Id.* ¶ 45. The PSR also determined that Wilford qualified as a career offender under U.S.S.G. § 4B1.1, based on his two prior federal convictions. *Id.* ¶ 46.[22]

---

[22] The offense level based on the career offender designation would have been 37. But, because the adjusted offense level of 43 exceeded 37, the offense level of 43 applied. *See* ECF 273, ¶ 46.

As I stated in ECF 678 at 18 n.10, if Wilford were sentenced today, he would not qualify as a career offender. This is because the underlying offense of conspiracy is not a qualifying offense. *See United States v. Norman*, 935 F.3d 232, 238-39 (4th Cir. 2019). But, as noted, defendant's offense level was not based on the career offender designation.

The PSR reflected that defendant had three prior adult criminal convictions, all in Maryland. *Id*. ¶¶ 49-53. In 1992, Wilford pleaded guilty in federal court to conspiracy to distribute cocaine, and was sentenced by Judge J. Frederick Motz to 60 months of incarceration and five years of supervised release. *Id*. ¶ 49; *see* case JFM-92-116. In 2001, defendant was charged in federal court with distribution of heroin. *See* case MJG-01-399. In that case, he was represented by Purpura. Wilford pleaded guilty. ECF 273, ¶ 50. And, Judge Garbis sentenced Wilford in 2003 to 24 months of incarceration, followed by four years of supervised release. *Id.* In 2011, defendant pleaded guilty in the Circuit Court for Baltimore County to conspiracy to possess with intent to distribute. *Id.* ¶ 53. Again, defendant was represented by Purpura, and he received a sentence of probation. *Id*.[23]

Defendant's convictions resulted in a subtotal of seven points. *Id*. ¶ 54. But, at the time of the instant offense, Wilford was on supervised release for the distribution of heroin conviction. *Id*. ¶ 55. Therefore, two points were added. *Id*. This yielded a total of nine criminal history points, which equates to a criminal history category of IV. *Id*. ¶ 56.[24] But, as mentioned, Wilford was also found to be a career offender. As a result, he had a criminal history category of VI under U.S.S.G. § 4B1.1. *Id*. ¶ 57.

---

[23] The PSR reflects a "Stet" on October 21, 2009, for the offense of disorderly conduct. ECF 273, ¶ 61. Maryland Judiciary Case Search indicates that Purpura was defendant's attorney in the case. *See* https://mdecportal.courts.state.md.us/MDODYSSEYPORTAL/ In their testimony on December 20, 2024, neither Purpura nor Wilford mentioned the case or Purpura's role.

[24] Effective November 23, 2023, under U.S.S.G. § 4A1.1(e), defendant's commission of the underlying offense while on supervised release would result in only one additional criminal history point, rather than two points. Therefore, if sentenced today, defendant would have eight criminal history points, and not nine. However, both eight and nine points equate to a criminal history category of IV.

Based on a total offense level of 43 and a criminal history category of VI, the Guidelines called for a sentence of life imprisonment. *Id*. ¶ 66. And, the PSR noted that Wilford's offense carried a mandatory minimum term of imprisonment of 20 years, pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851. ECF 273, ¶ 65.

Sentencing and forfeiture proceedings were held on August 7, 2014, and August 12, 2014. ECF 352; ECF 353; ECF 369; ECF 370. At the time of sentencing, Wilford was 41 years of age. ECF 273 at 1.

At sentencing, the government asserted that approximately $2 million in cash was seized from Wilford, as well as "$194,000 in watches and jewelry and high-end vehicles." ECF 369 (Tr., 8/7/14), at 139. The government sought a sentence of 360 months of incarceration. *See* ECF 284 (goverment's sentencing memo), at 1. Defense counsel sought the mandatory minimum term of 240 months (20 years), and lodged several objections to the PSR. *See* ECF 275 (Defendant's sentencing memo); ECF 336 (Defendant's sentencing memo).

I determined that Wilford had a final offense level of 40, not 43, and a criminal history score of VI.[25] *See* ECF 355 (Statement of Reasons); ECF 369 (Tr., 8/7/14), at 75-116; ECF 370 (Tr., 8/12/14), at 28-29. This resulted in a Guidelines range of 360 months of imprisonment to life imprisonment. ECF 355 at 1.[26]

---

[25] In particular, I found that a base offense level of 36, rather than 38, was appropriate, based on the drug quantity. ECF 355 at 1. I also applied a two-level reduction in the offense level based on then-forthcoming changes in the drug quantity table. ECF 369 at 76-78. Further, I rejected the proposed two-level upward adjustment under U.S.S.G. § 2D1.1(b)(14), for Wilford's use of his friendship with Hawkins, finding that it was duplicative of the adjustment under U.S.S.G. § 3B1.1(a). ECF 369 at 116. And, I rejected the two-level upward adjustment under U.S.S.G. § 3C1.2, because I was not satisfied that defendant intended to endanger the law enforcement officer in question. ECF 369 at 122-24.

[26] An offense level of 43 and a criminal history category of either IV or VI yields Guidelines of life imprisonment.

I sentenced Wilford to a below Guidelines sentence of 340 months of imprisonment, with credit for time served in federal custody since September 16, 2011, along with ten years of supervised release.  ECF 354 (Judgment); ECF 443 (Amended Judgment).[27]  Thereafter, in July 2022, upon consideration of defendant's motion for compassionate release, I reduced defendant's sentence to 280 months.  *See* ECF 686 (Amended Judgment); ECF 687.

Following sentencing, Wilford appealed to the Fourth Circuit.  ECF 357.[28]  During the pendency of the appeal, defendant filed a steady stream of pro se motions, letters, and other submissions.  *See* Docket.  For example, defendant filed a "Motion to Dismiss or Vacate for Lack of Jurisdiction . . .," in which he argued that the District Court was without jurisdiction to try him because he was never arraigned, and thus never afforded an opportunity to enter a plea.  ECF 416.  He also filed a "Motion for New Trial Based On Newly Discovered Evidence," asserting several grounds for a new trial under Fed. R. Crim. P. 33.  ECF 418.  On the unopposed motion of the government, the Fourth Circuit held Wilford's appeal in abeyance pending this Court's disposition of ECF 416 and ECF 418.  ECF 424.

By Memorandum (ECF 445) and Order (ECF 446) of February 26, 2016, I denied both ECF 416 and ECF 418.  Wilford appealed those rulings to the Fourth Circuit.  ECF 459.

The Fourth Circuit consolidated Wilford's two appeals.  *See* ECF 500.  And, in an unreported decision of May 9, 2017 (ECF 501), the Court affirmed.  *See United States v. Wilford*, 689 Fed. App'x 727 (4th Cir. 2017) (per curiam).  The Court rejected Wilford's arguments as to

---

[27] I issued an Amended Forfeiture Order on August 7, 2014, in the amount of $5 million. ECF 346. But, after the hearing of August 12, 2014, I issued a "Revised Amended Order of Forfeiture." ECF 356. I determined that approximately $3,808,000 constituted proceeds derived directly or indirectly from the offense, and forfeited defendant's interest in various substitute assets. *Id.*; *see also* ECF 350; ECF 352; ECF 370.

[28] Wilford had several court appointed attorneys for his appeal. *See*, *e.g.*, ECF 363 (appointing Jenifer Wicks); ECF 378 (appointing Steven Levin); ECF 391; ECF 498.

the merits of this Court's suppression rulings; the failure to arraign; alleged prosecutorial misconduct; and disputed jury instructions. *Id.* at 728-32.

With respect to the defendant's challenge to the warrantless use of GPS, the Court determined that evidence obtained by law enforcement prior to the decision in *United States v. Jones*, 565 U.S. 400, 404 (2012), was protected by the good faith doctrine. *Id.* at 729. In this regard, the Court cited its August 2014 decision in *United States v. Stephens*, 764 F.3d 327, 338 (4th Cir. 2014). *See Wilford*, 689 Fed. App'x at 729. The Court also discerned no error as to the motion to suppress evidence obtained by cell phone pinging under Maryland's pen register and trace and trap statute. *Id.* at 730. And, it concluded that Wilford lacked standing to challenge the use of a cell-site simulator. *Id.*

The Fourth Circuit subsequently denied Wilford's petition to rehear the case and to rehear it en banc. ECF 503. The mandate issued on June 28, 2017. ECF 504. Defendant petitioned the Supreme Court for a writ of certiorari, but it was also denied. *See* 585 U.S. 1033 (2017).

In August 2017, Wilford filed a "Memorandum and Motion to Dismiss for Lack of Subject-Matter Jurisdiction Pursuant to the Court's Inherent Supervisory Power and Not to Be Construed as 28 U.S.C. § 2255." ECF 507. By Memorandum (ECF 525) and Order (ECF 526) of May 4, 2018, I noted that Wilford's arguments in ECF 507 were essentially identical to those he advanced in ECF 416. Therefore, I denied ECF 507 for the reasons expressed in my opinion at ECF 445, as well as the Fourth Circuit's opinion in *Wilford*. ECF 525 at 4.

### D. The Post-Conviction Petition

#### 1. Background

In April 2019, Christopher Nieto was appointed to represent Wilford in connection with his Petition under 28 U.S.C. § 2255. ECF 540; ECF 543. Nieto filed the Petition in June 2019.

ECF 546.  It contains 59 claims of ineffective assistance of counsel and prosecutorial misconduct.  *Id.* at 4-14.  Simultaneously with ECF 546, counsel filed a motion to hold the Petition in abeyance, so that counsel could investigate the claims and supplement the filing.  ECF 547.  The Court granted the request.  ECF 548.

Wilford submitted a pro se "Letter to the Court" in February 2020, asserting various issues.  ECF 562.[29]  Then, in March 2020, before the Petition was supplemented by counsel, Nieto moved to withdraw as Wilford's attorney.  ECF 564.  Nieto cited a "breakdown in communication and trust between counsel and client," as well as disagreement over the proper course of the § 2255 investigation.  ECF 564, ¶¶ 3, 4.  The Court granted the motion.  ECF 565.  The following month, Mary E. Davis was appointed as Wilford's lawyer.  ECF 572.

In February 2021, Wilford, acting pro se, filed a supplement to the Petition, seventeen pages in length.  ECF 615.  It was accompanied by an Affidavit from Wilford.  ECF 615-1.  In ECF 615, Wilford lodged about 65 claims, some of which are related, but generally without citation to the record.  He asserted that the Court lacked jurisdiction; he received ineffective assistance of trial counsel, sentencing counsel, and appellate counsel; prosecutorial misconduct; and judicial errors.  *Id.*

As to Purpura, defendant listed eighteen grounds of ineffective assistance of counsel.  *Id.* at 5-8.  In Ground 4, which is pertinent here, Wilford alleged that Purpura and Eduardo Balarezo, counsel for codefendant Hayes, visited both defendants in April 2012 to discuss "plea deals offered by AUSA Sippel."  *Id.* at 5, ¶ 4.  Hayes's vehicle was also subjected to warrantless GPS tracking.  Yet, according to Wilford, Hayes was advised to accept the government's offer but he (Wilford)

---

[29] ECF 562 was docketed as a supplement to the Petition.

was told that his "circumstances were different and [he] should not." *Id.*; *see also* ECF 615-1 at 2, ¶ 5.[30]

Notably, Wilford alleged, ECF 615 at 5, ¶ 4: "The advise [sic] by counsel concerning the government's plea deal offer cause[d] Petitioner to not accept the guilty plea agreement offer which subsequently expired." Yet, Wilford did not assert that Purpura misrepresented the strength of the Suppression Motion. Nor did Wilford claim that he had declined to accept the plea offer because of Purpura's mischaracterization of the likelihood of success of the Suppression Motion.

In March 2021, the government responded in opposition. ECF 640.[31] And, Wilford filed a pro se reply. ECF 650. It was supported by exhibits. ECF 650-1 to ECF 650-12.

Then, in August 2021, Davis moved to withdraw as Wilford's counsel. ECF 651. She cited "a complete breakdown in communication between counsel and client," noting Wilford's repeated pro se filings. *Id*. ¶ 2. The Court granted the motion. ECF 652.

Brent Newton was appointed for Wilford on August 31, 2021. ECF 654; ECF 655. He continues to serve as counsel in this matter. On the same date, Wilford submitted several pro se filings. *See* ECF 656, ECF 657, ECF 658.

In November 2021, through counsel, Wilford filed the Supplement to the Petition. ECF 659. The Supplement became the operative pleading. There, Wilford maintained that his trial lawyer rendered constitutionally deficient performance "by overstating" (*id.* at 14) the merit and strength of the suppression arguments, when he should have advised defendant that none had merit. *Id.* at 11-15. According to Wilford, he received "objectively unreasonable advice about the Fourth

---

[30] Balarezo represented Mr. Jones in the trial court in the *Maynard* case. *See* 05-cr-0386 (D.D.C.).

[31] In November 2020, the Court directed the government to respond. ECF 597. The government requested several extensions. *See* ECF 604; ECF 632.

Amendment issues that made Mr. Wilford disinclined to accept a plea offer." *Id.* at 13. Moreover, Wilford claimed that he "rejected" the government's plea offer because "trial counsel advised him that [he] had a reasonable chance of ultimately prevailing" on his Suppression Motion. *Id.* And, Wilford reiterated that Purpura's "erroneous" advice caused him "to reject the prosecution's plea offers . . . ." *Id.* at 14. More recently, Wilford's counsel colorfully asserted that Purpura should have told Wilford that his Fourth Amendment issues were "dead in the water." ECF 749 at 133.

With the Supplement, Wilford also submitted his Declaration. *See* ECF 661-1. He averred that "[v]ery early on in Purpura's representation," Purpura informed him that the government had offered a plea deal of "less than 10 years in prison." *Id.* ¶ 3. However, Wilford claimed that he rejected this offer "based on [his] belief that Purpura would be able to file a successful motion to suppress the bulk of the prosecution's evidence for Fourth Amendment violations." *Id.* Wilford also claimed that "[l]ater," at an unspecified time, the government offered a 15-year plea deal, which Wilford maintains he rejected for the same reason. *Id.*

Wilford maintained that he "trusted Purpura's advice that the various Fourth Amendment claims that he raised in his pretrial motion had merit and stood a good chance of winning in front of the district court or at least on appeal to the Fourth Circuit," and he reiterated that he turned down the plea offers based on that advice. *Id.* ¶ 4. Further, Wilford averred, *id.* ¶ 5: "If I had been advised by Mr. Purpura that the Fourth Amendment claims that he raised lacked merit and stood very little chance of prevailing, I would have accepted the prosecution's initial plea offer and also its subsequent plea offer."

In addition, Wilford contends that the government should be required to withdraw the § 851 enhancement notice that it filed, which requires at least a 20-year mandatory minimum sentence.

ECF 659 at 14; *see also* ECF 749 at 149.  And, he maintains that he "is entitled to be reoffered the most favorable plea offer originally made."  ECF 659 at 14.

The government responded in opposition to the Supplement.  *See* ECF 673.  Defendant's post-conviction attorney replied.  ECF 674.  He argued, *inter alia*, that "both Mr. Wilford and trial counsel did not believe that Mr. Wilford had any realistic chance of prevailing at trial (if the motion to suppress was denied) and that his defense pivoted entirely on the pretrial suppression issues." *Id.* at 9 (citing ECF 324 at 8).  Therefore, post-conviction counsel claimed that defendant "only went to trial to preserve the Fourth Amendment issues for appeal."  ECF 674 at 9.  Further, counsel argued that, as defendant's Declaration and the trial record establish, defendant "relied on his counsel's advice that the Fourth Amendment issues had merit (when in fact they were foreclosed by extant precedent, as this Court found)."  *Id.* at 9-10.  Counsel added, *id.* at 10:  "If [defendant] would have been properly advised that the issues entirely lacked merit and stood no realistic chance of prevailing on appeal, he would not have gone to trial."  About two weeks later, counsel filed "Supplemental Authorities."  ECF 675.

### 2. The Hearing of December 20, 2024

As noted, the Court held an evidentiary hearing on December 20, 2024.  Purpura and Wilford were the only witnesses.  I shall review the testimony, at length.

Both Purpura and Wilford spoke of their long history.  *See*, *e.g.*, ECF 749 (Tr. 12/20/24), at 24-25, 68 (Purpura); *id.* at 86 (Wilford).  They met in connection with a federal case in Maryland that was assigned to Judge J. Frederick Motz in 1992.  *Id.* at 25; *see* JFM-92-0116.  Wilford was one of the defendants in that case and Purpura represented a codefendant, Walter Ingram.  *Id.* Thereafter, Purpura represented defendant in another federal drug case in this District, assigned to

Judge Marvin Garbis in 2001.  *See* MJG-01-0399.[32]  And, he also represented Wilford in a State drug case.  ECF 749 at 54-55, 85.

Purpura recounted that defendant retained him to represent him in this matter well before defendant was even arrested.  Purpura attempted to resolve the case with the government from the time he learned about it until just before trial.  ECF 749 at 54-55; *see also* ECF 750 at 30-36, 39-41.

Purpura is a seasoned criminal defense attorney who has "been practicing primarily criminal defense for 45 years."  ECF 749 at 50.  He has handled hundreds of federal criminal cases, as well as several death penalty cases, in Maryland and elsewhere, *id.* at 51-53, for which he has received the "learned defense designation."  *Id.* at 53.  Moreover, he has handled many high profile cases.  *Id.* at 53.  For example, in the Eastern District of New York he represented the notorious defendant known as "El Chapo."  *Id.*  Purpura is also a member of the elite American College of Trial Lawyers, which, after a rigorous investigation, admits only about one percent of lawyers in each state.  *Id.* at 52.  He was also the second recipient in Maryland of the prestigious John Adams Award, which is bestowed on a Criminal Justice Act attorney.  *Id.* at 52.

In addition, Purpura is a well respected advocate.[33]  At the attorney inquiry hearing on July 3, 2013, Magistrate Judge Gesner, a former federal prosecutor, observed that Purpura is a "capable lawyer," ECF 725 at 24, who is "quite noted in this court as being an incredibly zealous counsel."  *Id.* at 23.  Aware that Purpura had previously represented Wilford in other criminal cases, she said

---

[32] Due to the ages of the two prior federal cases, most of the filings are not electronically available.

[33] The Court is mindful that even the best lawyers, like all of us, can make mistakes.  I merely point out Purpura's experience and reputation as a practitioner because the defendant insists, *inter alia*, that Purpura misunderstood the contours of basic principles of criminal law, such as the good faith doctrine and standing.  *See, e.g.*, ECF 749 at 143.

to Wilford, *id.*: "That perhaps has been your experience with him in the past." Judge Gallagher, also a former federal prosecutor, made a similar observation at the attorney inquiry hearing that she conducted on February 18, 2014. She noted that Purpura appears "frequently in this court" and he enjoys a "very good reputation[]." ECF 726 at 18.

Purpura recalled that in both of defendant's prior federal cases, he pleaded guilty, pursuant to plea agreements. ECF 749 at 25; ECF 750 at 27-28. He also pleaded guilty in the drug case in State court for which Purpura was Wilford's lawyer. ECF 750 at 28-29.

Purpura testified that even before Wilford was arrested, he "advised" him to "try to resolve" the matter "by a plea" and Purpura continued that effort "up until two weeks before trial." *Id.* at 67; *see id.* at 55, 65; *see also* ECF 750 at 30-36, 39-41. Purpura explained that "it was [to] Mr. Wilford's benefit and that's what he wanted to do." ECF 749 at 55. Purpura also said, *id.* at 74: "The last thing I thought in Mr. Wilford's interest was to go to trial."

According to Purpura, after *Jones* was decided in January 2012, Purpura spoke with the defendant about the *Jones* case. *Id.* at 56. Wilford "was very interested" in the *Jones* decision. *Id.* Purpura described *Jones* as a "hot button topic," particularly among detainees at the Chesapeake Detention Facility, such as defendant. ECF 750 at 40. He explained that because warrantless GPS tracking was used in Wilford's case, "we thought perhaps this could be something we could use . . . ." *Id.* Purpura "tried to work" *Jones* into the plea negotiations with the government. *Id.* at 78. And, the prosecutor "agreed to an extent that this may be an issue" and it "would help the plea negotiations." *Id.* at 79.

In or about May 2012, the government extended a plea offer to Wilford for a below-Guidelines sentence, in the eight to ten year range. ███████████████████████████ ███████████████ Defendant rejected the plea offer. ECF 749 at 65. But, Purpura claimed

that "even as late as after motions", the government "held out an offer and that offer was somewhere between 11 to 15 years," *id.* at 35, although Purpura could not recall the precise terms. *Id.* Moreover, Purpura testified that the government never said it was too late for defendant to plead guilty. *Id.* at 75. According to Purpura, even after the government filed the sentencing enhancement notice under 21 U.S.C. § 821, the government was "willing to go well below" the mandatory minimum in the "enhanced notice." *Id.* at 76. And, Purpura claimed that he and AUSA Sippel "worked right up to two weeks prior to trial to resolve the case." *Id.* at 64; *see id.* at 67.

With respect to the government's plea offer, Purpura testified, *id.* at 65: "Mr. Wilford never said that he would take a plea. If he said he wanted a plea, to consider a plea, we would have had a plea." In response to a question from the Court as to whether and when Purpura advised defendant to take a plea, *id.* at 67, Purpura stated, *id.*:

> I advised Mr. Wilford that we should resolve this case, number one, when he was out before he was arrested in Maryland. I advised Mr. Wilford when he was arrested and not released after I entered my initial appearance before I received any discovery . . . that he should try to resolve by a plea again at that time and I continued with that, ongoing, right up until two weeks before trial. I looked -- you look at the evidence; I knew the evidence was overwhelming. I looked at the legal issues and they weren't the best. They were not frivolous, but they definitely raised the question. I understood his concern, but it wasn't worth the gamble. And I've expressed that numerous times between his arrest and going to trial over that two-year period of time.

Eventually, Purpura determined that the effort of securing a plea was "useless." *Id.* at 64. He explained, ECF 750 at 36: "I know there came a point after two years and so many months which I was just beating a dead horse, it was not going to be a plea, it was going to go to trial. . . ."

Newton asked, ECF 749 at 76: "Isn't it true Mr. Wilford did not go to trial for the purpose of getting a not guilty, he went to trial to preserve his Fourth Amendment issues for appeal?" Purpura responded, *id.*: "That's not true at all. Mr. Wilford when he wanted to go to trial, wanted to go to trial because he thought we could beat the case as well." But, Purpura also said that

45

defendant wanted a "conditional plea." *Id.* He explained, *id.*: "If it was going to be a plea, then

[Wilford] had to be able to keep his appellate issues alive and the government said no to that."

Purpura testified that he emphasized to Wilford the difficulty of prevailing on appeal. *Id.*

at 59. He stated, *id.*:

> And I said [to the defendant] probably literally out of the hundred cases that I've
> been through the Fourth Circuit I've had two successes. One was a complete
> remand which I retried and the client wanted to go to trial again and lost again the
> second time, and the other one was on – it was Judge Blake when I was the appellee.
> So that's it. So the likelihood of winning at the Fourth Circuit is – it was my opinion
> is not helpful. And that was never my way of approaching anything. And I was
> not an appellate lawyer and I wouldn't take the appeals there. That was just – you
> never count on the Fourth Circuit and that's what I told him, over and over again.

As to the merits of the Suppression Motion, Mr. Newton attempted to establish, *inter alia*,

that Purpura misunderstood the parameters of the good faith doctrine, and believed, erroneously,

that it is a subjective standard. *See*, *e.g.*, ECF 749 at 23-24, 30, 42-43. Purpura recognized that

the standard is an objective one. *Id.* at 30. However, he acknowledged that he sought to show that

the law enforcement agents in the case had "subjective knowledge of the *Maynard* decision . . . ."

*Id.* The following exchange is pertinent, *id.* at 41:

> [NEWTON]: You believed the subjective knowledge of the agents was relevant to
> the good-faith exception?
>
> [PURPURA]: We've gone through this before and the answer is it's objective, not
> subjective. But in this particular case I thought the fact that the agents might have
> been – the *Maynard* decision would be helpful with us, yes.
>
> [NEWTON]: And you advised Mr. Wilford that you believed that was a good issue
> for him?
>
> [PURPURA]: I advised Mr. Wilford that's an issue, yes.

Of import, Newton also asked Purpura, *id.* at 31-32: "In your discussions with Mr. Wilford,

did you tell him that you believed there was potential merit to the Fourth Amendment issues you

were raising?" Purpura responded, *id.* at 32:

Mr. Wilford and I discussed these issues hundreds of times. Did I say it was a complete loser? No. Did I think that it had potential in it? Yes. Did I bring another who I consider an expert in in, well, legal research in to speak to Mr. Wilford? Yes, and that was Marta Kahn. Did I tell Mr. Wilford that in our opinion on numerous times that it's not worth the risk on appeal? The answer is yes. Did I say it's frivolous? The answer is no, it's not frivolous. There's something there. I don't think it's what you think, Mr. Wilford. That's the gist of the conversations.

In addition, Mr. Newton sought to demonstrate that the Suppression Motion had insurmountable hurdles, such as the independent source and inevitable discovery doctrines as well as standing, *id.* at 36, which meant that defendant could not possibly have prevailed. *Id.* at 38. Newton specifically asked Purpura, *id.*: "[H]ow could you possibly have prevailed on either the GPS or pinging issue in this case?" Purpura responded, in part, *id.*: "Ít was, again, not a frivolous issue, but an issue." He added, *id.*: "But when a client like Mr. Wilford who has pressed so hard on these issues, and that's why we continued to press on those issues so hard because I wanted to do the best I could to flesh out what his issues were in open court. And if it was going to be denied, then he could hear it by the Court."

The following testimony is pertinent, *id.* at 39-40:

[NEWTON]: Isn't it true, Mr. Purpura, that you never sat down with Mr. Wilford and methodically went through the following issues: The good-faith exception, an objective standard; number two, the independent source doctrine; number 3, the inevitable discovery doctrine; and number 4, the lack of standing to challenge the co-conspirators' phones and GPS monitoring of their cars. Isn't that true, you never went methodically over all of those with him?

[PURPURA]: Mr. Newton, it is not true. We went through every one of those issues. Maybe not as you place them all five at once, but every single issue, time and time again because -- and you can check the records at Chesapeake Detention and see how often I visited Mr. Wilford. Here in the case was the squeaky wheel got the grease and I gave a lot of grease to Mr. Wilford on all these issues.

[NEWTON]: You remember talking about the inevitable discovery and independent source doctrines with him?

[PURPURA]: Yes. He raised those constantly.

[NEWTON]: What did you say? What was your advice to him about those things?

47

[PURPURA]: That we had a very, very difficult hurdle in this particular case, that these issues are interesting, that we're still waiting for the Supreme Court to make final decisions and if we're going to go forward on the motions, we're going to go forward.

Post-conviction counsel also questioned Purpura about Purpura's letter to Wilford dated November 13, 2013, *i.e.*, about one month before trial. *See* Defendant's Motion Exhibit 1. The letter states, in part, *id.* (emphasis added):

At this point your Pre-trial Motions have been preserved and litigated. When I receive Judge Hollander's Opinion on the "good faith", Rule 41 issues I will immediately arrange for a visit. *In anticipation of success on the Motions* please review connection between GPS tracking and all evidence seized by the government. *If successful,* the next step will be to inform the court as to what should be suppressed as a result of the violation.

The following exchange ensued, ECF 749 at 32:

[NEWTON]: Did at one point you tell Mr. Wilford in a letter you anticipated winning the motions?

[PURPURA]: I actually saw the one letter which you have there. I don't think that's exactly what it says, but this letter was written probably now we're at one month before trial. So for two years I had been banging on Mr. Wilford that this is a losing cause. And at this point I'm just ready to go to trial. And I wanted to keep him busy and do something, and this is what I said to do. I recall the letter.

Purpura added, *id.* at 34: "And again, that's 30 days probably before trial after two years . . . speaking to Mr. Wilford about the probable lack of success we're going to have. Although it's an interesting motion, although it's not frivolous, it's not worth betting your life on."

The colloquy continued, *id.* at 40-41:

[NEWTON]: Yet you told him in the letter [of November 13, 2013] you anticipated success on the motions.

[PURPURA]: Read the whole sentence, please.

*    *    *

[NEWTON]: "In anticipation of success on the motions please review connection between GPS tracking and all evidence seized by the Government. If successful, the next step will be to inform the Court as to what should be suppressed as a result

of the violation."

[PURPURA]: And again, "if successful" is in there. So that was always the question. Now again, this is 30 days as I mentioned before, before trial after discussing this at [sic] nauseam with Mr. Wilford for two years trying to resolve the case.

[NEWTON]: And your comment [to Judge Gallagher] on the record that you believed there may be success on appeal, you made that comment after finishing your representation of Mr. Wilford. Why would you say that?

[PURPURA]: Perhaps at that point to make Mr. Wilford feel a little better that he had something maybe to hope for but, you know, that was -- and again, the law wasn't settled. So it wasn't a frivolous issue, it's an issue that perhaps the Court would agree with. That's all I can tell you.

On cross-examination, the government questioned Purpura about his motion to withdraw as counsel (ECF 285), filed prior to defendant's initial sentencing date. ECF 749 at 66. In that motion, Purpura wrote, in part, ECF 285, ¶ 5: "Mr. Wilford followed his own advice, declined the Government's [plea] offer, and demanded full litigation of all legal issues and at trial."

The Court pressed Purpura as to whether defendant "want[ed] to pursue the case because [defense counsel] told him he had winning meritorious claims?" ECF 749 at 71. Purpura responded, *id*.: "I think I've said it, there's issues but it's not worth . . . taking it to appeal or going to trial for it." *Id.*

On redirect, post-conviction counsel questioned Purpura about a statement he made at the attorney inquiry hearing on July 3, 2013. *See* ECF 749 at 72. In particular, Newton asked about Purpura's assertion, as follows: "'We would probably come out on the wrong side at least on this level.'" ECF 749 at 72 (citing ECF 725 at 7).[34] In response to a question about what Purpura meant by "'at least on this level'", Purpura responded, ECF 749 at 72: "I meant that I anticipated we would not be successful at the trial level."

---

[34] Counsel cited ECF 725 at 7. But, the excerpt of the quote appears at ECF 725 at 6.

Purpura acknowledged that he never told the defendant he "definitely would not be successful" with regard to the Suppression Motion. *Id.* at 73. But, Purpura insisted that his advice to the defendant, from "beginning to end," was to plead guilty. *Id.* at 81.

The following exchange on recross-examination is pertinent, *id.* at 81:

[AUSA SIPPEL]: So Mr. Purpura, just so it's clear today, is it your position that during right up until trial was your advice to Mr. Wilford to plead guilty?

[PURPURA]: Yes, absolutely continuous ongoing chorus, beginning to end.

[AUSA SIPPEL]: And whose decision was it to proceed to trial?

[PURPURA]: Mr. Wilford's.

The Court then interjected, *id.*:

The question though really is that's part of the issue, but the other issue is did he make that decision because you told him that his issues if they don't prevail at the trial level might prevail, have a good chance of prevailing at the appellate level? So the focus now is not just did you advise him to plead, but did you suggest to him at any point that these [motions] were winners?

Purpura responded, *id.* at 82:

No . . . just the opposite on those are winners. I even to the extent that even if I thought they could be successful, I would not risk an appeal on it. I think that's just abundantly clear what I made to Mr. Wilford. There's no way I would risk it. I told you the multiple examples I used. . . . And it's foolish to risk that . . . .

Purpura continued, *id.*: "And the answer is I spoke to him every time that I would go to see him about the wisdom of not going forward and resolving the case. And that was just the constant chorus right up to the last two weeks. . . . I said I guess we're going to try it and we had to try it."

According to Purpura, defendant "became so fixated on these issues that he just couldn't get his mind off of it. And he seemed to be blinded to anything else, no matter what other type of reason you would apply . . . no matter what expertise you had, no matter [the] years of trial practice you had or how much experience you had with the appellate courts – –" *Id.* at 66. In particular,

Purpura claimed that defendant was fixated on "the fact that the Government cheated him, knowingly didn't get a warrant, should have gotten the warrant . . . ." *Id.*[35]

Wilford recalled that Purpura represented him in two previous drug cases, and he pled guilty in both. *Id.* at 25. Defendant stated that he "trusted [Purpura] a lot" because of their "very long history." *Id.* at 86. He considered Purpura "a friend," and he "trusted his leadership and advice." *Id.*

According to defendant, Purpura filed three suppression motions before he had "actual evidence" of GPS tracking. *Id.* at 88. Wilford recalled that Purpura thought the government was "lying" about the use of GPS, and after *Jones* was decided, "that would have been a problem." *Id.*

Wilford acknowledged that Purpura discussed the issue of standing with him, including that defendant lacked standing as to the use of GPS with respect to codefendant Hayes. *Id.* at 97. But, he did not remember any discussions about inevitable discovery or the independent source doctrine. *Id.*

Defendant acknowledged that in May 2012 Purpura conveyed a plea offer from the

---

[35] Purpura explained that inmates who are detained are often influenced by other detainees. This is something that the Court has heard before from other defense attorneys. With reference to *Jones*, Purpura stated, ECF 749 at 57:

> Obviously what happens is it's a very closed area in the detention center. Inmates have very little to do, but there's often a lot of discussion about cases. And sometimes that's the worst place your client can be because everyone is giving someone a different opinion. And they start picking up those opinions and they spread them around and it becomes like a disease over there.

> And what happened with Mr. Wilford, in my opinion, is that -- and I lost him so I did lose him, is that in the beginning he was ready to come in and do what I thought would be the smart thing and . . . to plead and resolve this with a reasonable plea. But he was convinced that we'd be successful on these legal issues. And I think that's part of the disease over at Chesapeake. And I just couldn't -- and we just couldn't resolve that.

government of eight to ten years. *Id.* at 88. But, Wilford "didn't accept it prior to its expiration"

in late May or early June. *Id.* at 88. As to the Suppression Motion, Wilford claimed that Purpura

"said that they had a good chance of winning . . . ." *Id.* Wilford also said, *id.* at 88-89:

> Well, because based upon, you know, what Purpura had been telling me and
> he believed that we had a good chance of succeeding on the suppression motions.
> To me it didn't seem worth taking [an] 8 to 10-year plea deal if we had a good
> chance of succeeding. And he believed, you know, very, very emotionally that the
> Government in his words back then was in a lot of trouble behind it.

Moreover, defendant believed that, if the Suppression Motion were successful, the charges

"would be dismissed" or at least the "vast majority of the evidence would have been out of the

door." *Id.* at 89. And, he "[a]bsolutely" believed that, if the evidence were suppressed, he would

win at trial. *Id.*

Defendant recalled that after this Court's ruling in June 2013 (*see* ECF 205, ECF 206), he

was "unhappy" with Purpura. *Id.* at 89. Yet, at the attorney inquiry hearing, Purpura was "upbeat"

because AUSA Sippel produced a Department of Justice memo that Purpura "dubbed as, like, a

smoking gun," with "some very strong information favorable to [the] suppression motions." *Id.*

at 90.

Wilford knew that his codefendant, Hayes, was represented by Mr. Balarezo, who had

represented Jones in the *Maynard* case in the trial court. *Id.* at 149. According to Wilford,

attorneys Purpura and Balarezo "communicated very closely" and that was why Purpura was

"chasing down the memo" from DOJ about the *Maynard* decision, "because he knew it existed."

*Id.* at 97. Defendant claimed that Purpura "was excited about the prospect of learning that the

Government was using GPS tracking against [defendant] without warrants." *Id.* at 98.

With respect to Purpura's letter of November 6, 2013, Wilford construed it as one that "was

anticipating that [he] was gonna succeed . . . ." *Id.* at 72. Nevertheless, Wilford acknowledged

that Purpura told him to "consider taking a plea." *Id.* at 91. Wilford claimed that as late as November 27, 2013, he was interested in a plea. *Id.*

The following exchange is noteworthy, *id.* at 91-92 (emphasis added):

[NEWTON]: After Judge Hollander denied the reconsideration motion [*see* ECF 252, ECF 253], clearly it was evident you weren't going to win at the District Court, did Mr. Purpura say anything to you that would make you believe you had a viable appellate issue in the Fourth Amendment claim?

[WILFORD]: Yes.

[NEWTON]: What did he tell you?

[WILFORD]: He had told me that, you know, there was no high expectations at that point in the District Court and that, you know, whatever we would do going forward would be to preserve for appeal.

[NEWTON]: Did he tell you that he thought you had very little chance of winning on appeal?

[WILFORD]: No, not at all.

[NEWTON]: What did he say, if anything, to your memory about your chances on appeal?

[WILFORD]: *He thought that I had a good chance on appeal.* In fact, that was part of the reason early on because *he would always say that there was a possibility that we would not win on the district level*, even though early on he believed that we had a good chance there and then it kind of diminished, but *he had always maintained that he believed that our better chance would be on appeal*.

The following colloquy is also pertinent, *id.* at 93-95:

[NEWTON]: If in May of 2012 when that plea offer was tendered Mr. Purpura had advised you there is very little realistic chance you're going to get any meaningful relief if we pursue this suppression motion, would you have accepted the plea bargain?

[WILFORD]: That was my history. That was what in the very beginning when I knew that the feds were looking at me and I went to Purpura, when I hired him I asked him to seek resolution that I was amenable to pleading guilty early on. I never wanted to play this out. So yes, absolutely. Had I known that, you know, they had all this evidence against me that I wouldn't be able to overcome in any fashion, sure. If he would have told me my chances were very low, of course. It wasn't even about my chances in the beginning. I knew what my history was so, you know -- and the record shows it. Every time I had a run-in with the law regardless of how I felt

about it I would always accept responsibility. That's who I am.

[NEWTON]: All right, I want to rephrase the question about a different time period. Let's go to after Judge Hollander had denied the reconsideration motion and it was a done deal in the District Court that you were not going to suppress any evidence. Okay? Let's go from that time period. If Mr. Purpura had advised you that there is very little chance you were going to win on appeal, would you have insisted on a conditional plea?

[WILFORD]:  No.

[NEWTON]: Would you have taken a plea offer of something less than 20 years which was the mandatory minimum at that point?

[WILFORD]:  Yeah, I would have taken the 8 to 10 years or 10 years.  I would have taken that. I mean, I was willing to take it. Just that, you know, based on the information that was provided, the advice that was provided by Purpura early on, I stood in. And then after the early on, after June of 2012, there was never another offer for me to debate. But yes, I was very willing to accept a guilty plea. I did not want this to play out.

Defendant added, *id.* at 95:  "The Government hadn't offered me a plea offer that I was aware of since May of 2012 and this was November of 2013.  So I wasn't aware of any other pleas being offered by the Government after May 2012."

On cross-examination, Wilford acknowledged that, after the Indictment was filed, Purpura advised him to return from California and turn himself in, but he did not do so.  *Id.* at 100.  Mr. Wilford also acknowledged that, despite his active participation in this case, he never informed the Court of his desire to plead guilty.  *Id.* at 104.  Wilford stated:  ". . . I never brought that to the Court's attention.  I think at the time that I started writing anything to the Court I had already been -- we were well along down the path in litigating the case and it wasn't during the time that the guilty plea was available or there was any real negotiation going on because that all stopped to my understanding after June, May 2012.  So I didn't bring that to the Court's attention after the fact."

In regard to defendant's ten-page, pro se discovery motion, docketed May 22, 2013 (ECF 197), I pointed out to defendant that he had "complained to me about a lot of different things," yet

he did not mention a desire to plead guilty. ECF 749 at 105. Defendant explained, *id* at 105-06:

>       Well, in speaking of the document that you mentioned, I believe that was during the time when we was engulfed in the litigating of the Fourth Amendment issues that I was led to believe that was, you know, meritorious. And so my focus at that time since there was nothing going on with any plea negotiations, because that was as you just stated like a year after all pleas was off the table, or the only plea was off the table and we had just finished up two suppression hearings in January and March of that year. And so the focus at that time was strictly on, in my mind, you know, was on what was being litigated in front of you and my dealings with counsel as it related to that. So my focus wasn't on, you know, bringing to your attention anything about a plea deal. You know, I was led to believe that I would succeed on the suppression motions and that's where if you look at most of my correspondence it was about. Because once that engine was turned on in my mind that, you know, hey, you know, I had a good chance of winning the suppression motions, that's where the bulk of my attention were.

I also asked defendant about his letter to me of June 25, 2013 (ECF 208), which post-dated

by just a few weeks my ruling on the Suppression Motion. *See* ECF 205; ECF 206. The Court

asked, ECF 749 at 107:

>       And I guess my question is again here, again, it's perfectly fine for you to be unhappy with my ruling, but you didn't tell me here in your complaints which led to my referring this for an Attorney Inquiry Hearing, "I didn't even want to pursue that hearing. I wanted to plead guilty and I thought it was a bad motion and now it's turned out I'm right, Your Honor, and I'm upset because I wanted to plea[d]." I mean, you write a lot of information to me, but you didn't write that. I was just wondering if you could explain why you didn't tell me.

Defendant responded, *id.* at 107-08: "By then we are a year past the plea so that's out of

my mind. I've already been made to believe that, you know, I would succeed on the Fourth

Amendment issues. So we are a year past the plea having dissolved --"

The exchange continued, *id.* at 108-09, 110:

[THE COURT]: . . . But the reason I'm asking -- I didn't mean to cut you off, I'm sorry, and feel free to go back to this. But just to make sure you understood my reason for my question is this letter that you wrote to me is after you lost the motion and you had a lot of unhappiness. And you disagreed with the ruling which is your perfect right, but you told me a lot of things that you were unhappy about and you didn't mention -- "I never thought it was a winning motion and I wanted to plead and now I'm all messed up because I didn't get a chance to plead and now you ruled

against me," or something like that. You never -- you were bringing a lot to my attention. That's the only point I was asking you about. You were a very frequent writer to me, but you didn't ever tell me "hey, I want to plead and he's standing" -- he, Mr. Purpura, "is standing in my way."

[WILFORD]: Well, because in context is when we go to the plea negotiation, it wasn't that he was standing in my way by saying "hey hey no, don't plea, don't plea," he was giving me advice to lead me to believe that I would succeed. And so the plea had expired at that point. So now we've moved beyond that point and what was fresh in my mind was your ruling and what had been going on since the suppression motions.

*    *    *

Had I not been led to believe that I would win, no way in the world I would have risked pursuing anything else. I would have accepted the plea deal like I've always done.

On redirect, Mr. Newton asked the following leading question, without objection, *id.* at 110: "So Judge Hollander asked you why you did not ever complain . . . many months after the written plea offer expired. Was that because you still believed the Fourth Amendment claim had merit?" Defendant answered, "Yes, yes." *Id.*

Additional facts are included in the Discussion.

### III. Standard of Review

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'" *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see also United States v. Hodge*, 902 F.3d 420, 426 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010). Relief under § 2255 is meant to remedy fundamental

constitutional, jurisdictional, or other errors.

Under § 2255, the petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). But, "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting Hill, 368 U.S. at 428). The defendant bears the burden of proving his grounds for collateral relief by a preponderance of the evidence. *See Jacobs v. United States*, 350 F.2d 571, 574 (4th Cir. 1965).

Of relevance here, when a defendant claims that ineffective assistance of counsel led to the rejection of a plea offer, he "[1] must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), [2] that the court would have accepted its terms, and that [3] the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 566 U.S. 156, 164 (2012). In this case, only the first element is in issue.

Pursuant to 28 U.S.C. § 2255(b), the court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief. . . ." *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see United States v. McNeil*, 126 F.4th 935, 942 (4th Cir. 2025); *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004). Generally, a district court has discretion as to whether to hold a hearing, but "a hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the

record, or when a credibility determination is necessary to resolve the claim[.]" *Mayhew*, 995 F.3d at 176-77. If the district court "denies relief without an evidentiary hearing," the appellate court will "construe the facts in the movant's favor." *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020); *see also United States v. Turner*, 841 F. App'x 557, 559 (4th Cir. 2021) (same).[36]

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to the effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 580 U.S. 100, 118 (2017); *United States v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015). Ineffective assistance of counsel is a well recognized basis for relief under § 2255. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler*, 566 U.S. 156; *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged framework set forth in *Strickland*, 466 U.S. at 687–88. *See Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. McNeil*, 126 F.4th 935, 942 (2025); *United States v. Sutherland*, 103 F.4th 200, 207-08 (4th Cir. 2024); *United States v. Palacios*, 982 F.3d 920, 923 (4th Cir. 2020); *Akande*, 956 F.3d at 260; *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). The petitioner must prove his claim by a preponderance of the evidence. *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010); *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

---

[36] As mentioned, the Fourth Circuit determined that a hearing in this case was required as to the claim of ineffective assistance of trial counsel. *See* ECF 727, ECF 727-1.

First, the petitioner must show that counsel's performance was constitutionally deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 580 U.S. at 118; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Premo v. Moore*, 562 U.S. 115, 121 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *McNeil*, 126 F.4th at 942; *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013).

The first *Strickland* prong, known as the "performance prong," relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Richter*, 562 U.S. at 104; *Sutherland*, 103 F.4th at 207-08; *Powell*, 850 F.3d at 149; *United States v. Richardson*, 820 F. App'x 225, 226 (4th Cir. 2020) (per curiam). The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has recognized that the "first prong sets a high bar." *Buck*, 580 U.S. at 118; *see also Powell*, 850 F.3d at 149. In *Padilla*, the Court stated, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task." To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687).

A "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 580 U.S. at 118 (citation omitted). Consequently, the performance prong, which is at the heart of this case, is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

Of import, "'*Strickland* does not guarantee perfect representation, only a reasonably competent attorney.'" *Cox v. Warden*, 102 F.4th 663, 675 (4th Cir. 2024) (quoting *Harrington*, 562 U.S. at 110) (cleaned up). Moreover, "the *Strickland* standard must be applied with scrupulous care," and "the standard of judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105; *see Strickland*, 466 U.S. at 689; *United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019)*.* The *Strickland* Court admonished, 466 U.S. at 689: "It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *See also Premo*, 562 U.S. at 122; *Bell v. Cone*, 535 U.S. 685 (2002).

The *Strickland* Court explained that, unlike "a later reviewing court," it is the boots-on-the-ground trial lawyer who "knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Strickland*, 466 U.S. at 689. Thus, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 466 U.S. at 689); *see Cullen*, 563 U.S. at 189; *Richter*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Of relevance here, the Supreme Court decided *Jones* during the pendency of defendant's case. Therefore, I highlight that a claim of ineffective assistance is evaluated in light of "the strength of case law as it existed at the time of allegedly deficient representation." *Palacios*, 982 F.3d at 924; *see Carthorne*, 878 F.3d at 466. In other words, "[t]o avoid the distorting effects of hindsight, claims under *Strickland's* performance prong are 'evaluated in light of the available authority'" at the relevant time. *Morris*, 917 F.3d at 823 (citation omitted). To be sure, counsel "are obliged to make [] argument[s] that [are] sufficiently foreshadowed in existing case law," but counsel is not deficient "for failing to predict" changes in the law. *Id.* at 824 (alterations in *Morris*; internal quotation marks omitted).

Under the second *Strickland* prong, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 580 U.S. at 119; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687; *see Thornell v. Jones*, 602 U.S. 154, 163 (2024) (death penalty case). However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d

987, 991 (4th Cir. 2015). Failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## IV. Discussion

### A. *Maynard/Jones*

For context, I begin with a review of the decisions in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), and *United States v. Jones*, 565 U.S. 400 (2012).

*Maynard* was decided by the D.C. Circuit on August 6, 2010, about three weeks before the investigation of the DTO began. ECF 204 at 67. Notably, Agents Lester and Edwards, the two DEA agents assigned to this case, were aware of the *Maynard* decision when the DTO investigation began. The use of GPS on Wilford's vehicles spanned the period from November 2010 to May 2011. *See* ECF 204 at 52-61, 121-23. The Supreme Court granted certiorari in *Maynard* on June 27, 2011. *See Jones*, 564 U.S. 1036. Oral argument was heard on November 8, 2011. And, the Supreme Court issued its decision in *Jones* in January 2012, while this case was still pending.

In *Maynard/Jones*, agents installed a GPS tracking device on the vehicle of defendant Antoine Jones, a suspected drug trafficker, while the vehicle was parked in a public parking lot in Maryland. Over a twenty-eight day period, law enforcement used the GPS tracking device, without a warrant, to monitor the vehicle's movements. Based in part on the information obtained from the use of the GPS tracking device, the government charged Jones, Maynard, and others with drug offenses. In the district court, Jones moved to suppress the evidence obtained through the warrantless use of the GPS device. The district court granted the motion as it related to data

obtained while the vehicle was parked in a garage at Jones's residence, but denied the motion as it related to data obtained while the vehicle was traveling on public roads.

The *Maynard* Court concluded, 615 F.3d at 558-64, that the admission of evidence obtained by the extended, warrantless use of the GPS tracking device violated the Fourth Amendment.  In particular, the court determined that the prolonged surveillance of Jones's movement by GPS tracking—twenty-four hours a day for twenty-eight days—constituted a search under the Fourth Amendment.  *Id.* at 558.  Among other cases, the Court contrasted *United States v. Knotts*, 460 U.S. 276 (1983), which involved limited information discovered by use of a beeper during a "discrete journey," and not the kind of sustained monitoring at issue for Mr. Jones.  *Id.* at 556 (citing *Knotts*, 460 U.S. at 277, 281, 283-85).  The D.C. Circuit also cited other cases that recognized the limited scope of *Knotts*.  *See Maynard*, 615 U.S. 3d at 557 (citing *United States v. Butts*, 729 F.2d 1514, 1518 n.4 (4th Cir. 1984); *People v. Weaver*, 12 N.Y. 3d 433, 440-44, 882 N.Y.S. 2d 357, 909 N.E. 2d 1195 (2009)).

In *Jones*, the Supreme Court unanimously held that the warrantless installation and use of a GPS device to track the movements of the suspect's vehicle constituted a search under the Fourth Amendment.  *Jones*, 565 U.S. at 404.  Although the decision was unanimous, "the Court was split on which constitutional precedent to use to resolve the issue . . . ."  Jace C. Gatewood, *"It's Raining Katz and Jones: The Implications of United States v. Jones – A Case of Sound and Fury,"* 33 PACE L. REV. (Spring 2013) at 691.

There were, at the time, "several existing Supreme Court decisions the Court could have used to help resolve the issue of 'whether the attachment of a Global-Positioning-System (GPS) tracking device to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets, constitutes a search or seizure within the meaning of the

Fourth Amendment.'"  *Id.* at 688 (quoting *Jones*, 565 U.S. at 402).  These cases included the seminal cases of *Katz v. United States*, 389 U.S. 347 (1967) (establishing reasonable expectation of privacy test); *Kyllo v. United States*, 533 U.S. 27 (2001) (holding thermal imaging technology constituted a search under the Fourth Amendment); *United States v. Karo*, 468 U.S. 705 (1984) (upholding the constitutionality of a tracking beeper to monitor the location of a car while on public roads, but concluding that the Fourth Amendment was violated by warrantless monitoring of the beeper in a residence); and *United States v. Knotts*, 460 U.S. 276 (1983) (concluding that the use of a beeper (radio transmitter) to track the defendant's movements in a vehicle did not violate a reasonable expectation of privacy in the defendant's movements).

Of import, the majority in *Jones* did not rely on the conventional "reasonable expectation of privacy" analysis, although that had been the favored approach to Fourth Amendment jurisprudence since the 1960's.  *Jones*, 565 U.S. at 406; *see Katz*, 389 U.S. at 360-62 (Harlan, J., concurring); *see also United States v. Ortiz*, 878 F. Supp. 2d 515, 527 (E.D. Pa. 2012).  Five justices in *Jones* relied on the common law trespass doctrine.  Justice Scalia observed, 565 U.S. at 404:  "The Government physically occupied private property for the purpose of obtaining information."

Some legal scholars and jurists believed that the Supreme Court's decision in cases such as *Katz, Knotts, and Karo* would provide "the constitutional framework" for the decision.  33 PACE L. REV. at 690.  As the author of one law review article puts it, they "were left utterly shocked" by the Court's reliance on the common law trespass doctrine, which "most believed was dead[.]"  *Id.*; *see also* Christopher Slobogin, *Making the Most of United States v. Jones in a Surveillance Society: A Statutory Implementation of Mosaic Theory*, 8 DUKE J. CONST. L. & PUB. POLICY 1 (2012-2013).

Indeed, at the hearing in this case in December 2024, Mr. Newton acknowledged that *Jones* constituted a "sea change" in the law.  ECF 749 at 125.

## B.  The Suppression Motion: Merit or no Merit?

The defendant's contention as to ineffective assistance begins with the Suppression Motion filed by Purpura (ECF 92, ECF 97, ECF 160, ECF 217), in which defendant asserted a violation of the Fourth Amendment based on the extended, warrantless use of GPS tracking devices on his vehicles.[37]  Defendant maintains that the Suppression Motion was patently devoid of merit.  In turn, he claims that his attorney was constitutionally ineffective because he overstated the strength of the Suppression Motion, and failed to advise defendant that the Suppression Motion was not likely to succeed.  As a result, Wilford alleges that he was misled by counsel and, as a consequence, he rejected the government's favorable plea offer.

Essentially, Wilford depicts the Suppression Motion as frivolous, such that Purpura should have explained to Wilford that it "lacked merit and stood very little chance of prevailing."  ECF 661-1, ¶ 5.  Moreover, Wilford posits that if he had been properly advised by Purpura that the Suppression Motion lacked merit, he would have pleaded guilty, rather than proceed to trial in December 2013.  *Id*.  Instead, claims Wilford, he rejected a favorable plea offer in May or June of 2012, because of trial counsel's erroneous advice.  ECF 659 at 11-15; ECF 740; ECF 733; ECF 733-1.

Following the hearing of December 20, 2024, defendant's post-conviction attorney presented the contentions, as follows, ECF 740:

---

[37] As noted, defense counsel filed several submissions pertaining to the use of GPS.  *See* ECF 92, ECF 97, ECF 160, ECF 180, ECF 217.  And, as indicated, I refer to the submissions collectively as the Suppression Motion.

1) "Mr. Purpura failed to determine the extent of GPS Tracking and Cell Phone 'Pinging' until January 2013 (two months *after* he filed the Third Motion to Suppress." *Id.* at 1 (italics in ECF 740, capitals deleted); *see also id.* at 2;

2) "Mr. Purpura erroneously believed that Mr. Wilford had meritorious Fourth Amendment issues and conveyed that erroneous belief to Mr. Wilford." *Id.* at 2 (capitals omitted); *see id.* at 2-4;

3) "Mr. Purpura failed to understand why Mr. Wilford would be unable to suppress evidence under the Fourth Amendment's Exclusionary Rule." *Id.* at 4 (capitals omitted); *see id.* at 4-6;

4) "Mr. Purpura failed to appreciate (and thus even address) the independent-source/Inevitable-discovery exceptions." *Id.* at 7 (capitals omitted); *see id.* at 7-8;

5) "Mr. Wilford's decision to go to trial was motivated by his desire to preserve the Fourth Amendment issues for appeal." *Id.* at 8 (capitals omitted); *see id.* at 8-9.

As to item one, as discussed earlier, Purpura's early motions were made in compliance with the schedule that was set by the Court. The record reflects that defendant had suspected he had been followed by law enforcement. Eventually, defendant's hunch was confirmed by discovery. Purpura complained about the belated disclosure by the government of the use of GPS. *See*, *e.g.*, ECF 324 at 18-19; *but see* ECF 171. However, that the defense may have filed a suppression motion before confirmation of GPS usage is of no moment in regard to the issues. As I said at the hearing on November 6, 2013, by the time I held the motions hearing in January 2013, the defense had the information it needed, and any complaint regarding the government's belated discovery disclosure was "water under the bridge." ECF 324 at 19. The contention that the motion was prematurely filed is now, as it was then, much ado about nothing.

Items 2 through 5 are related; they all pertain to the contentions that the Suppression Motion lacked merit; Purpura misled defendant about the strength of the Suppression Motion; and Purpura's erroneous advice caused defendant to reject a favorable plea offer from the government. Even if the Suppression Motion lacked merit and had little chance to succeed, those facts are immaterial if trial counsel did not mislead the defendant about the viability of the Suppression Motion.

For reasons addressed, *infra*, I conclude that Purpura did not mislead Wilford as to the likelihood of success of the Suppression Motion. Nonetheless, I will, in an abundance of caution, also address the contention that the Suppression Motion lacked merit. As discussed, that determination must not be made based on the distorting effects of hindsight. I am satisfied that, at the time the Suppression Motion was filed, it was not wholly devoid of merit.

### 1.

Wilford challenged, *inter alia*, evidence obtained by law enforcement officers by use of warrantless Global Positioning System slap-on tracking devices. Defense counsel relied, *inter alia*, on the D.C. Circuit's decision in August 2010 in *Maynard*, 615 F.3d 544, and the Supreme Court's decision in January 2012 in *Jones*, 565 U.S. 400. These cases concluded that the warrantless use of a GPS tracking device on a motor vehicle constitutes a search under the Fourth Amendment. Accordingly, Wilford maintained that the warrantless use of GPS tracking technology on his vehicles violated his Fourth Amendment rights.

The investigation of the DTO began a few weeks *after* the D.C. Circuit issued its decision in *Maynard*, 615 F.3d 544. The defense argued that, as a result of the *Maynard* decision, law enforcement agents were "on notice" that monitoring a target's location by means of a GPS device for an extended period, without a warrant, violated the Fourth Amendment and tainted the evidence

derived therefrom.  ECF 160 at 10.  Therefore, the defense argued that the good faith doctrine did not apply to the extended, warrantless use of the GPS devices for defendant's Crosstour vehicle for a period of 78 days, and for a period of 68 days for the Oldsmobile minivan that defendant utilized, spanning the period of November 2010 to May 2011.  ECF 204 at 52-61, 121-23.  And, in defendant's Disclosure Motion (ECF 166), he sought internal memoranda circulated by "various law enforcement agencies" pertaining to GPS tracking, in light of the *Maynard* decision.

I denied the Suppression Motion by Memorandum Opinion and Order of June 7, 2013.  ECF 205, ECF 206.  I relied on the good faith doctrine to uphold the pre-*Jones* warrantless use of GPS devices placed on defendant's vehicles.  *Id.* at 25-42.  The Fourth Circuit affirmed on direct appeal.  *See United States v. Wilford*, 689 Fed. App'x 727, 729-30 (4th Cir. 2017) (per curiam), *cert. denied*, 585 U.S. 1033 (2018).

Nevertheless, defendant's lack of success on the Suppression Motion is not the measure of its merit.  An unsuccessful argument is not necessarily a specious one.  Resolution of the Suppression Motion involved several days of hearings and two opinions issued by this Court, totaling a combined 71 pages—hardly the sign of meritless submissions.  *See* ECF 205; ECF 252.[38]

In my view, the Suppression Motion, assessed in real time, and not through the lens of hindsight, was far from frivolous.  Moreover, Mr. Newton's assertions that Purpura grievously misunderstood the parameters of the Fourth Amendment and the good faith doctrine, and otherwise overlooked or ignored the hurdles of standing and independent source/inevitable discovery, are plainly at odds with Purpura's credible testimony.  *See*, *e.g.*, ECF 749 at 41.

---

[38] As discussed earlier, it was Westlaw, not this Court, that designated ECF 205 for publication.

## 2.

A search "conducted in objectively reasonable reliance on binding appellate precedent [is] not subject to the exclusionary rule." *Davis v. United States*, 564 U.S. 229, 232 (2011). However, I expressly pointed out that the Fourth Circuit had not yet decided the issue presented in Wilford's case. Moreover, other federal courts had ruled that good faith does not apply to pre-*Jones* warrantless use of GPS in the absence of binding appellate precedent. In the Memorandum Opinion I said, ECF 205 at 38, 40:

> To be sure, the Fourth Circuit had not opined on the legality of warrantless GPS tracking devices at the time of the Hayes DTO investigation. And, I recognize that other federal courts have, since *Jones*, determined that the good faith exception does not apply in the absence of binding federal appellate precedent. *See, e.g.*, *United States v. Ortiz*, 878 F. Supp. 2d 515, 539-43 (E.D. Pa. 2012); *United States v. Lee*, 862 F. Supp. 2d 560, 567-671 (E.D. Ky. 2012); *United States v. Lujan*, No. 2:11CR11–SA, 2012 WL 2861546, *3 (N.D. Miss. July 11, 2012). . . .

>                               *    *    *

> At least one federal trial court has agreed with Wilford that a circuit split as to this issue defeats the good faith exception, in the absence of binding federal appellate precedent in the applicable circuit. *See United States v. Katzin*, No. 11-226, 2012 WL 1646894, *7-10 (E.D. Pa. May 9, 2012). . . .

For example, in *Ortiz*, 878 F. Supp. 2d 515, decided in May 2012, the district court concluded that the warrantless installation of GPS trackers on the defendant's vehicle violated the Fourth Amendment. *Id.* at 543. And, the court determined that the exclusionary rule barred admission of the evidence derived from the use of the GPS trackers, because there was no binding appellate precedent. *Id.* *United States v. Lee*, 862 F. Supp. 2d 560 (E. D. Ky. 2012), decided in May 2012, also involved the warrantless use of GPS on a vehicle. There, the court declined to apply the good faith exception after *Jones*, because of the absence of binding appellate precedent in the circuit. *Id.* at 571. In other words, by June 2013, some district courts had agreed with the position advanced by defendant.

69

But, I pointed to the decision of the Maryland Court of Special Appeals in *Stone v. State*, 178 Md. App. 428, 941 A.2d 1238-51 (2008).  There, the court found that warrantless use of a GPS device "was not relevant to the [defendant's] Fourth Amendment - based suppression motion."  *Id.* at 450.  I regarded *Stone*  as particularly relevant because the investigation of the DTO was conducted jointly by federal and Maryland law enforcement authorities.  And, *Stone* constituted binding appellate precedent in Maryland State courts.  *See Archers Glen Partners, Inc. v. Garner*, 176 Md. App. 292, 325, 933 A.2d 405, 424 (2007) (explaining that "a reported decision" of Maryland's intermediate appellate court "constitutes binding precedent"); *see, e.g.*, *Kelly v. State*, 208 Md. App. 218, 248, 56 A.3d 523, 541 (2012) (treating *Stone* as binding appellate precedent).  Moreover, *Stone* conformed to the substantial consensus of the federal courts regarding the expectation of privacy analysis.

Although I denied the Suppression Motion, I granted Wilford's Disclosure Motion (ECF 166), in part.  *See* ECF 205 at 21-25.  And, I denied Wilford's Suppression Motion, without prejudice to his right to renew his argument as to the inapplicability of the good faith doctrine, based on documents that might be produced by the government in connection with my ruling as to the Disclosure Motion (ECF 166).

With respect to defendant's challenge to cell phone pinging, I acknowledged: "No judicial decision offers any guidance as to the scope of the Maryland statute with respect to pinging."  ECF 205 at 47.  And, as to the defendant's request for a *Franks* hearing, I found that one of Wilford's arguments "merit[ed] further attention," given that he specifically identified several factual inaccuracies in relevant search warrant applications.  ECF 205 at 58.  Nevertheless, I concluded that the inaccuracies were the result of negligence.  *Id.*; *see also id.* at 57-61.

As discussed, in response to my Order of June 7, 2016 (ECF 206), the government produced a memorandum disseminated in August 2010 by OEO/DOJ in response to the *Maynard* decision.  *See* ECF 222-1.  I considered the OEO memorandum in connection with defendant's Motion for Reconsideration.  *See* ECF 217.

AUSA Sippel represented that he forwarded the OEO communication to DEA Agents Lester and Edwards in regard to an unrelated investigation.  ECF 252 at 4.  To review, the OEO memorandum (ECF 222-1) expressly advised of the *Maynard* decision.  The subject line stated: "URGENT UPDATE:  Slap-on GPS tracking devices."  Although OEO considered the *Maynard* decision as "fundamentally wrong," and contrary to settled law, OEO considered the *Maynard* decision important enough to alert law enforcement personnel immediately.   Indeed, the memorandum suggested that prosecutors and agents "may wish to consider obtaining warrants as a precaution . . . ."  *Id.*  And, it said, *id.*:  "In particular, *districts in the Fourth Circuit adjacent to D.C. should give careful thought to the* possibility that tracked vehicle may travel into D.C. . . . ." *Id.*  Nevertheless, OEO did not mandate compliance with *Maynard*.  In other words, it did not require federal law enforcement agents to obtain search warrants before using GPS slap-on tracking devices.

It is abundantly clear that the DEA agents in this case were made aware of the *Maynard* decision before the DTO investigation began in August of 2010.  *See*, *e.g.*, ECF 204 at 43, 67, 78-83.  But, because OEO did not mandate federal law enforcement agents to obtain search warrants before using slap-on GPS tracking devices, I denied the Motion for Reconsideration.  *See* ECF 252, ECF 253.

*United States v. Leon*, 468 U.S. 897 (1984), was decided in 1984.  *Leon* teaches that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well

trained officer would have known that the search was illegal" in light of "all of the circumstances." *Id.* at 922 n.23.  In establishing the good faith exception to the exclusionary rule, *Leon* provided for the admissibility of evidence seized pursuant to a warrant subsequently determined to be invalid, if the "officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment."  *Leon*, 468 U.S. at 922; *see also Herring v. United States*, 555 U.S. 135, 145 (2009); *United States v. Fall*, 955 F.3d 363, 371 (4th Cir. 2020); *United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018); *United States v. Thomas*, 908 F.3d 68, 73 (4th Cir. 2018); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018); *United States v. Rush*, 808 F.3d 1007, 1010 (4th Cir. 2015); *United States v. McKenzie*-Gude, 671 F.3d 452, 459 (4th Cir. 2011); *United States v. Doyle,* 650 F.3d 460, 467 (4th Cir. 2011).

The exclusionary rule is not a vehicle "to suppress evidence obtained as a result of nonculpable, innocent police conduct."  *Davis*, 564 U.S. at 240; *see Herring*, 555 U.S. at 144.  In other words, "the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance'" that their conduct was lawful.  *Herring*, 555 U.S. at 142 (citing *Leon*, 468 U.S. at 922).  To merit suppression of evidence obtained from an unlawful search, the conduct of law enforcement must, at least to some degree, exhibit deliberate, reckless, grossly negligent, or systemically negligent disregard for the Fourth Amendment.  *Davis*, 564 U.S. at 238; *Herring*, 555 U.S. at 144.

Mr. Newton has assailed Purpura's alleged misapprehension of the good faith doctrine. *See*, *e.g.*, ECF 749 at 23, 29-31, 125-26, 143-44.  For example, he asserts, ECF 749 at 125-26: "[T]here was a fundamental mistaken premise in Mr. Purpura's view of the law about the good-faith exception.  He believed the officer's subjective knowledge mattered.  It did not . . . . A non-

deficient attorney would have said to Mr. Wilford, forget it, there's absolutely no way we're going to get around this exclusionary rule."

At the hearing in December 2024, Mr. Newton asked Mr. Purpura, ECF 749 at 30: "Isn't it true you took the position legally in filings and in your oral advocacy that the agent's subjective knowledge of the *Maynard* decision -- I should say the agents in this case, their knowledge of the *Maynard* decision was very relevant under the good-faith exception?" Mr. Purpura responded, *id.*: "I attempted that. I do recall that, yes." However, Purpura claimed that he understood the good faith doctrine, and did not erroneously believe it to be a subjective standard. *See, e.g.*, ECF 749 at 23-24, 30, 39, 41.

There is no doubt in my mind that Purpura understood the good faith doctrine. Even a novice criminal law practitioner would know what *Leon* teaches. Purpura's point, in effect, was that it was not objectively reasonable, under the circumstances here, where the agents had actual knowledge of any appellate ruling requiring a warrant for use of a GPS tracking device, to disregard that ruling. That position does not suggest a misapprehension of the good faith doctrine.

Indeed, in a colloquy at the motion hearing on January 25, 2013, I said, ECF 204 at 81-82:

> But if there were a directive, for example – I'm not suggesting there was – but if the DEA said, was instructed that from now on you need to get a warrant if you're going to use a GPS, and the agent were to ignore that, how could you assert good faith? Don't I need to know the answer to that question?
>
> *   *   *
>
> I mean, if there were some evidence that they were told to get warrants and they ignored it, that would be very important.

I did not review the transcript of January 25, 2013, prior to the hearing on December 20, 2024. And yet, more than a decade later, the same concern gnawed at me. The following colloquy at the hearing on December 20, 2024, is pertinent, ECF 749 at 42-44:

[THE COURT]:  And I guess here is my question . . . [I]f you're sitting where Mr. Purpura is sitting in a case, a defense attorney who has allegedly concrete information that officers were told A and they still did B, wouldn't you want the judge to know that? Wouldn't you argue that they flouted clear instructions that said you should do it this way when they went ahead and did it that [way] . . . .  I know the standard.  You know the standard.  I know Mr. Purpura would know the standard, but if you have information that the police are told one thing and they nonetheless do something else, isn't that something you tell the judge?

*   *   *

I guess what I'm saying is . . . would you as the lawyer still be kind of beating that drum telling the judge look how outrageous their conduct was, they were told this and they went and did it anyway?

[NEWTON]:  But they weren't told not to do it.

[THE COURT]:  I'm just using that as an example.  Whatever *Maynard* was, *Maynard* was on the books . . . . [*See United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010).]

*   *   *

[NEWTON]:  . . . Your reliance [in ECF 205] on *Stone* [*v. State*, 178 Md. App. 428, 446-50, 941 A.2d 1238, 1249-51 (2008)] was consistent with *Davis* [*v. United States*, 564 U.S. 229 (2011)].  Relying on *Maynard* is not consistent with *Davis*. And *Davis* and *Jones* [*United States v. Jones*, 565 U.S. 400 (2012)] had both been decided by this time.  That's the critical thing.

Moreover, the contention that the agents here were on notice of the ruling of the D.C. Circuit in *Maynard*, and should have obtained a warrant, is hardly specious in light of the admonition in *Davis*, in which the Supreme Court said, 564 U.S. at 241:  "Responsible law enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules."  (quoting *Hudson v. Michigan*, 547 U.S. 586, 599 (2006)); *see also United States v. Hale*, 784 F.2d 1465, 1470 (9th Cir. 1986) (recognizing that a reasonably well-trained officer is required to know "well-established current law"); *United States v. Savoca*, 761 F.2d 292, 297 (6th Cir. 1985) (suggesting that a reasonably well-trained

officer would be aware of relevant court decisions), *cert. denied*, 474 U.S. 852 (1985).  Moreover, "'[t]he justifications for the good-faith exception do not extend to situations in which police officers have interpreted ambiguous precedent or relied on their own extrapolations from existing caselaw.'"  *United States v. Sparks*, 711 F.3d 58, 67-68 (1st Cir. 2013) (quoting *United States v. Davis*, 598 F.3d 1259, 1267 (11th Cir. 2010), *aff'd*, 564 U.S. 229 (2011)), *cert. denied*, 571 U.S. 878 (2013).

On the basis of these principles, the defense argument here was, in effect, that despite the agents' knowledge of *Maynard*, they failed to obtain a warrant, and such conduct could not be objectively reasonable.  I concluded that the DEA agents did not act improperly by failing to anticipate the change in the law brought by *Jones*, nor did they act unreasonably in failing to comply with *Maynard*.  Although the defense argument did not succeed, this does not establish a misunderstanding of the law of good faith by Purpura, nor does it establish that the contention was frivolous, as Wilford claims.

The issues presented here arose at a time of flux in Fourth Amendment jurisprudence, and *before* the Fourth Circuit resolved the question of the applicability of the good faith doctrine to pre-*Jones* warrantless use of a GPS tracker.  However, on review of my prior post-conviction ruling (ECF 678, ECF 679), the Fourth Circuit said, ECF 727-1 at 3:  "[G]iven the existing law at the time, we conclude that it would have been unreasonable to characterize the suppression motion—which challenged law enforcement's use of GPS tracking and cell phone location data— as having a 'good chance' of success."  In support of that conclusion, the Fourth Circuit cited its decision in *United States v. Stephens*, 764 F.3d 327 (4th Cir. 2014); *see* ECF 727-1 at 3.

In *Stephens*, a divided panel of the Fourth Circuit held that the good faith exception to the exclusionary rule applied to evidence obtained before *Jones* through warrantless use of GPS

tracking devices. Critically, *Stephens* was not decided until August 19, 2014, well *after* Purpura presented his Suppression Motion. In other words, when Purpura advanced his arguments, the Fourth Circuit had *not* decided the pre-*Jones* good faith issue.

*Stephens*, 764 F.3d 327, was a two-to-one decision of the Fourth Circuit. The division itself reflects the complexity and uncertainty of the matter. And, the timing of the decision in *Stephens* underscores that the matter of good faith in light of *Maynard* and *Jones* was unsettled when Purpura advanced his contentions in the Suppression Motion.

In *Stephens*, the defendant was convicted of illegal firearm possession. *Id.* at 328. As in this case, federal and State law enforcement officers in Baltimore conducted a joint investigation of the defendant for possible drug and firearms offenses. *Id.* In May 2011, a Baltimore City police officer installed a GPS device, without a warrant, under the rear bumper of the defendant's vehicle, while it was parked in a public lot. *Id.* at 329. The vehicle was later stopped, and both the defendant and the vehicle were searched. A loaded pistol was recovered. *Id.* at 330. The defendant was initially charged by the State, but was later indicted federally for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

As in this case, during the pendency of the *Stephens* case, the Supreme Court decided *Jones*, 565 U.S. 400. Based on *Jones*, the defendant moved to suppress the firearm and other evidence that was seized from him. Judge Bredar concluded that the use of the GPS was unconstitutional, but he declined to apply the exclusionary rule, based on the good faith doctrine. *Id.*

On appeal, the Fourth Circuit was not "concerned with the legality of the search." *Stephens*, 764 F.3d at 329. It said, *id.*: "Rather, we must decide the separate issue of whether the district court correctly declined to apply the exclusionary rule because the search was conducted

in 'good faith.'"  *Id.*  In turn, the Court said that, to resolve the question, it was required "to answer 'the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.'"  *Id.* (citing *Herring*, 555 U.S. at 145) (cleaned up).  But, the *Stephens* Court did not agree on the issue of good faith.

The panel majority held that the search was "conducted in objectively reasonable reliance on binding appellate precedent."  *Stephens*, 764 F.3d at 329 (citing *Davis v. United States*, 564 U.S. 229, 232 (2011)).  Therefore, the Court determined that the exclusionary rule did not apply, *id.*, and the Court affirmed the conviction.

In reaching its decision, the panel majority reviewed earlier Supreme Court decisions that led to the longstanding belief that "'the Fourth Amendment simply was not implicated by electronic surveillance of public automotive movements.'"  *Stephens*, 764 F.3d at 333 (citing *Sparks*, 711 F.3d at 67); *see*, *e.g.*, *Knotts*, 460 U.S. at 276.  Among other cases, the panel majority cited the decision of the Maryland Court of Special Appeals in *Stone*, *supra*, 178 Md. App. 428, 941 A.2d 1238, and the 2013 decision of the Maryland Court of Appeals in *Kelly*, 436 Md. 406, 82 A.3d 205, upholding warrantless GPS usage under the Fourth Amendment.  *Stephens*, 764 F.3d at 334.  The *Stephens* Court also concluded that the officers' use of the GPS was objectively reasonable because of the binding appellate precedent of *Knotts*, although it is "not exactly on point with the facts" of *Stephens*.  *Id.* at 337.

In this regard, the Court observed that as of 2011 neither the Supreme Court nor the Fourth Circuit "had expressly approved or disapproved of warrantless GPS usage . . . ."  *Id.* at 332.  But, in *Knotts*, 460 U.S. at 281, the use of a beeper to track a vehicle was not considered a search under the Fourth Amendment.  The *Stephens* Court stated, *id.* at 338:  "After *Jones*, we know that such an interpretation of *Knotts* is incorrect.  Without the benefit of hindsight, however, and with no

contrary guidance from the Supreme Court or this Court, we believe that a reasonably well-trained officer in this Circuit could have relied on *Knotts* as permitting the type of warrantless GPS usage in this case."

In addition, the Court pointed to the "dual role" of the Baltimore police officer, investigating both State crimes and federal crimes as a federal task force officer. It said, *id.*: "Under these circumstances, we would make a mockery of the good-faith inquiry if we were to ignore the clear pre-*Jones* state of the law in Maryland—as pronounced by Maryland's highest court [in *Kelly v. State*, 436 Md. 406, 82 A.3d 205 (2013)]—and hold that a Maryland officer's use of the GPS was objectively unreasonable."

Of import here, as to the issue of whether the law was settled and whether the Suppression Motion was destined for defeat, it is noteworthy that Judge Thacker wrote a vigorous dissent in *Stephens*. Among other things, she pointed out that, at the time of the warrantless search in that case, which corresponds to the time of the GPS usage here, no "'binding appellate precedent'" existed in the Fourth Circuit that authorized the actions at issue. *Id.* at 342 (citing *Davis*, 131 S. Ct. at 2434). Moreover, she pointed to the Supreme Court's description of the defendant in *Jones* "as being 'on much different footing' than the *Knotts* and *Karo* defendants because he actually possessed the vehicle at the time the Government installed the GPS tracker, and he had not consented to its installation." *Id.* at 343 (citing *Jones*, 132 S. Ct. at 952). She said, *Stephens*, 764 F.3d at 345: "Law enforcement officers in this case did not act in an 'objectively reasonable' manner, *Davis* at 2429 (quoting *Leon*, 468 U.S. at 919, 104 S. Ct. 3405)."

Moreover, Judge Thacker reiterated, 764 F.3d at 345, that "'[r]esponsible law-enforcement officers will take care to learn what is required of them, under Fourth Amendment precedent and will conform their conduct to these rules.'" (quoting *Davis*, 131 S. Ct. at 2429) (cleaned up)

(alteration in *Stephens*).  Of particular significance, Judge Thacker expressly observed, 764 F.3d at 345, that, at the time the warrantless search was conducted in *Stephens*, which again corresponds to the time of GPS usage in Wilford's case, the District of Columbia Circuit Court, "neighboring the District of Maryland where the warrantless search here occurred, had determined that a warrantless GPS search violated the Fourth Amendment.  *See United States v. Maynard*, 615 F.3d 544, 549 (D.C. Cir. 2010), *aff'd in part sub nom*. *United States v. Jones*, [565 U.S. 400,] 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012)."

Judge Thacker added, 764 F.3d at 345:  "In fact, at the time the warrantless search was conducted in this case, *Maynard* had been accepted for argument before the Supreme Court, further undercutting the Government's position here that the issue was generally settled."   And, she observed "that *as early as 2005*, similarly situated officers were obtaining warrants for GPS searches such as the one performed [in *Stephens*.]"  *Id.*  In her view, the officers "did not 'take care to learn,' what was required of them by Fourth Amendment precedent under these circumstances. *Davis*, 131 S. Ct. at 2429."

In addition, Judge Thacker said, *Stephens*, 764 F.3d at 346:  "In light of this era of fast-moving technological advancements and our ever-shrinking zone of privacy . . . law enforcement officers should be deterred from undertaking warrantless searches in situations where, as here, there was no binding appellate precedent authorizing the action, there was no exigent circumstance, and the state of the law was unsettled.  The Government must err on the side of the Constitution . . . ."  *Id.*

The *Stephens* case is crucial for a number of reasons, including the most obvious:  It establishes that, as to the pre-*Jones* warrantless use of a GPS tracking device, the good faith question was not resolved in the Fourth Circuit until *well after* Purpura raised the issue in Wilford's

case. It shows, too, that Mr. Newton's attempt to characterize Purpura's pursuit of the Suppression Motion and his understanding of good faith as misguided, ill-conceived, and mistaken is itself mistaken. Judge Thacker articulated a serious question concerning the good faith of law enforcement officers who, during the same time period as in this case, flouted the teachings of *Maynard*.

As I have said, I noted in ECF 205 that there were district courts that had denied application of the good faith doctrine based on facts akin to those here. For example, I cited the district court decision in *United States v. Katzin*, 2012 WL 1646894 (E.D. Pa. May 9, 2012). Since then, the Third Circuit has weighed in. *See United States v. Katzin*, 769 F.3d 163 (3rd Cir. 2014) (en banc), *cert. denied*, 574 U.S. 1177 (2015).

The *Katzin* decision, like *Stephens*, supports the view that the issue advanced by Purpura was not meritless. In my view, *Katzin* puts to rest the defendant's contention that when Purpura lodged his Suppression Motion, he should have known that the good faith argument was baseless and unlikely to succeed. That Wilford had other legal hurdles to overcome does not establish a fatal flaw in the Suppression Motion.

In *Katzin*, on December 13, 2010, FBI agents who were investigating multiple pharmacy burglaries installed a GPS device on a van, without a warrant, while it was on a public street. *Id.* at 168. Before doing so, the agents first conferred with an Assistant U.S. Attorney. *Id.* On December 15, 2010, following a burglary, the vehicle was located. The driver and two passengers, all brothers, were arrested. *Id.*

About a year later, the Supreme Court decided *Jones*. And, based on *Jones*, a judge in the Eastern District of Pennsylvania granted the defendants' suppression motions. *United States v. Katzin*, 11-226, 2012 WL 1646894, at *11 (E.D. Pa. May 9, 2012). The district court rejected the

government's good faith argument. *Id.* at *10. And, it also concluded that the two passengers had standing to challenge the search of the van. *Id.* at *11.

A three-judge panel of the Third Circuit unanimously agreed that the agents were required to obtain a warrant and that all three brothers had standing. *United States v. Katzin*, 732 F.3d 187, 191 (3rd Cir. 2013). The court affirmed the lower court. But, the panel was divided as to the issue of good faith.

The Third Circuit subsequently heard the case en banc, but only on the issue of whether the good faith exception to the exclusionary rule applied. *Katzin*, 769 F.3d 163. In an eight to five decision, the court reversed.

Writing in dissent in *Katzin*, Judge Greenaway, joined by four other judges, asserted, *inter alia*, that "*Maynard* muddies the waters." *Id.* at 195. After pointing out other flaws in the majority's analysis, he wrote that *Maynard* "sufficiently muddied the waters so that law enforcement officers could not know whether the attachment of a GPS device to the undercarriage of a vehicle would violate the Fourth Amendment." *Id.* He also observed that *Maynard* was decided four months before the conduct at issue. *Id.* at 196. And, he wrote that *Maynard* "focused on the quality and quantity of information gathered during the extended surveillance." *Id.*; *see Maynard*, 615 F.3d at 562. In the view of the dissent, "it should have given law enforcement pause as to the applicability of *Knotts* and *Karo* to the new world of GPS." *Katzin*, 769 F.3d at 196. The dissent reasoned, *id.*: "At the very least, they should have known that prolonged surveillance could be an issue and one that could be easily fixed by getting a search warrant . . . ." The dissent also characterized as "flawed" the majority's good faith analysis because, where "the law is unsettled," it would allow law enforcement officers to "engage in constitutionally reckless conduct and still reap the benefits of the good faith exception." *Id.*

The outcome in *Stephens* and *Katzin* is not the point. Rather, the cases illustrate the complexity of the issue that now, in hindsight, has been described as lacking in merit. It was anything but. It shows, too, that reasonable minds did, indeed, disagree.

Purpura presented a serious question that was unsettled when the parties here were embroiled in controversy. Contrary to defendant's view of the Suppression Motion, the issues were thorny and challenging. I waded through the thicket before reaching the conclusion that the pre-*Jones* warrantless use of GPS was protected by the good faith doctrine. Other courts could have seen it differently—and as I noted did, as I note here and in ECF 205 at 38-40.[39]

As stated earlier, to "avoid the distorting effects of hindsight," *Morris*, 917 F.3d at 823, a post-conviction claim must be evaluated in light of "the strength of case law as it existed at the time of allegedly deficient representation." *Palacios*, 982 F.3d at 924. Wilford relies on hindsight to maintain that the Suppression Motion was devoid of merit. Purpura was not ineffective in relying on *Maynard* and in arguing that the agents were aware of that decision and improperly ignored it. He was prescient in spotting an issue that had to be unpacked. And, the independent source doctrine and inevitable discovery doctrine would not have protected the government's right to use all of the evidence in the case.

The recent case of *McNeil*, 126 F.4th 935, helps to put the issue of pursuit of the Suppression Motion in perspective. There, the defendant pleaded guilty without a plea agreement. *Id.* at 939. He complained on post-conviction that his lawyer was ineffective for failing to file a motion to suppress "the fruits of the police officers' entry into his backyard," from which money,

---

[39] Defendant cites, *inter alia*, *United States v. Bellina*, 665 F.2d 1335, 1341 (4th Cir. 1981), for the proposition that no reasonable law enforcement officer in Maryland would have believed at the relevant time that it was unconstitutional to use a GPS device to track a car on a public road without a warrant. *See* ECF 773 at 9; *id.* at n.6; ECF 749 at 125. *Bellina* did not involve GPS and provides no guidance here.

marijuana, and guns were recovered. *Id.* at 940, 943. The district court rejected the challenge to the warrantless entry onto the curtilage of defendant's property, which then led to issuance of a search warrant, characterizing the challenge as "'frivolous.'" *Id.* at 943.

In the context of a ruling that the district court should have held a hearing, the Fourth Circuit said, *id.*: "On this record, it cannot be shown 'conclusively' . . . that the police did not violate McNeil's Fourth Amendment rights . . . ." To the contrary, the Court said that a suppression motion based on the defendant's argument "plainly would have had 'some substance' and may well have proved meritorious." *Id.*; *see also id.* at 945.

The defense concedes, as it must, that *Jones*, decided during the pendency of this case, "broke new ground" and constituted "a sea change in the law." ECF 749 at 125. It is difficult to conceive of a competent lawyer who would not have pursued the issue raised by Purpura. That he was unsuccessful does not equate to "dead in the water," as the defense suggests. Indeed, I am confident that, if Purpura did not press what was then a groundbreaking legal issue, I would be faced with a complaint akin to *McNeil*—that counsel was ineffective for failing to challenge the conduct here that was also at issue in *Maynard* and *Jones*.

Post-conviction counsel now flyspecks Purpura's decisions that were unfolding in "real time." It is easy, more than a decade later, to claim that the *Jones* case was besides the point because of other legal principles. It is easy, long after the fact, to proclaim that the Fourth Amendment challenge was meritless because of the good faith doctrine, inevitable discovery, and the independent source doctrine. *See*, *e.g.*, ECF 745 at 147. The Suppression Motion was unsuccessful. But, it did not lack merit.

### C.

Wilford maintains that he was misled by Purpura as to the strength of the Suppression Motion. He claims that if Purpura had told him that the Suppression Motion had very little chance of success, he would have taken the government's favorable plea offer. *See, e.g.*, ECF 661-1. But, such a conclusory, self-serving, and post hoc assertion, generally not reflected elsewhere in a record replete with communications from defendant to the court, does not suffice.[40]

The Fourth Circuit has remarked, in the context of a defendant who claims he would not have taken a plea deal but for counsel's ineffective advice: "[T]he defendant has an incentive to claim, in retrospect, that the result of the plea process would have been different regardless of whether that claim is, in fact, true. . . . Thus . . . we require defendants asserting deficiencies in the plea-bargaining process to provide *evidence of their sincerity*." *United States v. Murillo*, 927 F.3d 808, 815-16 (4th Cir. 2019) (emphasis added). The posture here is the opposite. Defendant did not take a plea offer; he rejected one. But, the proverbial Monday morning quarterbacking is the same. I see no indication of sincerity.

Defendant concedes, as he must, that Purpura advised him to plead guilty. ECF 740 at 9; ECF 749 at 115, 116. At the hearing on December 20, 2024, defendant's post-conviction lawyer acknowledged: "[Purpura] strongly advised Mr. Wilford to plea[d]. We don't dispute that." ECF 749 at 116; *see id*. at 115. Instead, the defense contends that, from the fall of November 2011 through December 2013, when the trial began, Purpura failed to "*clearly and unequivocally advise[]* Mr. Wilford that he stood no realistic chance of prevailing in the district court or on appeal" with respect to his Suppression Motion. ECF 740 at 9 (emphasis in ECF 740). As a result,

---

[40] *See, e.g.*, ECF 197, ECF 208, ECF 281, ECF 323, ECF 328, ECF 329, ECF 416, ECF 418, ECF 507, ECF 562, ECF 615, ECF 650. Even now, defendant persists in raising issues on other matters. *See* ECF 752, ECF 753.

Wilford contends that he "turned down favorable plea-bargain offers" and went to trial because of woefully deficient legal advice. ECF 733 at 1; see ECF 740 at 9.

Given that defendant admits that Purpura counseled him to plead guilty, his only path to success is to blame Purpura for deficient legal advice that somehow led Wilford not to follow Purpura's advice. I do not credit Wilford's testimony that he was misled by trial counsel as to the viability of the Suppression Motion, and for this reason did not follow Purpura's advice to plead guilty. I credit Purpura's testimony to the contrary.

Mr. Purpura testified categorically and credibly that he never told defendant that he was likely to succeed on his Suppression Motion, either in the District Court or in the Fourth Circuit. *See*, *e.g.*, *id.* at 31-32, 36-40, 59, 67, 81. Moreover, Purpura insisted that he told defendant not to put his eggs in the appellate basket. *Id.* at 59. It is difficult to conceive of any criminal defense attorney who would have assured a client of success with regard to a motion challenging the pre-*Jones* warrantless use of a GPS tracking device. Indeed, it would seem that even a novice criminal defense attorney would know better than to forecast a particular outcome, especially in an evolving area of the law. Purpura certainly was not a novice. I credit his testimony that he did not do so.

In Purpura's motion to withdraw as counsel (ECF 285), filed in February 2014, after trial but before Purpura had knowledge of the accusation lodged here, Purpura wrote, *id.* ¶ 5 (emphasis added):

> During this time period counsel entered into plea negations with government counsel and obtained a plea (for a third time federal offender) that could have resulted in a favorable sentence and the return of certain specified assets. Mr. Wilford was fully aware if he were convicted at trial his decision not to negotiate a plea agreement would lead to a mandatory minimum sentence of 20 years up to a maximum sentence of life. *Mr. Wilford followed his own advice, declined the government's offer and demanded full litigation of all legal issues and a trial.*

85

The assertion that Wilford called the shots is borne out by Wilford's remarks to Judge Gesner at the first attorney inquiry hearing in July 2013. He took credit for the GPS issue, claiming he "discovered" it and "presented" it to counsel. ECF 725 at 12. And, as Purpura said, defendant was "fixated" on it. ECF 749 at 66.

It is also noteworthy that I denied defendant's Suppression Motion on June 7, 2013 (ECF 205, ECF 206), six months *before* trial began in December 2013. The defendant was on notice at that point that his Suppression Motion was unsuccessful in the trial court. Purpura also made clear that defendant could not count on appellate vindication. Wilford had ample time to seek a plea agreement. But, he did not do so. Purpura repeatedly testified that he continued to engage in plea discussions with the government until about two weeks before trial, and that the government was amenable to a plea as late as two weeks prior to trial. In all that time, Wilford did not seek to negotiate a plea, because he would not follow counsel's advice.

The defense also points to Purpura's letter to defendant of November 13, 2013, to establish that Purpura misled the defendant. The letter is not a model of clarity. But, it does not establish that Purpura previously rendered misleading advice to defendant about the likelihood of success in regard to the suppression motions. And, in any event, because the letter was sent by Purpura to defendant almost on the eve of trial, defendant could not have relied on it in foregoing the plea offer of May 2012 or in failing to pursue any other plea agreement. By the time of the letter, on the eve of trial, defendant had long since cast his lot.

Moreover, defendant's focus on a handful of words is taken out of context. In my view, the letter is a slender reed on which to base a claim that Purpura's advice misled defendant about the merits of his Suppression Motion. Purpura consistently said there was an issue. And there was. That cannot reasonably be construed as an assurance of success.

Defendant appears to argue (ECF 674 at 9) that the last-minute plea discussion in December 2013 was prompted by my ruling of November 27, 2013 (ECF 252), which finally put to rest defendant's suppression arguments. But, this is not reflected in the record. The following exchange at sentencing is pertinent, ECF 369 at 165-66 (emphasis added):

> DEFENDANT: . . . So from that point on, moving forward up to the end of 2013, beyond the motions hearings, we came to this courtroom and we had a hearing on November 6th. A week after that hearing, Mr. Purpura sent me a letter telling me that I'll come and see you immediately upon Judge Hollander's ruling on the hearing.
>
> Well, on November 27th, Mr. Purpura shows up. He doesn't make me aware that you rendered your opinion. He asked me would I be willing to entertain a plea offer.
>
> THE COURT: Who asked you that? Mr. Purpura?
>
> DEFENDANT: Mr. Purpura. So I said, Well, you know, what is it, where is it? He said, Well, I don't have one but I want to know if you're interested in one because I'll go and communicate this to the prosecution. Again, he doesn't share with me the fact that you rendered your opinion that day. So we talked and I communicated something to him that he would take and offer [the prosecutor].
>
> Well, on December the 3rd, which was a week later, Mr. Purpura comes back. He tells me the prosecution is not interested, they want to move forward and, by the way, here's Judge Hollander's opinion. She ruled against you. Don't look at it right now. Take it back with you. We'll discuss that later.
>
> So we talked about an hour or so. He left. And as I went back to my cell, I look at your opinion. I said, Wow. *I wrote him, asked him to file, a motion in light of your ruling, to suppress the derivatives (sic) UPS evidence*. Well, at the time, this was December the 3rd, 2013. Trial was scheduled for December the 9th, which was that upcoming Monday. So I didn't see him until that Monday.
>
> We showed up here, as you recall, it was a snowstorm. We still made it to the courtroom, courthouse, but everything was postponed. He came up to see me, up in the bullpen. *We talked. I asked him did he file a motion*. He told me he did not. We talked about everything. He agreed that it should be filed. He agreed that he was going to file it that day.

Based on Wilford's narrative at sentencing, when Wilford learned of my ruling of November 27, 2013, his reaction was *not* to redouble his efforts to plead, but rather to insist that defense counsel file *another* motion, asking the Court to reconsider its ruling. In addition, Wilford seemed to indicate at sentencing that he did not want to agree to a plea that did not allow him to "preserve [his] Fourth Amendment issues" for appeal. ECF 369 at 166. The importance Wilford assigned to preserving these issues on appeal suggests he still continued to believe they had merit.

Furthermore, Wilford is a rather zealous and persistent advocate for himself. Yet, nothing in the content of Wilford's filings hints at the idea that he would have taken the government's earlier plea offer if he knew that his suppression motions lacked merit. The Supplement grounds this argument in the following claim from Wilford's original Petition: "Trial counsel was ineffective for failing to discuss with Wilford possible plea offers or the potential consequences should Wilford lose at trial." ECF 546 at 10; *see* ECF 659 at 2. But, this conclusory claim is hardly an assertion that Purpura provided Wilford with poor advice regarding the Suppression Motion, or that if Purpura had advised Wilford that the Suppression Motion was not likely to succeed, defendant would have pled guilty.

It is also notable that Wilford sought to communicate with the Court on many occasions, as the docket reflects. For example, defendant wrote to the Court on June 25, 2013 (ECF 208), a few weeks after I denied the Suppression Motion. But, he never indicated in his complaints that he had wanted to plead guilty.

In two pro se submissions (ECF 615, ECF 615-1) filed February 11, 2021, Wilford set forth eighteen grounds of ineffective assistance. He indicated that he turned down the government's plea offer in the Spring of 2012 because Purpura gave him incorrect advice as to whether the government could try him in the District of Maryland—an entirely different issue. *See* ECF 615

at 5; ECF 615-1, ¶¶ 4-5; ECF 650 at 8.  Wilford also indicated that he "could not in good faith accept" a plea agreement "while knowing the Government was suppressing" evidence in violation of *Brady v. Maryland*, 473 U.S. 83 (1963).  ECF 650 at 21-22.  But, Wilford did not state in these filings that he turned down the plea offer because of Purpura's poor or misleading advice as to the strength of the suppression motions.  That is a glaring omission, given the assertions lodged now.

More broadly, Wilford's prior filings contain numerous ineffective assistance of counsel claims based on arguments he contends Purpura should have made or made inadequately.  *See, e.g.*, ECF 615 at 6-8.  But, his many pro se filings do not reflect that he would have taken the government's plea offer if his attorney had only told him that the Suppression Motion was baseless. To the contrary, if Wilford's submissions leave any impression, it is of a defendant who continues to be absolutely convinced that he was the victim of injustice.

Based on the testimony of Purpura, I am satisfied that he never advised Wilford that the Suppression Motion was a sure winner.  He simply raised an issue which was, indeed, an interesting one, as he stated.  There is no basis for a finding that defendant was misled by Purpura to believe that the Suppression Motion was likely to succeed, either at the trial level or on appeal. Wilford is grasping at straws.

### V. Conclusion

This case is defined by the adage that hindsight is always 20/20.  The events at issue occurred about fifteen years ago, as the law of GPS usage was evolving.  Yet, *Strickland* admonishes that "[a] fair assessment of attorney performance *requires* that every effort be made to eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689 (emphasis added).  The Court also observed: "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or

adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.*  But, "a court must indulge a *strong* presumption that counsel's conduct falls within the *wide range* of reasonable professional assistance[.]" *Id.* (emphasis added).  Otherwise, "[c]riminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense." *Id.* at 690.

It is hindsight that drives the Petition.  *Maynard* was decided in 2010, before the investigation of Wilford had even begun.  *Jones* was decided in January 2012, during the pendency of this case.  Purpura properly lodged a challenge to law enforcement's prolonged, warrantless use of GPS, based on evolving law.  The claim that the Suppression Motion was without merit is unfounded.  And, Wilford was not misled by his lawyer to believe that a favorable ruling was likely.

## VI. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant.  A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order.  *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007).  In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 580 U.S. 100, 115 (2017).  Where the district court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that "reasonable jurists would find the court's assessment of the constitutional

claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

I conclude that Wilford has not made a substantial showing of the denial of a constitutional right.  Therefore, I decline to issue a COA.[41]

An Order follows, consistent with this Memorandum Opinion.


Date:   April 9, 2025                                  _____/s/_____
                                                      Ellen L. Hollander
                                                      United States District Judge

---

[41] The denial of a COA by the district court does not preclude defendant from seeking a COA from the Fourth Circuit.